F3q2end1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ENDO PHARMACEUTICALS, INC.
     and GRUNENTHAL GMBH,
4
                    Plaintiffs,
5
                 v.                        12 Cv. 8060 (TPG)
6
     TEVA PHARMACEUTICALS USA, INC.,
7    and BARR LABORATORIES, INC.,

8                   Defendants.

9    ------------------------------x

10                                      New York, N.Y.
                                        March 26, 2015
11                                      12:00 p.m.

12   Before:

13                    HON. THOMAS P. GRIESA

14                                      District Judge

15                        APPEARANCES

16   DECHERT LLP
            Attorneys for Plaintiffs
17   BY:  MARTIN J. BLACK
            SHARON GAGLIARDI
18          ROBERT D. RHOAD

19   FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
            Attorneys for Plaintiffs
20   BY:  BASIL J. LEWRIS
            JENNIFER H. ROSCETTI
21          JOANN M. NETH

22   GOODWIN PROCTER, LLP
            Attorneys for Defendant Teva
23   BY:  HUIYA WU

24

25

F3q2end1

1                          APPEARANCES (Cont'd)

2

HOLLAND & KNIGHT, LLP
3        Attorneys for Defendant Actavis
     BY:  CHARLES A. WEISS
4        ERIC YECIES

5    LOCKE LORD LLP
         Attorneys for Defendant Roxane
6    BY:  ALAN B. CLEMENT
         MYOKA GOODIN

7

WINSTON & STRAWN LLP
8        Attorneys for Defendant Impax/ThoRx
     BY:  GEORGE C. LOMBARDI
9        KEVIN E. WARNER
         MAUREEN L. RURKA

10

KNOBBE MARTENS OLSON & BEAR LLP
11       Attorneys for Defendant Ranbaxy
     BY:  WILLIAM ZIMMERMAN
12       CAROL PITZEL CRUZ

13   STERNE, KESSLER, GOLDSTEIN & FOX
         Attorneys for Defendant Amneal
14   BY:  KEETO SABHARWAL
         PAUL AINSWORTH

15

16

17

18

19

20

21

22

23

24

25

F3q2end1

| | |
|---|---|
| 1 | (Trial resumed) |
| 2 | THE COURT:  I am deeply apologetic to keep this |
| 3 | courtroom full of people waiting, but it was totally |
| 4 | unavoidable. |
| 5 | So you go ahead, please. |
| 6 | MR. SABHARWAL:  Thank you, your Honor. |
| 7 | For the record, your Honor, Keeto Sabharwal, on behalf |
| 8 | of Amneal Pharmaceuticals, representing the defendants. |
| 9 | Before we begin, your Honor, I just wanted to make |
| 10 | sure that your Honor has the David Lee white witness binder in |
| 11 | front of the court as well as our cross-examination binder -- |
| 12 | THE COURT:  I have the big white binder. |
| 13 | MR. SABHARWAL:  -- that is black in color, your Honor, |
| 14 | with a blue highlight on top of it.  It says "Amneal |
| 15 | Pharmaceuticals." |
| 16 | DAVID LEE, previously sworn. |
| 17 | CROSS EXAMINATION (continued) |
| 18 | BY MR. SABHARWAL: |
| 19 | Q.  Good morning, Mr. Lee.  How are you this morning? |
| 20 | A.  I am very good, thank you. |
| 21 | Q.  Dr. Lee, you have been very patient.  I am going to try to |
| 22 | move through this quickly.  As I said, the issues that we are |
| 23 | going to be talking about really don't overlap with what |
| 24 | Mr. Weiss was talking about. |
| 25 | Just a couple of housekeeping items before we get into |

F3q2end1                    Lee - Cross

1    the substance.  I wanted to make sure that the record was very

2    clear about the specific exhibits we were talking about

3    yesterday.

4           If you could please turn, sir, in the black binder to

5    tab 6.  Tell me when you are there, please, sir.

6    A.  Yes, I am.

7    Q.  And that is, for the record, Plaintiffs' Exhibit 0589,

8    correct?

9    A.  It is, yes.

10   Q.  And that is the August 20, 2000, meeting minutes, correct,

11   sir?

12   A.  August 21, I believe, yes.

13   Q.  August 21, yes.  Great.  Okay.

14          Directing your attention to the tab 4 in your black

15   binder, are you there, sir?

16   A.  I am, yes.

17   Q.  That is the Plaintiffs' Exhibit 345, the September 14,

18   2000, project team meeting minutes, correct, sir?

19   A.  That's correct.

20   Q.  Two more.

21          Tab 8 in your black binder, that is the -- can you

22   please read the exhibit number there?  I want to make sure it

23   is --

24   A.  I have Exhibit DTX 2977.

25   Q.  Great.  Thank you.

F3q2end1                    Lee - Cross

1          And then the last one is in tab 7 of your binder.

2     Could you read the exhibit number for that, sir?

3     A.   Certainly.  That is DTX 2974.

4     Q.   Very good.  Thank you, sir.  All right.

5          I would now like to direct your attention, Dr. Lee, to

6     PTX 0588, which is tab 5 in your black binder.

7               THE COURT:  Which tab again?

8               MR. SABHARWAL:  Your Honor, that would be tab five in

9     the black binder, PTX 0588.

10    Q.   Are you there, sir?

11    A.   I am, yes.

12    Q.   This appears to be another Alliance Committee meeting

13    minutes, correct, sir?

14    A.   That is correct, yes.

15    Q.   The date is October 26, 2000, correct?

16    A.   That's correct, yes.

17    Q.   And it looks like, among other people, you and Dr. Baichwal

18    attended the meeting?

19    A.   Yes, that's correct.

20    Q.   There were a number of issues discussed.  One of them was

21    the manufacturing process to Novartis which had been completed,

22    correct?

23    A.   Correct, yes.

24    Q.   Then directing your attention to the next page, you see

25    where it says patent update, sir?

F3q2end1                    Lee – Cross

1    A.  Yes, I do, on page 4 of those minutes.

2    Q.  I believe it says "A. Baichwal presented a summary of the

3    discussions that had taken place with the patent attorneys.  A

4    draft patent application will be available shortly."

5            Do you see that, sir?

6    A.  I do.

7    Q.  Do you recall ever seeing this draft patent application,

8    sir?

9    A.  I don't recall.  I'm not sure which draft patent

10   application is being referred to here.

11   Q.  Okay.  And do you recall attending this meeting with the

12   patent attorneys?  Just a "yes" or "no" answer.

13   A.  I don't, no.

14   Q.  Thank you.  Down below there is something about licensing

15   opportunities.  Do you see that, sir?

16   A.  I do.

17   Q.  It appears that a joint team had visited UPSA.  Do you see?

18   A.  I do, yes.

19   Q.  What is UPSA?

20   A.  I don't know what the initials UPSA stand for, but I think

21   it was a European subsidiary of the Bristol-Meyers Squibb

22   Company.

23   Q.  The second sentence says UPSA has contacted Endo and

24   indicated they are interested in Opana ER, correct?

25   A.  Correct.

F3q2end1                    Lee - Cross

1    Q.   The indication was for noncancer pain?

2    A.   It actually says an indication for noncancer pain --

3    Q.   -- is key for them, yeah.

4    A.   So it wasn't just that indication.

5    Q.   And do you recall what happened with this meeting between

6    Endo and UPSA?

7    A.   I have actually some very vague recollections of the

8    meeting, which I think took place in Paris, but the eventual

9    outcome, there was never an agreement, final agreement signed

10   with UPSA.

11   Q.   Okay.  Great.  Thank you very much.

12        I would like to direct your attention to PTX 144 that

13   is in your white binder.

14   A.   Okay, I have that.

15   Q.   Sir, this, again, appears to be another Alliance Committee

16   meeting minutes.

17        THE COURT:  Where are we now?

18        MR. SABHARWAL:  I am sorry, your Honor.  We are at

19   PTX 0144, and I am on the first page.

20        THE COURT:  All right.

21   BY MR. SABHARWAL:

22   Q.   I would like to scroll down, and do you see there is a

23   section there that says "key discussion points"?

24   A.   I do.

25   Q.   In one of those key discussion points, it says, "Timing of

F3q2end1                    Lee - Cross

1    final report for study EN3202-15, study report will be

2    finalized by 5/15/01 following resolution of several QA

3    issues," correct?

4    A.   Yes, that's correct.

5    Q.   "QA" is "quality assurance"?

6    A.   Quality assurance, yes.

7    Q.   It was confirmed that the preliminary study results and

8    conclusions would not change as a result of the resolution of

9    the QA issues, correct?

10   A.   That is also in here, yes.

11   Q.   Did you have involvement in that decision, sir?

12   A.   Yes, I'm sure I did, as a member of that team.

13   Q.   Thank you.

14           There are a number of pages in here that appear to be

15   a Power Point, if you go toward the end of the document, and I

16   am going to direct you now to 792.  It is a black page, and I

17   will give you the full numbers.  It is ENDO_OP_0171792.  Do you

18   see that, sir?

19   A.   No.  Just give me a moment, please.

20   Q.   Please take your time.

21   A.   Okay.

22   Q.   Am I correct that this particular presentation was given at

23   the May 2, 2001, Alliance Committee meeting?

24   A.   That is correct.

25   Q.   Directing your attention to the next page, which is now --

F3q2end1                    Lee - Cross

1    and I am reading the bottom page number, and it looks like this

2    has been produced twice -- ENDO_OP_0171799.  Do you see that?

3    A.   I do.

4    Q.   It looks like this particular document relates to study 15

5    final report, right?

6    A.   That's correct.

7    Q.   Can you read the conclusion in the third bullet point.

8    A.   It says, "Results/conclusions don't change.  Resolution

9    ensures questions not raised by agency."

10   Q.   When you say "results/conclusions," that's the results of

11   study 15, right?

12   A.   That was the preliminary results of study 15.  That's what

13   it has been referred to here.

14   Q.   And the resolution ensures questions not raised by the

15   agency.  That's the FDA, correct?

16   A.   The word "agency" refers to the Food and Drug

17   Administration.

18   Q.   That's not the patent office, correct?

19   A.   That's correct.

20   Q.   Thank you, sir.

21          We are moving pretty quickly.  I am now going to move

22   to a different topic.

23          Do you recall, sir, during your testimony...

24          (Pause)

25          MR. SABHARWAL:  Your Honor?  I was just waiting.  May

1    I continue, sir?

2            THE COURT:  Have you got a question pending?

3            MR. SABHARWAL:  Your Honor, I saw that you had asked a

4    question.  I wanted to wait until your Honor was ready.

5            THE COURT:  Well, as long as we are paused, what I

6    would like to ask you to do, at a time when it makes sense to

7    you, is to really do what I have asked other lawyers to do, and

8    that is to tell me what it is you are presenting.

9            MR. SABHARWAL:  Of course.

10           THE COURT:  Because I hear the details, but I am not

11   sure that I completely understand what -- where you are going.

12   At a time when it is convenient for you, why, discuss that with

13   me.

14           MR. SABHARWAL:  I certainly will, your Honor.  Would

15   the court like me to do that right now?

16           THE COURT:  Fine.

17           MR. SABHARWAL:  Your Honor, first of all, just as a

18   way of identifying myself, whenever I am standing up, it is

19   more than likely that I am going to be talking about the

20   on-sale bar issue, which is one of the other defenses that we

21   have in this case, not the obviousness issue in terms of the

22   direct evidence that we are going to be doing.

23           So the on-sale bar issue, your Honor, has two

24   components that we have to prove before a certain date.  One of

25   them is that the claims that are being asserted against the

1   defendants are ready for patenting, were ready for patenting

2   before what we call the critical date.  In order for us to do

3   that, your Honor, we have to show what was being discussed and

4   we have to show what were the admissions that were being made

5   about the claims and where they were in terms of their

6   knowledge of the product prior to the critical date which in

7   this case is October 15, 2000.

8           One of the things that's happened --

9           THE COURT:  October 15, 2000, is a year before --

10          MR. SABHARWAL:  -- the filing of what's called the

11  provisional application, your Honor.  We can try to put it up

12  if we have it.

13          Can we put up that opening slide?

14          THE COURT:  If you could do that again.  I think you

15  have shown it before.

16          MR. SABHARWAL:  It is right in front of you, your

17  Honor.

18          THE COURT:  Good.

19          MR. SABHARWAL:  Would you like me to walk you through

20  it, your Honor?

21          THE COURT:  It would help.

22          MR. SABHARWAL:  Okay.  Under the patent law, your

23  Honor, you have a year from the time that you essentially

24  recognize the facets of your invention that is defined by the

25  claims.  So the effective filing date, the actual date that is

1   not in dispute here is that Endo filed their application on

2   October 15, 2001.  If they had filed their application based

3   upon that, they have a year grace period.

4          THE COURT:  Say that again.

5          MR. SABHARWAL:  Sure.  There is a year grace period

6   that you have.  So if I come and I come up with an invention,

7   your Honor, I have a year grace period before I either put it

8   into the public domain or I offer it for sale.  That's the

9   bottom line.  What we are trying to show here is that all of

10  the activities that were necessary to meet both the "offer for

11  sale" component as well as the "ready for patenting" component

12  occurred before October 15 of 2000.

13         Because it did not fall within that time period

14  between October 15, 2000, and October 15, 2001, we will

15  demonstrate by clear and convincing evidence that all of the

16  claims of both '122 and '216 are invalid based upon the on-sale

17  bar.  It is essentially a strict liability.  If there is a

18  finding of these two things, it is a pretty simple issue; and

19  then the court can either say, yes, your evidence shows that

20  you met this or, no, and that's it.

21         THE COURT:  Look.  I thought I understood this.

22  Looking at this chart now, I really don't entirely understand

23  it.  So go over this again if you would.

24         MR. SABHARWAL:  Of course, your Honor.

25         So, your Honor, do you see the date August 21, 2000?

F3q2end1                    Lee - Cross

1          THE COURT:  Yes.

2          MR. SABHARWAL:  That was a document that I just spoke

3     with Dr. Lee about in which they had made a decision to proceed

4     with NDA approval because Dr. Lee admitted that they had

5     already completed the necessary studies to show that their

6     product was efficacious.  And, as Mr. Black said, efficacy over

7     a 12-hour period is the most important thing in the invention,

8     and we have an admission from Dr. Lee about that based upon a

9     written document.

10          And, just to be fair, I'm sure that Mr. Black has a

11     different version, and I am sure that we will have a debate

12     about, this a professional debate.

13          So these other things, your Honor, frankly are not

14     germane necessarily to Dr. Lee.  Dr. Palmieri, our expert, will

15     be taking the court through each of these step by step to show

16     that the dissolution studies had been completed, the

17     formulation had been completed, the pharmacokinetic studies

18     that are referenced in the claims had been completed, and the

19     analgesic studies had been completed and they had gotten to a

20     point where they were going out, getting licensing partners,

21     they were getting patent applications, and they did not

22     ultimately file their application in a timely fashion.

23          And the law is very clear.  You only get a year from

24     the time that you make this recognition.  I think that the

25     parties are going to have some debate about this.  We don't

F3q2end1                    Lee - Cross

1   have that many witnesses that we are going to be

2   cross-examining.  Unfortunately for Dr. Lee, he is one of them

3        THE COURT:  You are just going to have to do a little

4   repetition.

5        MR. SABHARWAL:  Of course.

6        THE COURT:  Again, what is meant by the critical date?

7        MR. SABHARWAL:  Sure.  The critical date is the date,

8   whenever you see that, your Honor, you can say, okay, that's

9   the defendants' date.  The defendants have to show me that

10  everything that they need to prove the on-sale bar occurred

11  before that.  We have to get to the left of that red sign.

12       The plaintiff, I suspect, is going to say, no, they

13  didn't do that.  There are a number of things that are to the

14  right of that sign.

15       So if we prove everything to the left --

16       THE COURT:  Let me interrupt you.  Of course the

17  significance of that year, what is that?

18       MR. SABHARWAL:  Because under the statute, your Honor,

19  35 U.S.C. 102(b), the law says that you cannot put something on

20  sale or in public use more than a year before your filing date.

21  And in this case the filing date is October 15 of 2001.

22       THE COURT:  Say that once more, please.

23       MR. SABHARWAL:  Of course.  Of course.  You see that

24  filing date there, your Honor, October 15 of 2001?

25       THE COURT:  Yes, I do.

F3q2end1                    Lee - Cross

1              MR. SABHARWAL:  You have a year, if you go backwards,

2       you have a year from the time that you have completed what you

3       need to file a patent, all right?  So if the plaintiffs can

4       show that the activities that led to the invention, not for the

5       FDA, but for the patent office, occurred between October 15 and

6       2001, then they can argue that we have not met --

7              THE COURT:  This date occurred when?

8              MR. SABHARWAL:  Between October 15, 2000, and October

9       '1.  What we are arguing is hey Endo had everything --

10             THE COURT:  You mean October 15, 2001?

11             MR. SABHARWAL:  Yes, your Honor.

12             THE COURT:  Say that again, then.

13             MR. SABHARWAL:  Of course.

14             THE COURT:  I think that was a little confusing.

15             MR. SABHARWAL:  I think that was my fault.

16             THE COURT:  Say it again.

17             MR. SABHARWAL:  Of course.

18             Under the patent law you have a year from the time

19      that you file your provisional to file your patent application.

20      From the time that you recognize you have either put something

21      on sale and it is ready for patenting, you have one year.

22      Maybe the easier way to look at this, because it is a little

23      bit confusing, you see this date August 21, 2000, your Honor,

24      up in the blue?

25             THE COURT:  Yes, I do.

F3q2end1                    Lee - Cross

1         MR. SABHARWAL:  Our contention is going to be that no

2    later than this date, or perhaps September, by that time, Endo

3    had all of the information it needed to file the application

4    and they had already engaged a company to start commercial

5    manufacturing.  They were already collecting inventory.  They

6    were buying product from Novartis.  And, based upon that, under

7    the law, they had one year from that time to get a patent on

8    file with the patent office.  They did not do that.  That's the

9    bottom line.

10         THE COURT:  Let's see if I understand.

11         MR. SABHARWAL:  Sure.

12         THE COURT:  In other words, there comes a time when,

13    for various reasons, a party has everything needed to file for

14    a patent.

15         MR. SABHARWAL:  Yes.

16         THE COURT:  Now, that time is X, let's say.

17         MR. SABHARWAL:  X.

18         THE COURT:  Now, they don't have to file for the

19    patent on ten days after X, but they have to file for the

20    patent no later than a year from X, is that right?

21         MR. SABHARWAL:  That is exactly right, your Honor.

22         THE COURT:  And your contention is, again?  You have

23    said it many times.  Say it again.

24         MR. SABHARWAL:  My contention is, very simply, they

25    missed the date.  My contention is, our contention is, based

F3q2end1                    Lee - Cross

1    upon Endo's own documents and some of the admissions that we

2    got yesterday and some of the other evidence that we are going

3    to see, that they had all the information they needed to file

4    this patent application.  They were speaking with patent

5    attorneys in July.  But, for whatever reason, it didn't happen.

6            I am not in any way, your Honor, to be clear, accusing

7    Endo of anything nefarious or fraudulent.  We don't have to do

8    that, and I am not doing it.  I am just saying that, under the

9    strict liability on-sale bar, you have a grace period of one

10   year from the time that you recognize your invention and you

11   have to get it on file.  It is like anything else in any other

12   facet of the law.

13           THE COURT:  I will be back to you, Mr. Black, but just

14   another few questions for this same lawyer.

15           MR. SABHARWAL:  Sabharwal.

16           THE COURT:  Sabharwal.

17           If everything necessary for filing for a patent

18   occurred, let's say, by November 2000, then they would be okay,

19   right?

20           MR. SABHARWAL:  If -- there is no evidence -- if we

21   fail to show that they knew or should have known that they

22   filed -- they had everything ready to file until November, then

23   we have not proven our case, that is correct.

24           THE COURT:  But what you say is you believe you have

25   proved that everything was set for the filing of the patent

F3q2end1                    Lee - Cross

1    before October 15, 2000, and that's your case, right?

2              MR. SABHARWAL:  That is part of our case, your Honor.

3              The other part of our case is what is called the offer

4    for sale.  We have to show that there was a commercial offer

5    for sale here.  In other words, under the law, if there was a

6    transaction between a supplier and Endo, and we can show that

7    with documents and testimony, then we have met the -- and that

8    occurred also before October 15 of 2000, if we show the court

9    that and we show the court the ready for patenting and the

10   court concludes, yeah, I see that both of those things occurred

11   before that date, then all of the claims that are asserted

12   against all of the defendants will be invalid pursuant to

13   35 U.S.C. 102(b), as opposed to what Mr. Weiss was talking

14   about, which was obviousness under 103.

15             May I proceed?

16             THE COURT:  Let me hear from Mr. Black.

17             MR. SABHARWAL:  Mr. Black, do you want to come back

18   here.

19             MR. BLACK:  Actually, I would.

20             I will be brief.

21             We largely agree with the defendants on the law, your

22   Honor, but there are two requirements.  There is the "on sale"

23   requirement and the "ready for patent" requirement.  And the

24   way the law came about is, let's say I invented this water

25   bottle today and I thought this was a great idea and I went out

F3q2end1                    Lee - Cross

1   and sold this water bottle to the public and shipped it all

2   around the country, and then two years later I said to myself,

3   I forgot to get a patent, I would really like to get a patent

4   and a monopoly.  I can't do that.  In the United States, at

5   least during the relevant time period, you could sell for six

6   months and then go and file your patent.  As long as you were

7   within a year after you started selling, you were okay under

8   the law.  Does that make sense?

9           THE COURT:  Yes, I understand.

10          MR. BLACK:  On the other hand, if you invented

11  something and kept it secret forever, then this bar doesn't

12  apply.  The penalty applies if you sell the product and then

13  later try to go get the patent.

14          THE COURT:  Okay.

15          MR. BLACK:  So they have to show two things: one, that

16  the inventions described in the claims -- and they have to go

17  one by one through the claims -- were ready for patenting at

18  the time, and we have already led the evidence that showed that

19  the clinical studies, which are discussed in the patent and

20  which were necessary to prove that this would work for 12 hour

21  relief, were not done anything -- they were done a couple of

22  weeks before the patent was filed, not more than a year.

23          So we disagree on whether it was ready for patenting.

24  That's a factual issue your Honor will have to decide.  They do

25  bear the burden on that by clear and convincing evidence,

F3q2end1                    Lee – Cross

 1    though.  It is not a 50/50 thing.  It is clear and convincing.

 2            The second part is, they have to show there was a

 3    sale.  We haven't heard much about it yet, but the sales they

 4    are relying on are not sales by Endo to the public, because it

 5    is undisputed that we didn't sell any products.  We didn't even

 6    get FDA approval until 2006.  So they have got a kind of

 7    creative theory that Endo's contracting with a supplier to

 8    provide tablets, under a servicing agreement to make the

 9    tablets for Endo, triggers the on-sale bar.  And, again, your

10    Honor will have to decide that.  They are saying we obtained

11    tablets from somebody.  Endo is small.  They got somebody else

12    to make the tablets for the clinical trials and for the

13    development work and they are saying that, by having somebody

14    else make the tablets, this bar was triggered.

15            THE COURT:  Okay.  Thank you very much.  Okay.  Let's

16    resume.

17            MR. SABHARWAL:  Does that cover it, your Honor?

18            THE COURT:  Yes.

19            MR. SABHARWAL:  Very good.  Thank you.

20            So, your Honor, just in terms of an interim statement,

21    what we are now going to be turning to are these clinical

22    trials that are part of the dispute on the ready for patenting

23    that Mr. Black says were after 2000 and I said he didn't need

24    them, okay?

25            THE COURT:  Fine.

F3q2end1                    Lee - Cross

1    BY MR. SABHARWAL:

2    Q.  When did you testify, sir, on your direct?  I'm losing

3    track of the days.  Tuesday, right?

4    A.  I began on Tuesday.

5    Q.  Began on Tuesday.  Your direct was on Tuesday.  And you

6    testified regarding a study, regarding study 3202-009, right?

7    A.  I believe so, yes.

8    Q.  And that is the steady state study?

9    A.  That is the study that is known as the steady state study,

10   yes.

11   Q.  I would like to direct your attention to, in your white

12   binder -- white binder, your Honor -- 281.  Tell me when you

13   are there, sir.

14   A.  I am there.

15            THE COURT:  Wait a minute.

16            MR. SABHARWAL:  No problem, your Honor.  Tell us when

17   you are ready.

18            THE COURT:  281, I have it.

19            MR. SABHARWAL:  It's going to be a pretty easy

20   question, your Honor.

21   Q.  Okay.  Now, according to this document -- I am on

22   Plaintiffs' Exhibit 0281, looks like page 1, it looks like this

23   study -- the steady state study was initiated on October 25,

24   2000, right?

25   A.  Yes, that is correct.

1   Q.  And it was completed on November 22, 2000, correct?

2   A.  That means that it was completed in the clinic on November

3   22, 2000.

4   Q.  In the clinic.  Okay.  And then you had a report date it

5   looks like August 14 of 2001, right?

6   A.  That is correct.

7   Q.  You would agree with me, sir, that this study hadn't even

8   started before Endo and Penwest were -- strike the question.

9          You would agree with me that Endo hadn't even started

10  this study, study 9, before Endo had reached a "go" decision

11  with respect to analgesic efficacy as set forth in the August

12  and September 2000 meeting minutes, isn't that correct?

13  A.  That.

14          THE COURT:  That was a long --

15          MR. SABHARWAL:  A long question.

16          THE COURT:  Hard for me to follow.  Can you break that

17  down, please?

18          MR. SABHARWAL:  Absolutely.  Let's get everything

19  together and then we can take a look at it because I am a

20  little confused by it.

21          This is going to be my tab 5.  What tab is it for

22  Dr. Lee?  Tab 6.

23  Q.  Go to tab 6 in the black binder.

24          MR. SABHARWAL:  Your Honor, in the black binder, tab

25  6.  And for the record this is PTX 589.

F3q2end1                    Lee - Cross

1    Q.  Tell me when you are there, sir.

2    A.  Yes, I am there.

3    Q.  This says, there are those three "go/no go" questions that

4    we talked about yesterday.  Do you remember?

5    A.  Yes, I do.

6    Q.  The ones you were involved in designing, right?

7    A.  Correct, yes.

8    Q.  And the date here is August 21 of 2000, right?

9    A.  That's correct, yes.

10   Q.  This was before you started the steady state study, is that

11   correct?

12   A.  It was before the study began in the clinic, yes.

13   Q.  And then remember we talked about a September press release

14   as well for meeting minutes?  What tab is that, Dr. Lee?

15         MR. SABHARWAL:  That would be tab 4, your Honor; tab

16   4, Dr. Lee.  And that is Plaintiffs' Exhibit 345.

17         THE COURT:  Tab 4.

18         MR. SABHARWAL:  In your black binder, your Honor.

19         THE COURT:  Okay.

20   Q.  Are you there, sir?

21   A.  I am, yes.

22   Q.  You would agree with me that the designation of status

23   completed for both the sustained release dosage form and the go

24   decision number two efficacy had been completed also prior to

25   starting the steady state study, isn't that correct?

F3q2end1                    Lee - Cross

1    A.  Yes these studies were done for the investment decision,

2    yes, and were completed by this time, or at least we had

3    preliminary results from them.

4    Q.  When you say investment decision, what do you mean?

5    A.  The decision that I think is referred to in the press

6    release that you mentioned yesterday --

7    Q.  I see.

8    A.  -- which said, Penwest actually said, we are prepared now

9    to invest in a full scale clinical program that will take this

10   to hopefully an NDA, an approved NDA.

11   Q.  So you were ready to go commercial then, right?

12   A.  We weren't ready to go commercial.

13   Q.  Were you ready to engage in a commercial activity at that

14   point, to start filing FDA, an NDA?

15   A.  You have to clarify.  I'm sorry.

16   Q.  Sure.  You said this was an investment decision.  In other

17   words, you made these decisions.  You issued these press

18   releases.  You are now going forward with the NDA, right?

19   A.  No, that is not correct.

20   Q.  That's what it says here.

21   A.  Where?  When you say "here," where do you mean?

22   Q.  You say, "Determination of efficacy.  Is this product an

23   analgesic at tolerated doses?  If yes, proceed to NDA --

24            THE COURT:  A little slower.

25            MR. SABHARWAL:  I'm sorry, your Honor.

F3q2end1                    Lee - Cross

1          Your Honor, I am on clinical program status.

2          THE COURT:  I see that.

3          MR. SABHARWAL:  Okay.

4    Q.  So tell me if I am reading this correctly Dr. Lee.  It

5    says, "If yes, proceed to NDA filing as rapidly as possible.

6    Status completed."  Right?

7    A.  With all due respect, counsel, I think you are

8    misrepresenting what is written here.  When it says, "If yes,

9    proceed to NDA filing as rapidly as possible," you are implying

10   that all of the work necessary to file an NDA had been

11   complete.

12         MR. SABHARWAL:  No, no, no, I am absolutely not saying

13   that.  I'm sorry.  If that was what I was implying -- I have

14   read the documents, sir.  I am certainly not saying that.

15         I am saying that you embark on the filing of the NDA.

16   You did not -- you had not completed the studies for purposes

17   of a completed NDA package.

18   A.  We hadn't even started many of the studies.

19   Q.  And for purpose of the NDA, I am not contesting that you

20   had completed them, so I apologize.  Okay.

21         Now, you looked at the patent claims, right?

22   A.  Yes, I have.

23   Q.  With respect to the '122 patent, those patent claims that

24   have been asserted against defendants don't have any steady

25   state limitations, do they?

F3q2end1                    Lee - Cross

1    A.  I am not sure about that actually.  I absolutely should --

2    Q.  Let's take a look.  I am now going to direct your attention

3    to PTX 001.  That is tab 1 in your black binder.

4               MR. SABHARWAL:  Your Honor, if you could please turn

5    to PTX tab 1, the words that we are looking for, your Honor,

6    are "steady state" in the claims.

7               THE COURT:  Okay.  I am at tab 1 in the black binder,

8    which is the patent.

9               MR. SABHARWAL:  Your Honor, could you please turn to

10   the claims which are going to be towards the back.

11   Q.  Dr. Lee, let's give the court a second to get there.  Would

12   you like me to repeat the question, sir?

13   A.  Yes, please.

14   Q.  My question is --

15              THE COURT:  Just a second.

16              MR. SABHARWAL:  Sure.

17              THE COURT:  Column what?

18              MR. SABHARWAL:  Column 25.

19              THE COURT:  Give me a minute to get there.  Okay.

20   Q.  Do you see the words "steady state" -- I am never going to

21   be able to say that -- "steady state" in claim one, sir?

22   A.  I don't.

23   Q.  Do you see "steady state" --

24              THE COURT:  Where is the word "steady state"?

25              MR. SABHARWAL:  They are not there, your Honor.

F3q2end1                    Lee - Cross

1    That's what I am trying to establish.

2              THE COURT:  Okay.

3    Q.  Now directing your attention to claim 2, the words "steady

4    state" are not there either, right?

5    A.  That's correct.

6    Q.  And they are not in claim 3 either, correct?

7    A.  That's correct.

8    Q.  And not in 19 either, correct?

9    A.  Those words are not there.

10   Q.  And those words are not in claim 20 either, correct?

11             THE COURT:  What words are you talking about?

12             MR. SABHARWAL:  The words "steady state," your Honor.

13   Q.  You were saying, sir?

14   A.  The words "steady state" are not in claim 20.

15   Q.  Thank you.

16             THE COURT:  What's the significance of this?

17             MR. SABHARWAL:  The significance of this, your Honor,

18   is there may be an argument, I think there will be an argument

19   that the claimed inventions rely on a steady state condition,

20   and the steady state study was not completed until after the

21   critical date, therefore, there will be an argument by Endo

22   that we did not meet our burden.  And we just established that

23   there is no steady state limitation in the claims.  Mr. Black

24   said that we need to show the invention in the claims.  There

25   is no steady state limitation in those claims.  I'm sure that

F3q2end1            Lee - Cross

 1   on redirect we will probably hear something different.  I just

 2   wanted that clarified for the record.

 3            THE COURT:  All right.  I understand.

 4   BY MR. SABHARWAL:

 5   Q.  If we can now move to the '216 patent, maybe I can shortcut

 6   this for you, sir.  Are you aware that there are no steady

 7   state limitations in any of the claims asserted against the

 8   defendants in the '216 patent?

 9   A.  I, without reading through these claims, wouldn't like

10   to --

11   Q.  Very fair.  Very fair.

12            MR. SABHARWAL:  This would be tab 2 in your black

13   binder, your Honor, tab 2 in your black binder.

14            THE COURT:  Right.  I am there.

15            MR. SABHARWAL:  And now the tab in my binder, I have

16   no idea.  2.  Okay.  Good.  That's easy.

17   Q.  There are a lot of claims here, sir.  I am not going to

18   take you through every one.

19   A.  Great.

20   Q.  Just 46 of them.

21            So if you could turn to column 26, your Honor, that's

22   where we are going to start.  It may be easier if you skim

23   through this and let me know if you see the words "steady

24   state" in any of the claims.

25            MR. BLACK:  Your Honor, I think the patent is in the

F3q2end1                    Lee - Cross

1    record.  It would take --

2              THE COURT:  Keep sitting down.

3              MR. BLACK:  I'm sorry.  The patent is in the record

4    and whether the words "steady state" appear or do not appear in

5    any of the claims is something we can all agree on or not agree

6    on later.  To have the witness read through it seems --

7              THE COURT:  Keep seated.  I am not hearing you.

8              MR. BLACK:  Your Honor, he is about to have the

9    witness read through each of the claims in the patent to

10   determine whether the words "steady state" appear in the

11   claims.  That seems time wasting, because the patent is in the

12   record and we can all look for ourselves whether it is there or

13   not later.

14             MR. SABHARWAL:  Your Honor, may I respond?

15             THE COURT:  Go on with your questions.  You are doing

16   okay.

17             MR. SABHARWAL:  Thank you, your Honor.  This will just

18   take a minute.

19   BY MR. SABHARWAL:

20   Q.  Do you see the words "steady state" in any of the claims of

21   the '216 patent?

22   A.  In a quick glance through the H2 claims, I don't see the

23   words "steady state."

24   Q.  And I will represent to you that they are not in there and

25   I also represent to you that if I find them I will let you

F3q2end1                    Lee - Cross

1    know.

2    A.   Thank you.

3    Q.   Moving right along, you testified yesterday regarding the

4    Opana clinical development plan, right?

5    A.   Correct.

6    Q.   You remember we saw a slide with a whole bunch of clinical

7    trials on it?

8    A.   I do.

9    Q.   I believe it was 33?

10   A.   Something like that, yes.

11   Q.   And would you agree with me that not all 33 were necessary

12   in your opinion to get a patent, correct?

13   A.   That's correct.

14   Q.   And we had actually talked about certain studies that you

15   believed were in the patent, right?  For example, the steady

16   state study?

17   A.   Correct.

18   Q.   I would like to now hear about a study 8.  Were you

19   familiar with that study, sir?

20              MR. SABHARWAL:  That is, by the way, in your white

21   binder.  That is PTX 0279, your Honor, PTX 0279.

22              THE COURT:  Where is that?

23              MR. SABHARWAL:  PTX 0279.

24              THE COURT:  How do I locate that.

25              MR. SABHARWAL:  It is in the white binder.  I don't

F3q2end1                    Lee - Cross

 1    think there are tabs in plaintiffs' binder.

 2              MR. BLACK:  There are.  Maybe we gave you one without

 3    tabs.

 4              MR. SABHARWAL:  Okay.  Thank you.

 5              Mr. Black --

 6              THE COURT:  Are you referring to this binder?

 7              MR. SABHARWAL:  Yes, we are.

 8              THE COURT:  Where?

 9              MR. SABHARWAL:  May we approach?  I can find it

10    easier.

11              THE COURT:  Sure.

12    Q.  Are you there, sir?

13    A.  Yes, I am.

14              MR. SABHARWAL:  Are you there, your Honor?

15              THE COURT:  Yes.

16    BY MR. SABHARWAL:

17    Q.  Okay.  I believe you testified that the primary -- let me

18    start over.

19              You did testify about this study, right?

20    A.  I am not sure about that.  You maybe have to remind me of

21    that.

22    Q.  In an abundance of caution, let's take a look at it.

23              For the record, this is just an excerpt that is in

24    your binder, right.

25    A.  That's correct, yes.

F3q2end1                    Lee - Cross

1    Q.  And this was a study that was initiated, according to this,

2    on May 2001 and completed on June 19, 2001.  Did I see that

3    correctly?

4    A.  That is completed in the clinic --

5    Q.  Yes.

6    A.  -- in June 2001.

7    Q.  In other words, the CMO, or whatever, had completed the

8    clinical studies by that time?

9              THE COURT:  By what time?

10             MR. SABHARWAL:  I am trying to get that from the

11   witness, your Honor.

12             THE WITNESS:  So, your Honor, by June 19, 2001, the

13   volunteers had completed their participation in this study.

14             THE COURT:  I see that date.  All right.  Fine.

15   BY MR. SABHARWAL:

16   Q.  Sir, in one of the documents that were produced to us, we

17   saw a description of the study date which said that it was to

18   further investigate the effect of food on the bioavailability

19   of oxymorphone?

20             THE COURT:  Where are you reading now.

21             MR. SABHARWAL:  Your Honor, this document is not in

22   the binder.  I will read it into the record.  It will show up

23   on your screen.  It is ENDO_OP_0179037.

24             THE COURT:  What is this?

25   Q.  Have you seen this document before, sir?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F3q2end1                    Lee - Cross

1    A.  I'm sure I have.  I don't immediately recollect it, but I

2    am sure I have.

3    Q.  Okay.  If you flip to the second page here, I have a full

4    copy here can I hand it to you.

5         MR. BLACK:  We have a logistical problem here, which

6    is that the agreement was that cross documents would all be in

7    the binder so we could have them, and this one is not in the

8    binder nor has a DTX label.  So can we get a copy of it?

9         MR. SABHARWAL:  Sure.

10        MR. BLACK:  And I would appreciate it if counsel, when

11   doing cross, would put all of the documents in the binder, as

12   we agreed.

13        MR. SABHARWAL:  Mr. Black, this actually just came up

14   at the last minute.

15        MR. BLACK:  You could have sent it to me last night,

16   Mr. Sabharwal, but you decided not to.  Your behavior is

17   consistent.

18        MR. SABHARWAL:  That's unfortunate.  I guess maybe you

19   were busy crossing the witness who was still on cross.

20   BY MR. SABHARWAL:

21   Q.  Do you have the document, sir?

22   A.  I do, yes.

23   Q.  Directing your attention to the second page, it says,

24   "Effect of meal type and timing on the viability of oxymorphone

25   following administration of oxymorphone CR."

F3q2end1                    Lee - Cross

1      Do you see that?

2  A.  Yes, I do, yes.

3  Q.  On the left side, it says "EN3202-008."  Do you see that?

4  A.  I do.

5  Q.  Here is what I want to ask.  It says, "The primary purpose

6  of this study is to further investigate the effect of food on

7  the bioavailability of oxymorphone.  Both meal type and timing

8  of the dose relative to the meal will be studied."

9      Do you see that?

10  A.  I do.

11  Q.  But hadn't you already done this type of study with respect

12  to EN3202-003 which is meant to investigate the effect of food

13  on bioavailability with a high fat meal?

14  A.  This was a higher unit dose of Opana ER, so these were 40

15  milligram tablets and we were required to ensure that the

16  highest unit dose of Opana ER that we were planning at that

17  time behaved in the same way as earlier lower doses that we had

18  tested.

19  Q.  And that was the FDA that required it?

20  A.  I think it was both the FDA and us internally requiring it.

21  I think we needed to know how our product was performing.

22  Q.  Right.  But was it a specific request by FDA to do this

23  study along with your internal discussions?

24  A.  I don't know that it was a specific request, but the Food

25  and Drug Administration, we assume, will require that you

1   evaluate the highest unit dose of the product you are

2   developing.

3   Q.  Okay.  Thank you very much.  You can put that aside, sir.

4           You also testified on Tuesday regarding EN3202-12, and

5   I think this may be my last study.  Do you recall that study,

6   sir?

7   A.  I do.

8   Q.  I believe that during your direct testimony you showed a

9   slide as to where you said the study 12 relates to in the '122

10  patent.  I can show you that slide.

11  A.  Yes, please do.

12  Q.  Of course.  If you don't have a hard copy in front of you,

13  you can use mine, but I am going to put it up on the screen.

14  This would be slide 44.  Can we put that up, please?  Do you

15  see it, sir?

16  A.  I do, yes.

17  Q.  And on the left side you agree with me that's the '122

18  patent, right?

19  A.  It is, yes.

20  Q.  On the right side is a copy of the cover page of the study

21  12, correct?

22  A.  That's correct.

23  Q.  It was your testimony a few days ago that the data for the

24  figures that's recited here came from study 12, is that right?

25  A.  That's right.

F3q2end1                    Lee - Cross

1    Q.  So here is where I get a little confused.  If we look at

2    figure 1, can we pull figure 1 of the patent up?  Actually

3    let's go to slide 46.  That will be easier.  Sir, in your

4    demo -- would you agree with me that these are slides from the

5    '122 patent figures 1 to 4?

6    A.  Yes, I would.

7    Q.  On the left side, the left vertical axis is measuring pain

8    intensity through one of the pain intensity indicators I

9    learned a few days ago, VAS?

10   A.  That's correct, yes.

11   Q.  As opposed to something like TOTPAR?

12   A.  For instance, yes.

13   Q.  Or SPID.

14   A.  That's another one.

15   Q.  I learned a lot over the last couple of days.

16           So the only parameter that is being measured on the

17   left side is the VAS specific parameter regarding pain

18   intensity difference, right?

19   A.  It's not the only one, because there is also categorical

20   pain scale, which is also shown in the slide.

21   Q.  Okay.  Fair enough, categorical pain.  And that's at the

22   bottom, right?

23   A.  That's at the bottom, yes.

24   Q.  On the horizontal axis is time, right?

25   A.  Yes.

F3q2end1                    Lee - Cross

1   Q.   And then can you explain to me what is on the right

2   vertical axis?

3   A.   That is the pain scale, as you have indicated there, visual

4   analog scale that we have shown earlier.

5   Q.   Isn't this the plasma concentrations?

6   A.   I'm sorry.  I apologize.  I am looking at the wrong side.

7   Yes.

8   Q.   No problem.

9   A.   You are absolutely correct.  It is the plasma

10  concentrations of oxymorphone and 6-hydroxy-oxymorphone.

11  Q.   Again, just to clarify for the court, on the left side we

12  have VAS vertical.  On the right vertical we have the

13  concentration of 6-OH-oxymorphone, for example, in the first

14  top left, and then on the horizontal we have time, right?

15  A.   That's correct, yes.

16  Q.   And I believe you testified that you were trying to show

17  the correlation between pain intensity and the amount or

18  concentration of 6-OH-oxymorphone, is that correct?

19  A.   Oxymorphone and 6-OH-oxymorphone, yes.

20  Q.   In fact, in the patent, in the section that you pointed us

21  to, there is a particular paragraph, can we blow that up?  So

22  this is from column five, sir.  This says, as can be seen from

23  these figures, 1 to 4, "There is a correlation between pain

24  relief and both oxymorphone and 6-hydroxy-oxymorphone levels."

25  Do you see that?

F3q2end1               Lee - Cross

1    A.  Yes.

2    Q.  And I assume you agree with that statement?

3    A.  Yes.

4    Q.  Then it says, "As the blood plasma levels of oxymorphone

5    and 6-hydroxy-oxymorphone increase, pain decreases."  Do you

6    see that?

7    A.  Yes.

8    Q.  And do you agree with that?

9    A.  Yes.

10   Q.  "Thus, to the patient, it is the level of oxymorphone and

11   6-hydroxy-oxymorphone in the blood plasma which is 'most

12   important.'"  Do you see that?

13   A.  Yes.

14   Q.  And you agree with that?

15   A.  Yes.

16   Q.  My first question is, are you sure that the data that you

17   are relying on came from study 12?

18   A.  The data that is described here came from two different

19   studies.

20   Q.  So not just study 12?

21   A.  The pain data came from study 12.  The blood level later

22   came from a different study.

23   Q.  And what study was that, sir?  Because you didn't mention

24   that the other day.

25   A.  I'm not sure I was asked about that the other day.

F3q2end1                    Lee - Cross

1   Q.  Okay.  I can read your testimony, but that's okay.

2   A.  The blood level data came from one of the other studies,

3   and I would have to refresh my memory as to exactly which study

4   it was.

5   Q.  Okay.  No problem.  But just let's look at your testimony,

6   because maybe I misunderstood.  I thought you said that -- I

7   thought you testified that figures 1 to 4 in the patent come

8   from study 12.  Was that not correct?

9   A.  Well, if I didn't say specifically that the pain data came

10  from study 12, the blood level data, and I think it is actually

11  indicated in the patent, it nowhere says that the blood level

12  data and the pain data came from the same study.  I don't

13  believe it does, anyway.

14  Q.  I think that's not what you said, but I just want to make

15  the record clear.

16      MR. SABHARWAL:  Can we pull up transcript 209/line 22

17  to 210/line 4.  Okay.  It is really difficult to read.  Here we

18  go.

19  Q.  209/22:  "There are two other studies that I want to

20  mention" -- this is Mr. Black -- "what was the status of study

21  12?

22      "At the time of this May 2001 meeting, the study had

23  been completed in the clinic, so all of the patients who were

24  intended to be treated had been treated, and no more patients

25  were being enrolled," and it goes on.  Right?

F3q2end1                    Lee - Cross

1   A.  Right.

2   Q.  I don't know if this is the right one.  Let's go to 213.

3   So we have now introduced the study.  Go to 213/line 11.  Okay

4   here we go:

5       "Yes, it is in the patent.  It is in the patent known

6   as the '122, in column 5, and the patent at lines 9 to 43, you

7   said the VAS score was taken based upon asking patients how

8   much pain they were in.  Could you tell us what that is on

9   slide 45?"

10      So I want to be clear, because maybe it was my

11  confusion, that only some of the data in figures 1 to 4 came

12  from study 12, right?

13  A.  The pain data in figures 1 to 4 came from study 12.

14  Q.  But the concentration of the oxymorphone came from a study,

15  and you just don't remember what study it was.

16  A.  It did not come from study 12.  It came from one of the

17  pharmacokinetic studies, and I would have to -- I wouldn't want

18  to give you misidentified study numbers and confuse the

19  situation.

20  Q.  No problem.  Now, I am almost done.

21      Now, isn't it true, sir, that it has never been

22  established that there is a correlation between the

23  concentration of oxymorphone and the pain relief that it

24  provides?

25  A.  If you are saying -- well, perhaps I shouldn't put words in

F3q2end1                    Lee - Cross

1    your mouth.  Perhaps you could just clarify what you mean

2    there, because obviously we have shown some relationship

3    between blood levels and pain relief, but perhaps you can

4    explain further what you mean.

5    Q.  What I mean is by a prior deposition of yours in which you

6    were asked that question and I believe you said there is no

7    correlation.  That's why I am confused.

8    A.  Well, I can't remember exactly what I say, whether I said

9    there is no correlation or no correlation had been proven to

10   the satisfaction of the of the FDA.

11           THE COURT:  We will take our lunch until 2:15.

12           MR. SABHARWAL:  Lunch until 2:15?  Yes, sir, your

13   Honor.

14           (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

F3QTEND2                    Lee - cross

1                          AFTERNOON SESSION

2                             (2:15 p.m.)

3              THE COURT:  Go ahead, please.

4              MR. SABHARWAL:  Thank you, your Honor.

5    BY MR. SABHARWAL:

6    Q.  Dr. Lee, good afternoon.

7    A.  Good afternoon.

8    Q.  I only have a few more questions.  I would like to go back

9    to the subject that we were talking about right before the

10   lunch, and that was the Figures 1 to 4 in the patent.  Do you

11   recall that?

12   A.  I do, yes.

13   Q.  And there was a certain section in Column 5 I was asking

14   you about the correlation between the blood plasma level and

15   pain relief.  Do you recall that?

16   A.  I do, yes.

17   Q.  Can we pull that up, please.

18           For the record, Dr. Lee, I am in the '122 patent that

19   is in your white binder columns 31 to 40 something.  Column 35

20   to 42 or something like that.  It's hard to read on my screen.

21           Tell me when you're there.

22   A.  Can you -- sorry, I'm trying to find it in my hard copy,

23   can you --

24   Q.  I can come over and show it to you but Column 5.

25   A.  Sorry, I have gone too far.

F3QTEND2                    Lee - cross

1   Q.  Column 5 I think maybe the 31, beginning with the words,

2   "As can be seen from these figures?"

3   A.  Right.

4   Q.  And it's actually on your screen as well.

5   A.  It's fuzzy on the screen, but I can see it.

6   Q.  Same here.  I have to take my glasses off here.

7         But we talked about this before, right?

8   A.  We did, yes.

9   Q.  And you said that you agree with the statement, for

10  example, in the middle of paragraph beginning at line 35:

11  Thus, to patient it is the level of oxymorphone and

12  6-hydroxy-morphone in the blood plasma which is most important,

13  correct?

14  A.  That's what is written here.

15  Q.  In other words, as the blood plasma level of oxymorphone

16  increases, the pain decreases?

17  A.  In general, yes, that's right.

18  Q.  And the reason that I'm confused is I thought you said that

19  you agreed with this statement.

20  A.  I agree with the statement as is written here, yes.

21  Q.  Okay.  Now Dr. Lee, do you recall that you were previously

22  deposed in this case in September of 2009?

23  A.  I do, yes.

24  Q.  And at that time -- just for the record it's a prior case,

25  you were representing Endo in 2009?

F3QTEND2                    Lee - cross

1   A.  Okay, yes.

2   Q.  And you were deposed in that case, correct?

3   A.  I was, yes.

4   Q.  And that testimony related to Opana ER, correct?

5   A.  Yes, it did.

6   Q.  Isn't it true, sir, that you were asked the following

7   question:

8        Is there a correlation of Opana ER's pharmacokinetic

9   properties to the pain relief that it provides?

10       And you responded:  That's never been established.

11       Do you recall that?

12  A.  I don't recall those specific words, but I'm sure what

13  you're reading is correct, yes.

14  Q.  And then you actually went on in that, and the question was

15  asked:

16       So if --

17       MR. BLACK:  Could we have the page and line number?

18       MR. SABHARWAL:  Sure, I'm sorry.  That is going to be

19  page 108, starting line 7 -- actually starting line 3.

20  Q.  And the question was asked:  Why has that not been

21  established?

22       And your answer was:  With this class of molecule

23  opioids, it is not proven to be so far or proven to be very

24  difficult to establish a correlation between blood levels and

25  analgesic effect.

F3QTEND2                    Lee - cross

1            Do you recall saying that?

2    A.   I can recall that being discussed, yes.

3    Q.   So here's why I'm confused, and maybe it's just me, why is

4    it that you agree with the statement in the patent that there

5    is a correlation, but you said under sworn testimony in 2009

6    that that has never been established?

7    A.   It's, again, the context of it, and I totally don't

8    remember the context in which the question was asked in 2009,

9    but certainly the answer that I gave then, what I'm pretty sure

10   I had in mind, is as far as the Food and Drug Administration

11   was concerned, in other words, proving beyond a reasonable

12   doubt that there is a correlation in which one studies and then

13   does appropriate modeling in the same patient measuring both

14   blood levels and pain relief, or in a group of patients, and

15   then proving statistically beyond a reasonable doubt that there

16   is a correlation, that is what I think I was referring to

17   hadn't been done and was difficult to show.

18   Q.   Let me see if I understand what you're saying.  Even though

19   you agree that your statements in your patent that there is a

20   correlation between blood plasma and oxymorphone, you

21   nevertheless said the opposite in your deposition, but that was

22   based upon a proof beyond a reasonable doubt assumption?

23   A.   Yeah, I'm not sure I would agree with you that they're the

24   opposite.  I think actually on the figures that you're

25   referring to, there is actually a little R, and it says R

F3QTEND2                    Lee - cross

equals -- I forget exactly, I don't have it in front of me,

which is in fact a statistical test.

Q.   Okay.

A.   And what was done there was attempting to show

statistically, based upon the data that is presented in the

patent and in which we have said came from two different

studies, that there was a correlation between the lines on

those charts.

          What I believe, but it was in 2009 that I was

referring to in the deposition, was is there proof that the

Food and Drug Administration would accept that you could prove

that there is a correlation between blood levels and pain

relief in the same patient measured in the same study.

Q.   Okay.

A.   So I don't see a conflict there, but obviously that's open.

Q.   I'm not here to debate with you, sir, but you would agree

with me that to a lay person like me, if I'm reading where it

says there is a correlation in the patent and then reading

where you say that there has in fact never been established a

correlation, that would create an apparent inconsistency,

wouldn't you agree?

A.   As you say, an apparent inconsistency.

Q.   All right.  But your position is because your testimony,

which I believe was in a patent case, you were talking about in

the context of the FDA?

F3QTEND2                    Lee - cross

1    A.   Again, I don't remember the context of the question, but --

2    Q.   Well, I don't see anything here where you're clarifying it

3    that with respect to the lack of correlation that was with

4    respect to the FDA.  Do you recall at some point sending what

5    we call an errata sheet on this deposition to say that well, my

6    testimony was really from the viewpoint of FDA?

7    A.   I don't recall sending such an errata sheet.

8    Q.   Because again, this says the question was:  So if Opana ER

9    delivers oxymorphone over a twelve-hour period, this doesn't

10   necessarily indicate that the patient will receive pain relief

11   for twelve hours, is that correct?

12              You said:  That's correct.

13              Then the question was:  How much pain relief will a

14   patient get from one dose of Opana ER?

15              Your answer was:  Highly dependent on each individual

16   patient.

17              Question:  So you cannot tell how much pain relief a

18   patient will get from one dose of Opana ER?

19              Answer from you:  That's correct, it's not possible to

20   predict that.

21              Now here's where I get confused --  So far you agree

22   that you said that, or do you want me to show you the

23   transcript?

24   A.   Let's leave it for the moment I agree with what you just

25   read there.

1    Q.  So here's where I get confused, and this is in 2009, it

2    says:  So Endo has not made any claim of Opana ER's efficacy

3    based solely on pharmacokinetic properties, is that right?

4              And you said:  That's correct.

5              And that was in 2009, isn't that right, sir?

6    A.  That's right.

7    Q.  But isn't it true that your patent is making that type of

8    correlation?

9    A.  Well, you used the word "claim."  It depends how you're

10   using the word "claim" there.  Sorry, I'm putting words in your

11   mouth now, but I assume you're implying "claim" in the sense of

12   a patent claim, whereas I'm sure in that question I was -- I

13   had in my mind "claim" in the sense of a marketing claim.

14   Q.  I see.  Okay.  So you certainly wouldn't say that with

15   respect to any of the patent claims there's a correlation,

16   right?

17   A.  So in the patent, as I just mentioned, we have shown there

18   is the charts there and there was a statistical evaluation done

19   of the correlation between those lines between the pain relief

20   and the plasma levels, and that shows some statistical

21   correlation between those two lines.

22   Q.  Right.  But in your sworn testimony in 2009 after this had

23   been filed you said that Endo has not made any claim of

24   correlation between pain and pharmacokinetic parameters, isn't

25   that true?

F3QTEND2                    Lee - cross

1    A.  We're back to same thing I just said.  I was talking there

2    claim, or at least I had in my mind, maybe pain it wasn't

3    clarified, claim in relation to a marketing claim, not a patent

4    claim.

5    Q.  But with a patent claim you would be comfortable making

6    that assertion but you wouldn't be comfortable making that

7    assertion in a marketing claim, is that what you're saying?

8    A.  Marketing claims have to be approved by the Food and Drug

9    Administration.  And as I have said earlier, proving to the

10   Food and Drug Administration's satisfaction that there is a

11   correlation between blood levels and pain relief hasn't been

12   shown.  But that's different to -- we're using the word "claim"

13   in two different contexts there.

14   Q.  Did you ever tell FDA that you had actually made statements

15   to the patent office that there is in fact a correlation -- a

16   positive correlation between pain relief and the amount of

17   drug?

18   A.  I really can't answer that question, I have no idea.

19   Q.  You don't know, and you don't know whether Endo ever let

20   them know that, do you?

21   A.  I have no idea, no.

22   Q.  But in your mind, you were sort of separating what you were

23   saying to the FDA versus what you were saying in the patent,

24   right?

25   A.  I have been encouraged to do that.

1   Q.  And who encouraged you to do that?

2   A.  Yourself.  I mean we separate what we need to prove to the

3   FDA, you want to keep the FDA out of this, and what is in the

4   patent, so I'm just following with what you are saying.

5   Q.  I'm saying you said you were encouraged to keep them

6   separate.  Who encouraged you?

7   A.  I thought you were doing that.

8   Q.  No, I wouldn't encourage you to do anything.

9   A.  Then I misunderstood.

10  Q.  Let's move on.

11          Sir, isn't it true that you actually told the FDA the

12  opposite of what you told -- what you said in your patent

13  application regarding the correlation between blood plasma and

14  amount of pain?

15          THE COURT:  What's the question again, please?

16          MR. SABHARWAL:  Your Honor, the question that I'm

17  asking the witness is whether or not the witness said the

18  opposite to FDA as what he said in his patent.

19          MR. BLACK:  Your Honor, this is the second day of

20  cross of this witness --

21          THE COURT:  Keep seated because I can't hear.

22          MR. BLACK:  It's the second day of cross of the

23  witness.  This is argumentative.  He's reading from a

24  deposition where the witness was testifying about the FDA.

25  He's conflating the word "claims."  This is irrelevant.

F3QTEND2                    Lee - cross

1          MR. SABHARWAL:  Your Honor, this is highly relevant.

2     I think we have a situation here --

3          THE COURT:  I'm going to overrule the objection.  You

4     go ahead.  And the witness I'm sure will listen carefully, and

5     if there's a need for clarifying, he will do that, and then

6     there can be redirect.

7          MR. SABHARWAL:  Thank you very much, your Honor.

8     BY MR. SABHARWAL:

9     Q.  Dr. Lee, I want to be clear that I'm not accusing you of

10    anything, I am just confused myself and I want to see if I can

11    understand the testimony, okay, so the record clear?

12    A.  Absolutely.

13    Q.  So please don't take anything from the questions I'm asking

14    you, but I do have to ask:  Isn't it true that you told the FDA

15    that there was actually a negative correlation between blood

16    levels of 6-OH oxymorphone and pain relief?

17    A.  If I ever told the FDA that, I certainly have no

18    recollection.

19         THE COURT:  Say it again, I didn't hear it.

20         MR. SABHARWAL:  Sure, your Honor.

21         THE COURT:  I'm not hearing the witness.

22         THE WITNESS:  Sorry, your Honor.  I said -- counsel

23    asked me if I had made a particular statement to the Food and

24    Drug Administration, and I was saying that I don't have any

25    recollection of making such a statement.

F3QTEND2                      Lee - cross

 1    Q.  Okay.  Now I'm going to hand you select pages of your NDA.

 2              MR. SABHARWAL:  I want to say for the record before

 3    anybody gets upset, this is purely for impeachment, and the

 4    reason we're bringing this out is because the witness does not

 5    recall making the statement.  So I am going to hand up this

 6    document.  It is a long document, I'm going to ask you about

 7    two pages.

 8              THE COURT:  I don't need any of that.

 9              MR. SABHARWAL:  Sorry, your Honor.

10    Q.  Now Dr. Lee, you have been here for a long time and I am

11    not going to ask you to read this whole thing.

12    A.  Thank you.

13    Q.  I would like you to confirm for the record that this is DTX

14    0962 and the title of this is Endo Pharamaceuticals oxymorphone

15    extended release ER tablets application summary dated

16    December 16, 2002.

17              Do you see that, sir?

18    A.  I do, yes.

19    Q.  And you recognize this as an FDA-related document, sir?

20    A.  I do.

21    Q.  Now I'm going to direct you to paragraph -- page 98, it

22    will be on the screen.  Hopefully this will be my last couple

23    questions.

24              Tell me when you're there, sir.

25    A.  Okay.

F3QTEND2                    Lee - cross

1    Q.  Do you see where it says 6.10?

2    A.  I do.

3    Q.  Pharmacokinetic, pharmacodynamic relationships?

4    A.  I do.

5    Q.  I'm sorry, go ahead to the second paragraph.

6           The second paragraph, it says -- and this is a lot of

7    language here, but you see the sentence it says "Analysis?"

8    A.  Yes.

9    Q.  It says:  Analysis of the data, meaning the data for Opana

10   ER, did not reveal a linear relationship between plasma

11   oxymorphone concentrations and pain intensity.  There was a

12   weak but statistically significant association indicating that

13   pain intensity increased as the concentration of 6-OH

14   oxymorphone increases.  This association is not in the expected

15   direction and is the result of a few data points.  These

16   analyses were very limited in scale and should not be viewed as

17   conclusive.

18          Do you see that, sir?

19   A.  I do.

20   Q.  Did you agree with that statement at the time it was sent

21   to the FDA?

22   A.  I'm sure I did.

23   Q.  So here's my question, sir:  Is there a positive

24   correlation between blood plasma concentration of 6-OH

25   oxymorphone pain relief, no correlation, or a negative

F3QTEND2                    Lee - cross

1   correlation?  Because we have three different statements from

2   three different documents, and now I'm very confused.

3   A.  Well, based upon the data presented here and what is

4   written here, it is not possible to say that there is any

5   correlation or no correlation or some correlation.  It says

6   this association is not expected, it's the result of a few data

7   points.  The analyses were very limited in scale and should not

8   be viewed as conclusive.  In other words, there's no conclusion

9   that could be drawn from these.

10  Q.  Do you recall ever telling the FDA there is in fact a

11  positive correlation between pain relief and blood plasma

12  concentration of 6-OH oxymorphone?

13  A.  What we told the FDA is contained in this document.

14  Q.  That was not my question.  My question was:  Do you recall

15  ever telling the FDA what you said in your patent, which is

16  that there is a positive correlation between 6-OH oxymorphone

17  or oxymorphone and pain relief?  Yes or no.

18  A.  No, I don't.

19  Q.  Okay.  And conversely, you never told the patent office

20  that you told FDA that there is a negative correlation between

21  pain relief and the level of oxymorphone, isn't that right?

22  A.  There is no negative correlation.

23  Q.  What is this saying?  This is saying that actually as you

24  increase --

25          THE COURT:  Keep your voice up a little bit.

F3QTEND2                    Lee - cross

1          MR. SABHARWAL:  Sorry, your Honor.

2   Q.  Isn't it true, sir, this document is saying that the more

3   oxymorphone you get, the higher your pain intensity?

4   A.  It says it's the result of a few data points and should not

5   be viewed as conclusive.

6   Q.  I understand that.

7   A.  Well, there is no negative correlation.  It doesn't say

8   that here.

9   Q.  Well, did you ever tell the patent office that you

10  testified that there has never been established any correlation

11  between 6 oxymorphone and pain intensity in your sworn

12  deposition in 2009?

13  A.  I have never had such a discussion with the patent office.

14  Q.  Do you know if anyone has ever bothered to tell the patent

15  office that the senior executive of the company testified about

16  a statement that is directly contrary --

17          THE COURT:  That's just an argumentative question.

18          MR. SABHARWAL:  I withdraw the question.

19  Q.  Do you know whether anyone at Endo has informed the patent

20  office about the testimony regarding no correlation between

21  oxymorphone and pain intensity?

22  A.  I don't know if anybody from Endo has ever said that.

23          MR. SABHARWAL:  Thank you.  I have no further

24  questions at this time.

25          THE COURT:  Does any other attorney have cross?

1              All right.  Then let's go to redirect.  Do you have

2      redirect?

3              MR. BLACK:  Yes, your Honor, may I have five minutes

4      to consult with my team?

5              THE COURT:  Of course you may.

6              MR. BLACK:  Take a short break?

7              THE COURT:  Take your time, but we won't take a break.

8              MR. BLACK:  Okay.

9              (Pause)

10     REDIRECT EXAMINATION

11     BY MR. BLACK:

12     Q.  Dr. Lee, would you take out your white witness binder and

13     turn to patent PTX 1.  If you would turn to the -- open the

14     page to column 25 where the claims begin.  There were a series

15     of questions about Claim One and whether or not the words

16     "sustained release" appears in the claim.  Do you recall that?

17     A.  I do, yes.

18     Q.  I'm sorry, let me get my place here.

19              If you would look over to the left side of the page in

20     column 23.

21     A.  Yes.

22     Q.  In particular at line 6 there's a statement there, "The

23     intent of a controlled release opioid," would you read that

24     into the record?

25     A.  The intent of a controlled release opioid formulation is

1   the long-term management of pain.  Therefore, the performance

2   of a composition when administered periodically (one to three

3   times per day) over several days is important.  In such a

4   regime, the patient reaches a steady state where continued

5   administration will produce the same results when measured by

6   duration of pain relief and blood plasma levels of

7   pharmaceutical.  Such a test is referred to as a steady state

8   test and may require periodic administration over an extended

9   time period, ranging from several days to a week or more.

10  Q.  Thank you, that's good.

11          So the words "steady state" does not appear in the

12  claim, but we see it several times in the discussion of the

13  intended use of the product, correct?

14  A.  Correct.

15  Q.  Would you turn in your binder to PDX 217.  Do you recall

16  some questions about the size of the pain market?

17  A.  I do.

18  Q.  Would you take a look at the page that is marked Endo OP

19  0360378.

20  A.  Okay.

21  Q.  And do you see that it says market dynamics?

22  A.  I do.

23  Q.  What's the first word?

24  A.  Unsatisfied.

25  Q.  Do you recall why that was written?

1   A.  Because at the time we believed that there was still very

2   significant under-treatment of moderate to severe chronic pain.

3   Literally tens of millions of Americans suffer from long-term

4   chronic, moderate to severe pain, and the drugs that were

5   available to treat them were just inadequate or not adequate

6   enough, I should say, perhaps I should clarify.

7   Q.  Please turn to PTX 157 also in your white binder.

8   A.  Okay.

9   Q.  These are the meeting minutes of the project team meeting

10  held on January 22nd, 1998.

11  A.  Correct.

12  Q.  And there were some questions about dissolution curve.

13          Before we get there, please turn to Endo OP 0126499.

14  And can you tell us what we see here?

15  A.  Yes, this is a table in fact of so-called stability data in

16  which several different experimental formulations of Opana ER

17  were tested in standard stability tests.  And these are the

18  results of those standard stability tests again for several

19  different experimental formulations.

20  Q.  Had formulation been selected at this point?

21  A.  No, it had not.

22  Q.  And then on the next page, there's the curve that you spent

23  some time on during cross-examination.  Do you see that?

24  A.  I do.

25  Q.  And that refers to TIMERx V, what is TIMERx V, if you know?

1   A.  TIMERx V, that is one of the grades of TIMERx, the matrix

2   that was the basis of Opana ER's formulation.  But this

3   particular grade of TIMERx, which I think was evaluated in

4   experimental formulations in the laboratory, never progressed

5   any further.

6   Q.  Yesterday you noted that the dissolution curve shown to you

7   for this prototype formulation did not indicate the testing

8   conditions used to generate the dissolution curve.  Why was

9   that important?

10  A.  There are several different methodologies and conditions

11  under which dissolution can be tested in the laboratory.  And I

12  am far from certain that one can compare the results of one

13  test with another unless the methodology, the equipment used

14  and the medium, the conditions under which the tests are done,

15  are explained and likely comparable.  Otherwise, the results

16  may not be comparable.

17  Q.  Please turn back to PTX 1, the patent, and turn to table

18  four, which is in column ten.

19  A.  Okay.

20  Q.  How many examples are shown in table four?

21  A.  Three different formulation examples.

22  Q.  And are those all formulations according to patent?

23  A.  They are.

24  Q.  At the time of the patent application filing, did you have

25  a belief that all of these would work?

1    A.  Yes, we did.

2            MR. BLACK:  Let's put up slide 83 from the opening.

3    And we'll identify the opening as PX 4003, your Honor, if

4    that's okay.

5            THE COURT:  Certainly.

6    Q.  I'm going to represent to you that we have graphed here the

7    dissolution curves or the three samples in the patent in gray.

8    It's a little bit washed out on the screen, but I hope you can

9    see it.

10   A.  I can, yes.

11   Q.  And the two red lines on either side, the bands are reflect

12   the ranges in the patent.  Do you see that?

13   A.  I do, yes.

14   Q.  Is it true that in the pharmaceutical industry dissolution

15   testing -- it's common to use dissolution testing and for there

16   to be a range of acceptable values around the curve that has

17   been demonstrated to provide efficacy and that will also be

18   expected to have similar efficacies?

19           MR. WEISS:  Objection, leading.

20           THE COURT:  Overruled.

21   A.  Yes, that is standard in the pharmaceutical industry.

22   Dissolution testing is the standard test that is done before

23   batches of commercialized material are allowed out and allowed

24   into the marketplace.  So dissolution testing is an important

25   component of the pharmaceutical industry's practices.

F3QTEND2                       Lee - redirect

1    Q.  Is it true or false that with dissolution testing it is

2    common for there to be a range of acceptable values around a

3    curve that has been demonstrated to provide efficacy that would

4    also be expected to have similar efficacy?

5    A.  Yes, that is true.

6    Q.  Was it your responsibility to determine the appropriate

7    values for the dissolution ranges in the patent?

8    A.  No, that was not my direct responsibility.

9    Q.  And you, in your cross-examination, said that you were not

10   an expert in this area.  What did you mean by that?

11   A.  The individual who will define ranges, such as indicated

12   here for instance by the red lines, would be somebody skilled

13   in the art of formulation development.  That is not my

14   expertise.

15   Q.  Would you take a look at Exhibit 157, PTX 157, also in your

16   white binder.

17   A.  Yes.

18   Q.  Was the development work that led to Opana ER in the

19   patents done by this point in time, which is February of '98?

20   A.  No, it wasn't.

21   Q.  Had you established that the product was fit for its

22   intended purpose of twelve-hour pain relief yet?

23   A.  No, we hadn't.

24   Q.  Please take a look at Exhibit 589.  And now we have to move

25   to the black binder, I guess there may be two up there, black

F3QTEND2                    Lee – redirect

1    binder with blue cover.  Tab 6 in the black binder with the

2    white and blue cover.  It says Lee cross-examination exhibits.

3    A.  Tab 6?

4    Q.  Yes.

5    A.  Right.

6    Q.  You provided some testimony about the comments from C.

7    Laudadio who presented preliminary results.  Do you see that in

8    the middle of the page?

9    A.  I do.

10   Q.  And under that are listed five studies, correct?

11   A.  Correct.

12   Q.  Including study twelve?

13   A.  That's correct.

14   Q.  Would you turn the page and read into the record the status

15   of study twelve?

16   A.  Yes, under the heading EN, a study EN3202-012, it says

17   enrollment is ongoing and slightly behind schedule.  Last

18   patient to enroll is expected on 9/29 with database lock

19   targeted for 10/16.  Final study report is due by 12/19/2000.

20   Q.  So there was an implication on cross that study twelve was

21   done and supported a finding that there were preliminary

22   results.  Was that the state of affairs at that time?

23   A.  No, the study was not completed.  It was still ongoing, and

24   there could not have been any results discussed or presented at

25   this meeting, only the status of the study.

1    Q.  Just for the record, can you describe the process of doing

2    a study from -- just generally when is a study designed,

3    enrollment of patients, the locking of database, can you

4    describe that?

5    A.  Yes.  Very briefly, the study begins with the development

6    of a study protocol, which describes all the steps that are

7    going to take place in the study, including the type of

8    patients to be enrolled and the number of patients to be

9    enrolled.  And it also describes the statistical plan, the

10   plan, the method of statistical analysis, and the way in which

11   the data will be handled once the study is completed.

12           Once the study protocol is approved, study sites are

13   recruited, that is, clinical sites where there are doctors that

14   specialize in conducting clinical trials and who see the type

15   of patient that the study protocol requires.  And there may be

16   several sites around the United States that are enrolled in

17   such a study.  And the each study investigator is given a

18   target number of suitable patients to enroll under that study

19   protocol.

20           Over the next period of time, which could be days,

21   weeks, months or even years, depending on the type of study,

22   the study investigator will enroll the patients, treat them,

23   and evaluate them according to the details laid out in the

24   study protocol.

25   Q.  What's a database lock?

A.  When the study has been fully completed, and the target

number of patients and the data collected from each of the

study sites, and is brought to place where the data are going

to be analyzed, there are individuals who are required to go

through all of the data that is collected to make sure that it

appears to be intact and there are no discrepancies or

inconsistencies in the data.

         And this is all done while the study is blind, in

other words, nobody knows which of the patients received what

of the active drugs in the study or the sugar pills, the

placebo.  Once all the data have been cleaned to the

satisfaction of the chief statistician of the study and no

further changes can then be made to the study data, the

database is then locked.  And at that point, nothing can be

done to change any of the data unless there are some very

special requirements met.

Q.  And is it possible to run correlations or do anything with

the data before the lock?

A.  Yes, it may be possible to do that, but in what's known as

a blinded fashion.  So the data is divided up into perhaps

groups A, B and C, and maybe some things could be done --

analyses, I shouldn't say "things," could be done, but that

would be for a very specific purpose and wouldn't give you any

specific information because you wouldn't know what those

groups A, B and C, for example, are.

1   Q.  With respect to study 15, turning back to the document, the

2   bottom of the page, there's a note that says the database has

3   been locked with final study report due October 30.  Do you see

4   that?

5   A.  I do.

6   Q.  Did the final study report arrive on October 30?

7   A.  I don't believe it did, no.

8   Q.  Why was it delayed?

9   A.  There were some questions, some issues raised around this

10  study, both in terms of its execution and in some elements of

11  the statistical analysis.

12  Q.  What was the problem in execution?

13  A.  There was at least one study site where the study

14  coordinator had been found to be diverting study drug for her

15  own use and for the use of her friends.  And at that point, it

16  was decided that the data collected by that particular site was

17  not reliable, and a decision was made to remove that data from

18  the final analysis of the study.

19  Q.  You were asked whether it was a goal of your development

20  project to increase the oral bioavailability of oxymorphone

21  with your formulation.  Do you recall that?

22  A.  I do.

23  Q.  Did you do a test to compare oral bioavailability in

24  solution versus in the controlled release formulation?

25  A.  Yes, we did.

1    Q.  And what was the result of that study?

2    A.  We found that formulating oxymorphone in the formulation

3    that became Opana ER did not have a negative impact or in fact

4    a positive impact on the bioavailability of oxymorphone.  It

5    really didn't change the bioavailability significantly.

6    Q.  That was surprising or not surprising?

7    A.  We found that actually to be a rather pleasant surprise,

8    yes.

9            MR. BLACK:  Thank you, your Honor, let me confer with

10   my team for a moment.

11           (Pause)

12           MR. BLACK:  Thank you, your Honor, that's all I have

13   on redirect.

14           MR. WEISS:  May I your Honor, ask three or four

15   questions to clarify the record on recross?

16           THE COURT:  Sure, of course.

17           MR. WEISS:  Thank you, your Honor.

18   RECROSS EXAMINATION

19   BY MR. WEISS:

20   Q.  Dr. Lee, Mr. Black asked you to the effect of if it was

21   your responsibility to define the ranges around the dissolution

22   curves and you said it was not, correct?

23   A.  It was not my direct responsibility, that's correct.

24   Q.  Whose responsibility was it, please?

25   A.  Formulators, formulation scientists.

F3QTEND2                    Lee - recross

1    Q.  Can you tell me the name of the person?

2    A.  I believe in this case it would have been Dr. Danny Kao or

3    Dr. Danny Kao with members of his team.

4    Q.  Do you know if he actually did that, or you're surmising?

5    A.  He was the senior formulator on the project, and he is a

6    named inventor, so I think it's a reasonable surmise.

7    Q.  That he determined the ranges for the patent as opposed to

8    the ranges that were required for tolerance on the commercial

9    product?

10   A.  Perhaps both, but I would be speculating then.

11   Q.  And you explained for Mr. Black the requirements to do a

12   database lock before analyzing the study, do you recall that?

13   A.  I do, yes.

14   Q.  That's a requirement of the FDA, right?

15   A.  Well, it is a requirement of the FDA, but it's also good

16   clinical practice, and no pharmaceutical company will conduct a

17   clinical trial other than in accordance with good clinical

18   practice.

19   Q.  And you're not aware of a requirement to do a database lock

20   before analyzing data for a patent, correct?

21   A.  That is not something I have ever considered.

22            MR. WEISS:  Thank you, your Honor.

23            Thank you again, Dr. Lee.

24            THE COURT:  All right.  Dr. Lee, thank you very much,

25   and we'll have our next witness.

1          THE WITNESS:  Thank you, your Honor.

2          MR. BLACK:  Thank you, Dr. Lee.

3          We'll shuffle around a little bit.  Mr. Rhoad will

4     take command and move into the infringement case as the

5     plaintiffs call Dr. Reza Fassihi.

6          MR. WEISS:  If I could note, your Honor, also, the

7     drawings that I worked on yesterday with Dr. Lee we have marked

8     as DX 9000 for identification in the record, and we'll give a

9     copy of that, of course, to everyone.

10          THE COURT:  Are you offering that?

11          MR. WEISS:  I think, your Honor, it's probably more

12     formally a demonstrative.  I just want the record to show what

13     it was we did.

14          THE COURT:  All right.  You can have it marked for

15     identification or received in evidence, whatever you wish to

16     do.

17          MR. WEISS:  If there's no objection, we would like to

18     have it received in evidence so it's clear.

19          THE COURT:  Received.

20          (Defendant's Exhibit 9000 received in evidence)

21          (Continued on next page)

22

23

24

25

F3QTEND2                      Fassihi - direct

1    REZA FASSIHI,

2         called as a witness by the Plaintiffs,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. RHOAD:

6    Q.  Doctor, could you please state for the record your full

7    name and where you live.

8    A.  Reza Fassihi.  I live in Fort Washington, Pennsylvania.

9              THE COURT:  Could you spell your last name once again.

10             THE WITNESS:  Fassihi, F-A-S-S-I-H-I.

11   Q.  Have you prepared a set of slides to go along with your

12   testimony here this morning?

13   A.  Yes, I have.

14   Q.  And where are you currently employed?

15   A.  I'm employed at Temple University in Philadelphia.

16   Q.  And what position do you hold there?

17   A.  I am a professor of biopharmaceutics and industrial

18   pharmacy.

19   Q.  And can you tell the Court, please, what is

20   biopharmaceutics?

21   A.  Biopharmaceutics is that part of science that deals with

22   drugs, solubility of the drug, absorption of drugs, dosage form

23   design and all of that.

24   Q.  And you said you were a professor of biopharmaceutics and

25   industrial pharmacy.  What is industrial pharmacy?

1    A.   Industrial pharmacy is formulation development,

2    preformulation, evaluation of the dosage forms both in vitro

3    and also manufacturing of pharmaceutical dosage forms.

4    Q.   And what are your responsibilities in your position as a

5    professor of biopharmaceutics and industrial pharmacy at

6    Temple?

7    A.   Apart from some administrative responsibilities on the

8    committees that I'm a member of many, my major role is to do

9    teaching and research.

10   Q.   And what is the nature of the research that you do?

11   A.   My research focuses on development of dosage forms.  I

12   teach a number of graduate students that are in the program,

13   and I teach various courses which relates to biopharmaceutics,

14   pharmaceutical formulations, and so on.

15   Q.   And to what extent does your research and teaching deal

16   with oral control release dosage forms in particular?

17   A.   I would say 80 percent of my research and teaching role is

18   devoted to solid dosage forms.

19   Q.   Can you tell us what type of work and what type of teaching

20   you do relating to oral control release dosage forms?

21   A.   In the school of pharmacy we have a large number of

22   pharmacy students that graduate and become pharmacists.  As

23   part of their training they need to learn about dosage forms,

24   pharmaceutical product, how they are developed, how they are

25   evaluated, how they are approved by FDA.  So I teach all of

1    that to my students.

2            For PhD side, the graduate students that go for PhD,

3    we have courses that are more advanced.  And they cover applied

4    biopharmaceutics, which is application of biopharmaceutics,

5    which I mentioned, that we apply to understand so the students

6    can learn how drugs are absorbed, how they are evaluated as a

7    dosage form, and also manufacturing.  There are regulatory

8    issues which relate to the development of dosage forms.  I

9    teach all of that.

10   Q.  And have you done any consulting with the pharmaceutical

11   industry, companies in the pharmaceutical industry relating to

12   the design, development, and use of oral controlled release

13   dosage forms?

14   A.  Yes, I have.

15   Q.  Can you summarize that for us?

16   A.  Sure.  I have consulted with many generic companies as well

17   as brand companies.  I have given seminars.  I have given

18   lectures.  I have had collaboration in designing, developing,

19   and progressing basically controlled dosage form throughout the

20   processes, from very beginning to very end.

21   Q.  And do you have any training or experience in consulting

22   with doctors or other health care professionals regarding the

23   proper use and administration of controlled release dosage

24   forms?

25   A.  Well, in the school of pharmacy, as professor of pharmacy,

1     I often -- of course I teach all about pharmacy, and my

2     students will graduate, they will be doctor of pharmacy, they

3     go to hospitals they go to private practices.  But at Temple

4     University and associated hospitals, whenever there is an issue

5     with a pharmaceutical dosage form or physicians require

6     information about a particular drug product, they call me.

7     Many of them they know me, and if they don't, they will send an

8     email and inquire about issues related to what the question is.

9     Q.  And how about do you regularly consult with patients

10    regarding a proper use and administration of prescription

11    medications?

12    A.  Patients -- my students who graduate and go as a

13    pharmacy -- as a doctor of pharmacy out there, they deal with

14    patients.  And through those doctor of pharmacies I am also in

15    contact with patients, but personally I'm not involved with

16    patients.

17    Q.  And can you describe for the Court your educational

18    background, please?

19    A.  I'm a pharmacist by training.  I have bachelor's in

20    pharmacy.  I got my bachelor's back in 1974.  I got a first

21    class honors from Punjab University in India.  I got my PhD, my

22    doctorate in pharmaceutics from Brighton University in the

23    United Kingdom.

24    Q.  And what was the subject area of your doctoral research?

25    A.  Major focus of my dissertation was solid dosage forms and

1    formulation development.

2    Q.  And are you involved with or a member of any professional

3    organizations relating to design, development, or use of

4    controlled release formulations?

5    A.  Well, I am a member of numerous societies.  I am a member

6    of the Controlled Release Society.  I am a member of the

7    American Association of Pharmaceutical Scientists.  In fact,

8    I'm a fellow of that organization.  I am a member of the

9    American Colleges of Pharmacy, and a number of other

10   organizations.

11   Q.  And have you been published in the area of oral controlled

12   release formulations?

13   A.  Yes, I have.

14   Q.  Can you describe -- give a summary of the extent of your

15   publications in that area.

16   A.  Sure.  I have published more than 130 peer reviewed

17   publications.  I would say 100 of them relate to control

18   release dosage forms, how they work, how they are formulated,

19   how they are evaluated.  Those publications are all available

20   on my CV.

21   Q.  You mentioned your CV.  Can you turn to PTX 794 in your

22   binder and let us know if that is a copy of your CV, the larger

23   white binder.

24   A.  Sorry, you mentioned PTX?

25   Q.  794.

1   A.  Maybe it is not in this binder.  I found it, yes, it is,

2   indeed.  I'm sorry.  Yes, it is my CV.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And does that CV provide more detail regarding your

2    background and experience in these areas that you have been

3    telling us about?

4    A.  Yes, it does.

5    Q.  Does that provide a more comprehensive listing of your

6    publications in the area?

7    A.  That's right, they are more in details and titles, journals

8    where they were published, and so on.

9         MR. RHOAD:  Your Honor, plaintiffs would offer

10   Dr. Fassihi as an expert in the field of pharmaceutical

11   sciences including, in particular, design, development, and use

12   of oral controlled-release formulations.

13        THE COURT:  All right.

14   Q.  In connection with your work in this case, Dr. Fassihi,

15   have you studied Endo's '122 and '216 patents?

16   A.  Yes, I have.

17   Q.  If you can turn in your binder, the large white binder, can

18   you confirm that they are exhibits PTX 0001 and PTX 0005?

19   A.  Yes, they are.

20   Q.  Is it your understanding those are the two patents in suit

21   that are at issue in this case with respect to the claims

22   asserted by Endo?

23   A.  Yes, I am.

24   Q.  In connection with your work, have you also studied

25   abbreviated new drug applications that have been filed by each

1   of the defendants in this case?

2   A.   Yes, I have.

3   Q.   Have you studied various portions of those abbreviated new

4   drug applications?

5   A.   Yes, I have.

6   Q.   Is a common acronym for abbreviated new drug application

7   "A-N-D-A"?

8   A.   That's correct.

9   Q.   Or ANDA?

10  A.   ANDA, yes.

11  Q.   As a result of the work you have done, have you formed any

12  opinions as to whether the generic extended relief oxymorphone

13  tablets described in each of the defendants ANDAs infringe

14  claims of the two patents in suit, the '122 and the '216

15  patents?

16  A.   Yes, I have.

17  Q.   And what is your opinion?

18  A.   After I have reviewed all the ANDA information and compared

19  it with the patents, they do infringe the patents.

20  Q.   And did you provide a series of reports in this case

21  explaining in detail the basis for your opinions in that

22  regard?

23  A.   Yes, I have.

24  Q.   Do those reports set forth your opinions and the bases for

25  your conclusion that the defendants' tablets infringe the

1   patents in suit?

2   A.   That's correct.

3   Q.   Before we start getting into detail about your opinions in

4   that regard, your Honor, I thought it would be helpful to give

5   a background of the technology and some of the things that we

6   have been talking about and that your Honor has been hearing

7   about.

8          So maybe the first thing we could do, could you

9   describe for the court exactly what an oral -- I mean an

10  immediate release oral dosage form is?

11  A.   Yes, as shown here on the screen, the immediate release

12  dosage form releases substantially all of its drug within a

13  short time frame, maybe, as you can see the animation, the

14  tablet is swallowed and within a few minutes it disintegrates

15  and everything gets absorbed.

16  Q.   And is that, an immediate release oral dosage form, is that

17  something that is compared to a controlled release oral dosage

18  form?

19  A.   If you move to the next slide, please, so controlled

20  release dosage form releases a drug over a long time frame and

21  rate of release is important and where drug is released in the

22  human body.  So the animation, you see the tablet swallowed and

23  then some releases in the stomach; the dosage form moves inside

24  the intestine and continuously releases the drug; and it

25  reaches eventually the point where there is no more drug to

1   come out.

2   Q.  Are there advantages to controlled release dosage forms as

3   compared to immediate release dosage forms?

4   A.  Of course.  If you move to the next slide, please.

5           THE COURT:  Keep your voice up a little more.

6           THE WITNESS:  Sure.  I get closer to the microphone.

7   A.  Controlled release dosage forms, when they are

8   administered, they are administered once a day, maybe twice

9   daily.  They are much more convenient and less disruptive to

10  the patients.  So patients, for example, at night, if you are

11  sleeping, they don't have to wake up and take a tablet.  They

12  also improve patient compliance, and they also provide steadier

13  blood levels, which is also very important to relieve pain.

14  And the therapeutic effect is much longer than immediate

15  release dosage forms.

16  Q.  Can you describe for the court the way controlled release

17  dosage forms work?

18  A.  Sure.  If you would move to the next slide, please.  I

19  believe I have divided how controlled release works into four

20  step.

21          First, drug must be released from the dosage form; and

22  then it should be absorbed into bodily tissues; and then it has

23  to pass through the liver to get into bloodstream; and once in

24  the bloodstream, it will be delivered to where the site of

25  action is.

1  Q.  Let's walk through each of those steps in a little more

2  detail.  Can you explain to the court what it means for the

3  drug to be released from the dosage form and how that works?

4  A.  Would you please turn to the next slide.

5          So release of drug from the dosage form, as I showed

6  in the animation, once the drug is swallowed by the patient or

7  even *in vitro* the drug has to be released first and then it has

8  to be absorbed in order to be therapeutically effective.  Rate

9  of release is very critical in absorption process.  Because if

10  it comes out too fast, then it will be like immediate release,

11  but it has to come out slowly.  And the rate is also affected

12  by everything which is in the GI tract, for example, solubility

13  of the drug plays a role, the type of controlled release

14  delivery system and formulation specifics and also interaction

15  that is happening in the GI tract between food, nutrients, pH,

16  everything else that is in the GI tract with the dosage form,

17  all of that will impact release from the dosage form.

18          THE COURT:  Can you just pause and let me read that,

19  please.

20          THE WITNESS:  Sure.

21          (Pause)

22          THE COURT:  Okay.  Go ahead.

23  A.  So that was the step one that the drug is released.

24          If you move to the next slide, please.

25  Q.  Could you talk to us about an example of one type of

1  controlled release dosage form and the way it operates?

2  A.   Sure.  One type of controlled release systems are referred

3  to as matrix systems, and a matrix system is dosage form that

4  can hydrate and swell.  And I have one schematic here to show

5  you, for example, in zero time there is tablet, and two hours

6  it is hydrated and it is gelled.

7  Q.   Can you explain to us exactly what's shown on these the

8  zero hours?

9  A.   Sure.  In the zero hour it is just a plain tablet which is

10  now placed in the aqueous environment.  In two hours we see the

11  tablet, and around the tablet there is a gel formation and

12  still tablet is there.  In four hours we can see that

13  completely is now converted into a gel.  Next, please.  So

14  here, at eight hours, gel has expanded and all of this is

15  happening while the drug comes out.  And go further, please.

16  At 12 hours you can see that the dosage form is all now

17  degraded and everything is released and dosage form is

18  basically nonexistent.

19  Q.   So this is just one type of controlled release dosage form.

20  There are other types of oral released dosage forms, is that

21  correct?

22  A.   That's right, yes.

23  Q.   But they all must first, as part of the first step, they

24  must release the drug?

25  A.   That is right.  All of the controlled release dosage forms,

1   they have to release in a controlled manner.

2   Q.  So let's move on to the next step, then.  Can you describe

3   the second step in a little more detail for us?

4           THE COURT:  Before we do that, let's take a recess.

5           (Recess).

6           MR. RHOAD:  Your Honor, to orient ourselves here,

7   Dr. Fassihi was in the middle of explaining the four steps that

8   a controlled release dosage product must go through typically

9   to become effective.  We have gone through the first step, the

10  release of the drug out of the dosage form and into the

11  gastrointestinal tract, either the stomach or intestines, and

12  we are going to move on now to the second step in that process.

13          THE COURT:  All right.

14  Q.  Dr. Fassihi, could you please explain to the court the

15  second step in the process by which controlled release dosage

16  forms typically work?

17  A.  Please, if you would go to next slide.  So the second step

18  is about absorption of drug into bodily tissues.  So we talked

19  about the fact that drug has to be released from dosage form

20  and be absorbed to be therapeutically effective.  It is first

21  absorbed into bodily tissues, then we said that presence of

22  food would impact how release is happening, how dosage form

23  passes through the GI tract and physical/chemical properties of

24  the drug, such as molecular weight, permeability, the stability

25  in the GI tract, all of that will impact absorption.

1      So if you move to the next slide, please, so this is a

2 tablet which releases drug --

3 Q.  Just so the court is clear, you are now moving on to the

4 third step in the process.  It has been released from the

5 dosage form, it has been absorbed into the bodily tissues, and

6 now we are moving on to the third step, is that right?

7 A.  That is correct, yes.

8      So drug is now released in the GI tract and, as I have

9 shown here on this slide, it gets into bodily tissues which are

10 epithelial cells.  It goes into a major vein called portal

11 vein.

12 Q.  Can you point out for the court where exactly it is?

13 A.  Sure, sure.  On all the three red paths that lead into

14 portal vein to the left-hand side of the slide, we can see

15 that, and portal vein goes into the liver.  In the liver, part

16 of the drug is metabolized, and after that drug molecules going

17 into bloodstream, as it is shown, on the upper part of the

18 liver.

19 Q.  Now, you said that in the liver the drug is metabolized.

20 What do you mean by the term "metabolized"?

21 A.  Every drug that goes through the liver, depending what type

22 of drug it is, portion of that would be subjected to enzymes

23 which are present, so -- thank you for the slide -- so enzymes

24 in the liver can break down the drug.  That is called

25 metabolism.  Extent of metabolism of course depends on

1    different drugs behave differently.

2           The rate of delivery of the drug to the liver also has

3    something to do with the metabolism.  For example, if

4    everything is poured into liver, it can saturate the enzyme and

5    more of drug goes into blood circulation.  When it goes slower,

6    the chances for greater metabolism is always there.

7    Q.  A term that has been discussed some in this case before you

8    took the stand is a term "bioavailability."  Can you explain to

9    the court what that term is?

10   A.  If you would move to the next slide, please.  So we talked

11   about drug metabolism and here bioavailability, so on the

12   right-hand side I have this schematic which represents, for

13   example, if we give a drug, a dosage form which has 100

14   milligram of the drug in it, the blue color on the right-hand

15   side, if, for example, 60 milligram of that 100 milligram is

16   absorbed, we say it has bioavailability of about 60 percent.

17   Q.  You are saying 60 milligrams gets absorbed?

18   A.  Into the bloodstream.

19   Q.  Into the bloodstream.

20   A.  That's correct.

21          And the orange example is, again, another drug which

22   has 100 milligram as an example in the dosage form and when it

23   is swallowed by the patient and drug is released, what gets

24   into blood circulation is only 10 percent of 100 milligram,

25   that is 10 milligram, one-tenth.  So in this case we say

1   bioavailability is 10 percent.

2          So basically the definition which I have put on the

3   left-hand side of the slide "bioavailability" measures how much

4   of the administered drug gets past the liver and becomes

5   available in the body.  And those were the examples which I

6   have shown.

7   Q.  And is one of the reasons why a drug would have a

8   bioavailability that is less than 100 because of this

9   metabolization or the metabolism that occurs in the liver?

10  A.   That is correct, that is correct.  So every drug has

11  different percent bioavailability.  Some drugs, like the orange

12  one, whatever it is, it has bioavailability of 10 percent.  The

13  other one has bioavailability which is 60 percent.  And this

14  generally happens.  But if you give something IV, for example,

15  we introduce 100 milligram into blood circulation, so that is

16  yardstick against which we can measure.

17  Q.  So now we have covered the release of the drug from the

18  dosage form, the absorption into the bodily tissues, the

19  passage through the liver and the bloodstream.  What's the next

20  step, the fourth step in the process?

21  A.   Yes, if you go to the next slide, please, once the drug

22  pass the liver and it is now in the blood circulation, it

23  reaches the site of action, and that is the therapeutic effect

24  is observed at this stage.

25  Q.  Let's return for just a moment to the first step in the

1    process, the release of the drug or the dissolution of the drug

2    out of the dosage form, and talk about some of the things and

3    some of the equipment that the judge has heard a little bit

4    about already.

5            So if you can first tell us, is there a test that

6    formulators use to measure this first step, to measure how much

7    of the drug is released from the dosage form?

8    A.  Yes.  When we develop dosage form, we evaluate *in vitro*,

9    see how much drug is released.  If you go to the next slide

10   please, the way we measure is referred to as dissolution

11   testing.

12   Q.  It refers at the top to *in vitro* dissolution testing.  What

13   does the word *in vitro* mean.

14   A.  *In vitro* means we are doing it in the laboratory and

15   nothing to do with the human body yet, but in the lab, in the

16   laboratory.

17           So in the middle of this slide we have a vessel that

18   is shown.  We have some medium, some aqueous medium, in that

19   vessel.

20   Q.  When you say "aqueous medium," what do you mean by that?

21   A.  It means water, for example, water or medium which has

22   certain pHs; and then we have a tablet, that is the red tablet

23   at the bottom of the vessel; and then we have a paddle, which

24   basically we set it up, and if you move to the next slide,

25   please, so here this is a typical dissolution apparatus.  There

1    are many types of dissolution apparatuses, and this is one

2    version.  As you can see, the blue colors are the vessels.  So

3    in this particular apparatus we have about eight or seven

4    vessels and each of them has a medium in it, medium is that

5    water, the blue color here.  There a paddle, and you put the

6    tablet and we set the machine, it rotates, and dissolved drug

7    is measured automatically.

8    Q.  You mentioned there are a couple -- there are different

9    varieties of equipment.  Can you explain to us a couple typical

10   ones?

11   A.  Sure.  So these are just two typical apparatus, types that

12   are used.  One is vessel with a paddle in it.  The other one is

13   vessel with a basket in it.  So they are referred to by *United*

14   *States Pharmacopoeia*, which is a standard book that we work

15   with.  One is called apparatus one and one is two.  So the one

16   on the left-hand side is the paddle measure, or apparatus two;

17   the one on the right-hand side is a basket measure, or

18   apparatus one.

19   Q.  Am I correct that on the one on the right the dosage form

20   of the pill is inside the basket?

21   A.  That's correct.  So these are two different types, the way

22   they operate.  As you can see, on the right-hand side, the

23   tablet is in the basket; and in the other one, tablet is at the

24   bottom of the vessel.  So these are two different apparatuses

25   which are recognized in pharmaceutical companies.

Fcq2end3                    Fassihi - Direct

```
 1  Q.  Are you familiar with the terms either "dissolution curve"

 2  or "dissolution profile"?  I think the judge has heard those

 3  terms somewhat through now.  Can you tell us what those terms

 4  mean?

 5  A.  Once we do the dissolution measurements, if you move to the

 6  next slide, please, so here we have on the Y axis, which is on

 7  the left side, percent of the drug which is released; and on

 8  the X axis we have time.  So if you, for example, start

 9  dissolution machine and we collect data points, as shown here,

10  so if you would go further, please.

11  Q.  So these are points in time, a percent of drug released

12  that's measured at a particular point in time?  Is that

13  correct?

14  A.  That's right, yes.  If you continue that until all the drug

15  is out of the dosage form so, as you can see on the top, you

16  can please run the curve to it, so this is how a dissolution

17  curve is obtained, and the conditions of course have to be

18  defined, and both condition we achieve this curve.  So this is

19  called dissolution curve.

20  Q.  You earlier talked about immediate release dosage forms as

21  compared to controlled release dosage forms.  Is there a

22  difference in the typical dissolution curve that you see for

23  immediate release dosage forms as compared to the controlled

24  release dosage forms?

25  A.  Sure.  If you would move to the next slide, please.  Here
```

1  there is also animation which we pass, okay, so here is the

2  comparison between immediate release tablets and controlled

3  release.  The red curve shows what happens with the immediate

4  release.  Practically all of the drug is dissolved within maybe

5  15 minutes, 30 minutes.  The blue line shows the controlled

6  release.  As we can see here, slowly drug comes out over a

7  number of hours, it could be up to 12 hours, sometimes up to 24

8  hours.

9  Q.  So on the left-hand side, again, this is the amount of drug

10 that's released, the percent of drug that's released out of the

11 dosage form?

12 A.  That's correct.

13 Q.  And then as time is going on, as you move further right,

14 that is farther in time?

15 A.  That's right, yes.

16 Q.  So let's then go back to the second and third steps in the

17 process.  So the absorption of the drug into the bodily tissues

18 and then eventually into the bloodstream.  Are there tests that

19 drug developers -- or during the drug development process that

20 are used to measure the rate and extent to which a drug is

21 absorbed by those processes into a subject bloodstream?

22 A.  Sure.  Those are referred to as *in vivo* data.  So here, if

23 you please move to the next slide, so when we measure amount of

24 drug in the bloodstream, how it gets there, how fast, how --

25 what is the duration, those kind of information that we

Fcq2end3                    Fassihi - Direct

1   gathered are referred to as pharmacokinetic data or

2   pharmacokinetic information.  Basically pharmacokinetic data is

3   used in clinical practice to ensure that drug is administered

4   safely and effectively.  It also shows the extent of drug

5   absorption, how much drug is absorbed, how it is distributed in

6   the body, and metabolism and as elimination.

7   Q.  We are talking in connection with the first step, drug

8   dissolution, there was a drug dissolution curve that we just

9   looked at.  Is there similarly a pharmacokinetic curve that is

10  oftentimes drawn when we are dealing with the amount of drug

11  absorbed into the bloodstream and we are talking about

12  pharmacokinetics in the body?

13  A.  Of course.  If you would move to the next slide.  So just

14  very similar to the dissolution curve which we had *in vitro*,

15  here this is actual curve that one gets *in vivo*, in human body.

16  And as you can see on the Y axis is amount of drug in the

17  blood, in the plasma or blood, and on the X axis is time.  So

18  this curve as a whole is called pharmacokinetic curve.

19  Q.  Can you show us how this curve is developed and put

20  together.

21  A.  Sure.  If you would move to the next slide, please.  So

22  here drug is administered to the patient or to the subject, a

23  person, and blood samples are drawn as time goes on.  So

24  whatever is absorbed, we can take blood sample and measure.

25  For example, this is one time point.  If you move on, please,

1   so continue, please.  So in this manner we collect blood

2   samples and we measure how much drug is in that blood sample

3   and we plot the curve, if you would pass the line through it.

4   So this is a pharmacokinetic curve that we can obtain.  It is

5   called PK curve sometime.

6   Q.  Just so we are clear here, can you describe for the court

7   exactly what the Y axis or the horizontal --

8              THE COURT:  Just go back to that.  Let me look at the

9   slide for a minute.

10             (Pause)

11             THE COURT:  What are the two axes?

12             THE WITNESS:  The Y axis, your Honor, to the left-hand

13  side is -- demonstrates how much of the drug is in the blood

14  and the other axis which shows time --

15             THE COURT:  Time, all right.

16             THE WITNESS:  -- is basically over what time frame,

17  how long.

18             THE COURT:  Okay.  Very good.  Go ahead.

19  BY MR. RHOAD:

20  Q.  Is there a concept known as a therapeutic window in this

21  area?

22  A.  Yes.  If you would move to the next slide, please.  So in

23  the middle of this slide you see an open wide window, which I

24  highlighted as therapeutic window.  So whenever a drug is

25  administered, blood levels need to reach that window in order

1    to be effective.  In other words, if a small amount of drug

2    gets into the body, it will be too little.  You may not see any

3    effect.  So therapeutic window basically is where drug

4    concentration is going to be therapeutically effective.

5            If you would move to the next slide, please.  So here

6    it is an example when we have given a dosage form, but it is

7    absorbed, but it has never reached the therapeutic window, so

8    it is not going to be effective.

9    Q.  And that is because not enough of the drug has gotten into

10   the bloodstream?

11   A.  That is correct.  And if you move on to the next

12   possibility, so if the drug gets into the bloodstream too fast,

13   it might actually exceed the upper portion of therapeutic

14   window, which we call it safe concentration.  It goes in to

15   gray area.  Gray area usually is an area where toxicity or side

16   effects are observed.

17           So ideally what we want to have, if you move to the

18   next curve please, ideally we want absorption to happen and

19   concentration of drug to remain in the therapeutic window as

20   long as possible.

21           So one thing that controlled release dosage form do

22   is, if they are well designed, that is what they would provide,

23   and this is therapeutically effective and very useful.

24   Q.  Just like we saw with dissolution curves that there was at

25   least a somewhat typical dissolution curve for immediate

1    release dosage form versus the controlled release dosage forms,

2    are there typically differences when we are looking at

3    pharmacokinetic curves in terms of the shapes of the

4    pharmacokinetic curves between immediate release and controlled

5    release dosage forms?

6    A.   Of course, just like dissolution.  If you go to the next

7    slide, please.  So here, if we give it immediate release dosage

8    form, it gets absorbed very quickly, it reaches the therapeutic

9    window, but it also declines.  So it peaks and then it goes

10   down.  If you continue administering this -- I'm sorry, if you

11   would move to next one, yes, so here, for example, with

12   immediate release, the problem is that we give them, they get

13   absorbed, peak and then they go down.  As they go into the

14   yellow area, that is where there is no efficacy.  That is

15   where, if the patient is suffering from pain, during that time

16   period which is in the yellow, that patient would suffer from

17   pain.  And, as you can see, there are peaks and troughs.  In

18   one day, for example, with immediate release, you may have to

19   give three, four, sometimes five different dosages in order to

20   keep blood levels in the therapeutic window.

21   Q.   How about for a controlled release dosage form?  Can you

22   show us a typical -- do you have a slide to show us a typical

23   pharmacokinetic curve for a controlled release product?

24   A.   Yes.  On this slide, as we have already talked about, this

25   is a controlled release pharmacokinetic curve that we can

1  achieve.  So here, for example, we give once-a-day dosage.  And

2  if you go on and continue on this, so if we give multiple doses

3  every 12 hours for number of days, the advantage of controlled

4  release is that blood levels would remain within therapeutic

5  window.  We don't have those sharp peaks and troughs.  So this

6  is in terms of therapeutic efficacy and convenience for the

7  patient.  This is what we are looking for.

8  Q.  Are we -- in this particular slide, are we looking at

9  PX4002.38?

10  A.  That is correct.

11  Q.  Is another term for pharmacokinetic curve a PK curve for

12  short?

13  A.  Yes, we can refer to PK curve as pharmacokinetic curve,

14  sure.

15  Q.  And the PK is short for pharmacokinetic?

16  A.  Yes.  PK is short for pharmacokinetics.

17  Q.  Are there PK values or pharmacokinetic values that are

18  oftentimes calculated in connection with studies of how much

19  blood is absorbed into a subject's bloodstream?

20  A.  Of course.  So just if you go to the next slide, please, so

21  here this is a pharmacokinetic curve and, as you can see, it

22  reaches certain level, maximum concentration within therapeutic

23  window.  That concentration is referred to as C max value.

24  Q.  Does the C max, does the C stand for something?

25  A.  Concentration of the drug in the plasma, in the blood, as

1    shown also here.

2    Q.  And how about the max, what does the max part of C max

3    stand for?

4    A.  Means maximum level that has reached, and C max basically,

5    as I have put on the slide, maximum concentration of drug in

6    bloodstream.

7    Q.  What is the significance of the C max value when analyzing

8    the PK data, pharmacokinetic data?

9    A.  C max plays a major role, of course, because, first of all,

10   we like the C max to be within therapeutic window so that it is

11   effective.  If it is in the yellow area, which I talked about,

12   it is not effective.  If it is, the C max goes in the gray area

13   which I was talking earlier, it is going to be toxic and lots

14   of side effects.  So controlled release dosage forms provide a

15   C max that would get there.  It might not be same as immediate

16   release.   Immediate release C max is very quick.  Controlled

17   release would happen with a delayed time, but it gets there.

18   Q.  Is there another pharmacokinetic term cited in the patent

19   referred to as AUC?

20   A.  Yes, there is.

21   Q.  Can you explain to the court what AUC stands for and what

22   it represents?

23   A.  So we saw how drug is absorbed, and basically the

24   pharmacokinetic curve has the measurement that we do, we

25   measure how much is the surface area under that curve.  So the

Fcq2end3                    Fassihi - Direct

1   blue line is the curve, and we measure the surface area that

2   curve covers.  We call it area under the curve.  So area is

3   surface area and it represents, as I have shown on this slide,

4   extent of absorption.

5   Q.  So when we are talking about area, that's like if you have

6   a rectangle, the area of the rectangle is the length times the

7   width of the rectangle, is that right?

8   A.  That is correct, yes.

9   Q.  But here they are calculating using calculus and other

10  things exactly what the area underneath of this pharmacokinetic

11  curve is?

12  A.  That is correct.

13  Q.  And in the patent we see the term AUC and then a

14  parenthetical, parentheses come after it and it says zero to

15  INF or zero to a number.  Could you explain to us what that

16  means?

17  A.  Sure.  If you would turn to the next slide, whenever we

18  measure area under the curve, we measure it between zero area,

19  that is time of administration until basically an extended time

20  frame that we call infinite.  So what you see on the top of

21  this slide is, A, you see in parenthesis you can see zero to

22  infinity, basically means the full curve, full area under that

23  curve.  Sometimes there are different representations.  For

24  example, we can show AUC from zero to, in this case, from the

25  slide I have, 18, it could be zero to 24.  So we have that

444 of 106

Fcq2end3                    Fassihi – Direct

1    option.  But for mainly we are using entire area under the

2    curve.

3                    (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F3QTEND4                      Fassihi - direct

1          MR. RHOAD:  And just for the record, the area under

2     the curve slide that we showed was PX4002.41, and the PK curve

3     showing the C max value was 4002.39.

4     Q.  Coming back then, can you tell us the significance of this

5     PK value referred to as AUC?

6     A.  Sure.  So AUC basically shows how much of the drug has

7     reached blood circulation.  We call it extent of absorption, so

8     that is it absorption to the full extent.  So every dosages

9     form has different strengths, and depending what strength is

10    used, we can measure extended absorption.

11    Q.  And the extent of the absorption, how does that relate to

12    the significance in terms of if the patient gets the drug, what

13    is the AUC?  What is the significance of that in terms of the

14    impact on a patient?

15    A.  It is very significant, because the AUC shows how effective

16    and safe the drug can be.  So for example, as I showed earlier,

17    if the AUC is too small, it is not going to be effective.  If

18    it is too large, it could be toxic.  But here we have an AUC

19    that is within the therapeutic window, so obviously therapeutic

20    efficacy and safety of the drug is directly related to AUC.

21    Q.  With some of that background involved about some of the

22    background principles of controlled release dosage forms and

23    some of the values that are measured during the process of drug

24    delivery, let's turn to the patents in suit that we're talking

25    about here, the '122 and the '216 patent.  Could you kind of

1    give the Court a brief overview of exactly the nature of the

2    '122 and '216 patents and what they teach and describe in terms

3    of the invention?

4    A.   Sure, if you move to next slide, please.

5         THE COURT:   If possible, I have those patents in this

6    binder.  Is it possible that somebody has loose copies?

7         MR. RHOAD:   We have extra copies we could hand up to

8    Court if the Court would like.

9         THE COURT:   I would appreciate that.

10        MR. RHOAD:   Your Honor, we'll try to staple them so

11   you don't lose pages.

12        THE COURT:   All right.

13        MR. RHOAD:   We'll have clips for you instead of

14   stapled.

15        THE COURT:   That's fine, very good.

16   BY MR. RHOAD:

17   Q.   So you were going to give us an overview of what the '122

18   and '216 patents are about.

19   A.   Sure.  So I looked at the patents, and the patents are

20   about treating pain.  So in the patent they have specified in

21   different areas, which I have highlighted here, that pain, of

22   course, is something that we all suffer from from time to time,

23   but there are millions of people that are chronologically in

24   pain.  And it was not addressed properly.  I think earlier on

25   Dr. Lee mentioned, and I agree, that there was problems with

1    treating pain.  So there was a need to find something better

2    that would help patients.  So instead of giving a dosage form

3    every four hours, there was a need to give a controlled

4    release.

5            So if you move to next step, please, so controlled

6    release formulation of oxymorphone was needed to overcome these

7    issues.

8    Q.  And were there --

9            THE COURT:  I'll tell you what, sorry, I was looking

10   down at the patent.  Can you go over this slide once more,

11   please?

12           THE WITNESS:  Sure.  This slide, your Honor, or the

13   prior one?

14           THE COURT:  Let's look at the prior one.

15           THE WITNESS:  Yes.  So your Honor, here the patent is

16   talking about pain, and they do talk, for example, third line

17   in the upper paragraph, many millions of people in the U.S.

18   suffer from pain.

19           THE COURT:  Now look, what is being shown here, part

20   of the patents or what?

21           THE WITNESS:  Yes, they are part of the specifications

22   of the patent, your Honor.  Below each box they refer to patent

23   '122, and column one is mentioned, and lines 16 through 20 in

24   the patent.  And for example, the last paragraph shows that the

25   schedule, rather than as needed administration of opioids, is

1    currently recommended the guidelines for chronic pain, and this

2    has come from column one, lines 47 and 50 of the '122 patent.

3                 THE COURT:  I think I better take a minute and read

4    this.

5                 THE WITNESS:  Sure.

6                 THE COURT:  Go ahead.

7    BY MR. RHOAD:

8    Q.   So Dr. Fassihi, in that middle cut out from column one,

9    lines 39 to 45, it talks about regular administration of an

10   analgesic is generally required to ensure that the next dose is

11   given before the effects of the previous dose have worn off.

12   Do you see that?

13   A.   Yes.

14   Q.   What is an analgesic?

15   A.   An analgesic is a dosage form that relieves pain.

16   Q.   When it's talking about having regular administration to

17   ensure that the next dose is given before the effects of the

18   previous dose has worn off, how does that relate to your

19   explanation before when talking about the PK curves?

20   A.   I showed on the slide with immediate release dosage forms

21   that they are rapidly absorbed and there are peaks and troughs.

22   Troughs are levels of the drug in the blood that go into that

23   yellow area that we're talking about.  This one exactly.  So

24   what it means in that paragraph, in that statement in the

25   patent, is that instead of having multiple administration, we

1    can give one dosage and achieve, I think we were --

2    Q.  You want to go back to that?

3           Let's go back to the slide where -- this is what you

4    were talking about the troughs and the immediate release?

5    A.  That's right.  As we can see here, the statement in the

6    patent talks about regular administration, so that before the

7    pain comes back, we give another dose.  So very inconvenient,

8    multiple administration, three, four, five times a day to treat

9    pain.  So that is what they talked about.

10   Q.  When it's talking about regular administration, so you give

11   it before the next dose wears off, how does that relate to the

12   controlled release curve that we looked at earlier?

13   A.  If you go to that curve, if you would, please, so

14   controlled release, as we can see here, the drug remains in the

15   therapeutic window, and we only give it once a day, that is

16   every twelve hours or sometimes twice a day, basically.

17   Q.  Twelve hours, is that twice a day?

18   A.  Well, every twelve hours, twice a day.  So the blood levels

19   remain in the therapeutic window and the patient is -- mainly

20   the pain is not there any more.

21   Q.  If we go back to the slide, which is PX 4002.45 where we

22   were looking at some of the statements in the patent.

23   A.  Yes.  So if you would go to the next step, please.

24          So based on this -- so this is a different excerpt

25   from the patent '122.

1  Q.  Are these all still from column one?  These are three

2  different excerpts from column one of the '122 patent, is that

3  right?

4  A.  That is correct.

5  Q.  And the same language also appears in the '216 patent, is

6  that right?

7  A.  That is right, yes.  So here the top one talks about

8  oxymorphone, which is marketed as an injection.  It is also

9  available as a suppository.

10  Q.  So an injection is then something that is injected directly

11  into the bloodstream, it's not taken orally, is that right?

12  A.  That is correct.  So this is what was available regarding

13  oxymorphone.

14  Q.  At the time the patents were filed?

15  A.  That is correct.  So there was also at one time the

16  immediate release dosage form that was used, but it was taken

17  off market for some reason.  And we knew that there was a need

18  for pain prevention, so controlled release formulation was

19  something that the inventors of the patent came up with.  So

20  they developed this formulation so that it can be used on a

21  daily basis to prevent pain.

22  Q.  What do we see on this next slide again.  Are these all

23  excerpts from column two?  This is on slide PX 4002.47.  Are

24  these all excerpts from column two of the '122 patent?

25  A.  That's correct.

1   Q.  And this language appears as well in the '216 patent?

2   A.  Yes, it does.  And again we read here on this slide it

3   talks about drug metabolism and so on.

4   Q.  And the drug metabolism, that's what you were talking about

5   what happens in the liver as part of that third step in the

6   process, is that right?

7   A.  That's correct.  In the middle section of this slide it

8   talks about oxymorphone is metabolized basically in the liver

9   resulting in an oral bioavailability of about ten percent.

10  Q.  That was the oral bioavailability where you showed the ten

11  percent and then the 60 percent.  If we can go to the slide

12  that showed that.

13          Well --

14  A.  Yes, the slide that --

15  Q.  Sorry here we are.  Thank you.

16          So if we can go -- this is the slide where you were

17  talking about bioavailability.  So oxymorphone has a

18  bioavailability as reported in the patent of ten percent, like

19  in the orange on PX 4002.16, is that right?

20  A.  That is correct, yes.

21          Basically there was a need for controlled release

22  formulation.  The patients needed that, but no one really

23  thought of using oxymorphone except the inventors of the

24  patents.

25  Q.  And so what is the -- what is it that the patentees

1    invented as described in the patent?

2    A.  Well, the summary of the invention -- and I read that from

3    the slide -- this invention provides methods of relieving pain

4    by administering the controlled release pharmaceutical tablet

5    which contains oxymorphone which produces at least

6    predetermined minimum blood plasma levels for at least twelve

7    hours after dosing with tablets that produce the sustained pain

8    relief over time period.

9    Q.  And can you describe for the Court at a sort of high level

10   what the nature of the invention is that is taught in claim --

11          Before we get there, let's look, is there PK curves,

12   the curves that show the amount of drug that gets into the

13   bloodstream that are reported in the patent?

14   A.  Yes, this is figure five from '122 patent.  And here in

15   this figure, which these are excerpts from figure five that are

16   presented here, so we have an immediate release oxymorphone

17   which is administered to a subject, to a human subject, and you

18   can see how fast it is absorbed.  It peaks and then rapidly

19   comes down.

20   Q.  And immediate release is denoted there IR in the red, is

21   that right?

22   A.  Right.  IR stands for immediate release.

23          And the blue curve is a controlled release oxymorphone

24   formulation that was administered.  And as you can see,

25   absorption is much slower.  The peaks are much lower.  In other

1    words, this is where the therapeutic window was that I was

2    talking about.  So these peaks, these blood levels that we see

3    for the blue CR stands for controlled release.  So this is a

4    typical curve for controlled release here in this figure and

5    shows the differences between IR versus CR.

6    Q.  Does the patent also include figures that relate to pain

7    relief that was seen by subjects who received a dose of the

8    controlled release oxymorphone tablets described in the

9    patents?

10   A.  Sure.  If you would move to next slide, here this is a

11   figure two from the '122 as well as '216 patent.  And if you

12   look at the highlighted yellow curve and values which are

13   mentioned, on the Y axis we have pain intensity differences or

14   basically supression of pain.  So the curve, as we can see, is

15   arrived from patients that were given oxymorphone and the pain

16   was measured.  So this curve shows that over time, over a

17   two-hour period after that administration of the oxymorphone

18   tablet, the pain was controlled, it was suppressed, as you can

19   see the curve is continuously coming down.  So that shows that

20   the pain relief is there.

21            THE COURT:  All right.  Tomorrow we'll start at 11:30,

22   please, 11:30.

23            (Adjourned to March 27, 2015 at 11:30 a.m.)

24

25

INDEX OF EXAMINATION

Examination of:                                Page


DAVID LEE

Cross By Mr. Sabharwal . . . . . . . . . . . 352

Redirect By Mr. Black  . . . . . . . . . . . 405

Recross By Mr. Weiss . . . . . . . . . . . . 415


REZA FASSIHI

Direct By Mr. Rhoad . . . . . . . . . . . . 418


DEFENDANT EXHIBITS

Exhibit No.                                Received

 9000    . . . . . . . . . . . . . . . . . 417