F3RTEND1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ENDO PHARMACEUTICALS, INC.
    and GRUNENTHAL GMBH,
4
                    Plaintiffs,
5
                v.                          12 Cv. 8060 (TPG)
6
    TEVA PHARMACEUTICALS USA, INC.,
7   and BARR LABORATORIES, INC.,

8                   Defendants.

9   ------------------------------x

10                                          New York, N.Y.
                                            March 27, 2015
11                                          11:40 a.m.

12  Before:

13                  HON. THOMAS P. GRIESA

14                                          District Judge

15                      APPEARANCES

16  DECHERT LLP
            Attorneys for Plaintiffs
17  BY:  MARTIN J. BLACK
         ROBERT D. RHOAD
18       JONATHAN LOEB
         KEVIN FLANNERY
19       JULIE M. LATSKO

20  FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
            Attorneys for Plaintiffs
21  BY:  BASIL J. LEWRIS
         JENNIFER H. ROSCETTI
22       JOANN M. NETH

23  GOODWIN PROCTER, LLP
            Attorneys for Defendant Teva
24  BY:  BRIAN ROBINSON
         DANIEL MARGOLIS
25       ELIZABETH HOLLAND
         HUIYA WU

F3RTEND1

1                     APPEARANCES (Cont'd)

2

HOLLAND & KNIGHT, LLP
3        Attorneys for Defendant Actavis
BY:  CHARLES A. WEISS
4        ERIC H. YECIES

5  LOCKE LORD LLP
         Attorneys for Defendant Roxane
6  BY:  KEITH D. PARR
         ALAN B. CLEMENT

7

WINSTON & STRAWN LLP
8        Attorneys for Defendant Impax/ThoRx
BY:  GEORGE C. LOMBARDI
9        MAUREEN L. RURKA

10  KNOBBE MARTENS OLSON & BEAR LLP
         Attorneys for Defendant Ranbaxy
11  BY:  WILLIAM ZIMMERMAN
         CAROL PITZEL CRUZ

12

STERNE, KESSLER, GOLDSTEIN & FOX
13        Attorneys for Defendant Amneal
BY:  KEETO SABHARWAL
14        UMA EVERETT
         PAUL AINSWORTH
15        RAMI BARDENSTEIN

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Let's resume with this witness.

3          MR. RHOAD:  Good morning, your Honor.  We wanted to

4   let your Honor know that there was a scheduling issue with one

5   of the defendants' witnesses.  So what our plan was for this

6   morning is that I would continue my examination of Dr. Fassihi,

7   to get to a convenient breaking point hopefully in maybe 45

8   minutes or so.  At that point we would be willing --

9   reluctantly, but we would be willing to stop our examination to

10  allow the defendants to present a witness, Dr. Deer, who needed

11  to testify today.  He will hopefully starting before the lunch

12  break and continue after the lunch break, and then we could

13  finish him, and if there's more time, I will resume my

14  examination of Dr. Fassihi, if that's okay with your Honor.

15         THE COURT:  Of course it's okay.

16         MR. RHOAD:  Okay.  So just to reorient ourselves, your

17  Honor, yesterday Dr. Fassihi went through the background of the

18  technology and explained how drugs are released -- have to be

19  released in the body, absorbed into the bodily issues, go

20  through the liver, get into the bloodstream in order for them

21  to become therapeutically effective.  He talked about the

22  dissolution curve and dissolution equipment and how that is

23  drawn, as well as the pharmacokinetic curve or PK curve that

24  reflects how much of the drug actually gets absorbed into the

25  body.

F3RTEND1

1          Then he talked about, if you look at these slides as

2     he went through the patent about the problem of chronic pain,

3     that there were some oxymorphone formulations that were on the

4     market in terms of an injectable product and suppository, and

5     that the patentees believed there was a need for a controlled

6     release oxymorphone.

7          And so let me continue with that point.  I think

8     that's where we are.

9          THE COURT:  Go right ahead.

10     REZA FASSIHI,   (Continued)

11          called as a witness by the Plaintiffs,

12          having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. RHOAD:

15    Q.  Do you understand that when we're talking about patents and

16    we're talking about claimed inventions that the claimed

17    invention is what is in the claims of the patent that come at

18    the end of the patent?

19    A.  That's correct, yes.

20    Q.  So the patent -- the claims at the end are what define the

21    claimed invention?

22    A.  Yes.

23    Q.  And so we'll get into the specifics of some of the claims

24    and the claim limitations in a minute, but can you describe for

25    the Court at a high level what the nature of the claimed

1    inventions are that are taught and claimed in the '122 and the

2    '216 patents?

3    A.   Sure.  As I have shown on this slide, '122 and '216

4    patents, they have claims that relate to controlled release

5    oxymorphone formulation that would achieve specified

6    dissolution and pharmacokinetic parameters which I went over

7    also yesterday.  This was discovered by Endo, and it was safe

8    and effective, and it provided twelve hours of pain relief.

9    Q.   And so let's look at a couple of representative --

10               THE COURT:  Can I read this another minute?

11               MR. RHOAD:  Sure.

12               (Pause)

13               THE COURT:  Go ahead.

14   Q.   So Dr. Fassihi, let's look at a couple of representative

15   claims and walk through them limitation by limitation so we can

16   see what exactly the claims are directed to.  And let's start

17   with claim 19 of the '122 patent.  Okay?

18   A.   Yes.

19   Q.   If you could walk us through that claim, please.

20               THE COURT:  Let me get that.

21               MR. RHOAD:  It will be up on your screen, your Honor,

22   if you would like to look at that, which may be more convenient

23   because we highlighted particular sections.

24               THE COURT:  Sure.

25   A.   On this slide, claim 19 of '122 patent, it talks about an

1    analgesically effective controlled release pharmaceutical

2    composition with a twelve-hour dosing interval in the form of a

3    tablet.

4    Q.  And just to review, analgesically effective, what does that

5    manner?

6    A.  That means it would relieve pain with a dosing interval

7    that is mentioned here every twelve hours after administration.

8    Q.  Let's go to the next limitation in claim 19.

9    A.  The limitation -- another limitation of claim 19 is that it

10   talks about oxymorphone pharmaceutically -- oxymorphone or

11   pharmaceutically accepted salt of oxymorphone.  That would be a

12   sole active ingredient.

13          THE COURT:  I want to interrupt and get better

14   acquainted with the patent.  So claim 19 is where in the

15   patent, what column?

16          MR. RHOAD:  26, your Honor.

17          THE COURT:  All right.  Go ahead.

18          MR. RHOAD:  Do you want to us go back and start over

19   again?

20          THE COURT:  I would appreciate that.

21   Q.  Dr. Fassihi, can you start at the beginning of claim 19

22   again and start to walk us through each limitation.

23   A.  Sure.  The first limitation of claim 19 is that claim 19

24   talks about an analgesically effective controlled release

25   pharmaceutical composition with a twelve-hour dosing interval

F3RTEND1                    Fassihi - direct

1    in the form of a tablet.

2    Q.  And as you just explained to us, analgesically effective

3    means it's effective in relieving pain, is that right?

4    A.  That's correct.

5    Q.  And a controlled release pharmaceutical composition, those

6    are the controlled release dosage forms you were explaining to

7    us about yesterday?

8    A.  That's correct.

9    Q.  And this is one that has a twelve-hour dosing interval?

10   A.  That is right.  So if we move to the next slide, another

11   limitation of the claim is that the active -- it is an

12   oxymorphone or salt of oxymorphone.

13   Q.  Let me stop you there.  It says a salt of oxymorphone.  Is

14   oxymorphone hydrochloride a pharmaceutically acceptable salt of

15   oxymorphone?

16   A.  That is correct, yes.

17   Q.  And in fact in all the tablets, what is the active

18   ingredient in those tablets?

19   A.  Oxymorphone hydrochloride.

20           THE COURT:  Let me look at this another minute.

21           MR. RHOAD:  Sure.

22           THE COURT:  Go ahead.

23           THE WITNESS:  Shall I go over this, your Honor, or the

24   next slide?

25   Q.  Why don't you -- so you started this limitation we have on

1   the screen on PX 4002.54, and you said it had to have

2   oxymorphone or pharmaceutically acceptable salt thereof, and if

3   you continue from that point.

4   A.  That is the sole active ingredient in the tablet, and it is

5   a controlled release delivery system.  It is comprising

6   hydrophilic material that forms a gel upon exposure to

7   gastrointestinal fluid.

8   Q.  So is that -- it says controlled release delivery system,

9   is that the thing that provides the controlled release of the

10  dosage form?

11  A.  That is correct.

12  Q.  And the hydrophilic material that forms a gel, is that one

13  of the examples of a controlled release dosage form that you

14  discussed yesterday?

15  A.  That is right, yes.

16  Q.  And if we could go maybe to that slide, slide 12.

17  A.  So this is a slide that I showed yesterday.  So a

18  controlled release tablet that makes a gel is described here on

19  this slide.  So there is a tablet at zero hours, and then in

20  the aqueous environment of the gastrointestinal tract it

21  hydrates, swells, as you can see in two hours, four hours,

22  eight hours, and it starts degrading and releasing drugs

23  continuously, and by twelve hours nothing of this system is

24  left.

25  Q.  Let's go back then to where we were in the claim

F3RTEND1                     Fassihi - direct

1    limitation.

2    A.   Sure.  So another limitation -- so this is a gel forming

3    that we talked about, if you go to next slide.

4         Another limitation of claim 19 relates to specifics of

5    dissolution testing.  And I showed on slides yesterday how

6    dissolution care is obtained, and condition of that dissolution

7    is described here, USP paddle method.

8         THE COURT:  I'm not understanding you now.  Take it a

9    little slower.

10   Q.   Maybe if we could go to back to slide 20.

11   A.   So your Honor, one of the limitations relates to

12   dissolution studies, and this is an apparatus that I was

13   talking yesterday that put the tablet into these vessels, which

14   are blue in color and they have medium in them, the paddle

15   which is inside rotates.

16        Then go to the next slide where dissolution curve is

17   there.  So this is a dissolution curve that we are talking

18   about.  So the tablet releases the drug, we measure it, and

19   then we plot it in this manner, the curve, and this is called

20   dissolution curve.  So the specifics of obtaining this

21   dissolution curve are in the limitations of the claims.

22        So if you go back to the slide 19 on the limitations,

23   please.

24   Q.   If we could go back for one moment to -- this is slide 21.

25   Is the paddle that is referred to in the claim the type of

F3RTEND1                    Fassihi - direct

1    equipment that is shown on the left here?

2    A.   That is correct, yes.

3    Q.   So let's go back to the slide that has the limitation,

4    please.

5    A.   So your Honor, this first part of the limitation is what I

6    described just now.  So it talks about in vitro dissolution

7    test, it talks about USP paddle method, and 50 RPMs, the

8    rotation of the paddle.

9    Q.   What does RPM mean?

10   A.   It means revolutions per minute, so number of times that it

11   revolves, the paddle rotates in one minute.

12            Then it talks about that media, the aqueous

13   environment, 500 milliliter.  And there is also a pH -- range

14   of pH that the tablet would be tested in one of those pHs.

15   Q.   And then the second part of the limitation --

16            THE COURT:  I'm really not getting this.

17            THE WITNESS:  So shall I go over it one more time,

18   your Honor?

19            THE COURT:  I think you better do that.

20            THE WITNESS:  Sure.  So it says whereupon placement of

21   the composition.  So this is a controlled release composition

22   that we talked about the hydrophilic matrix.

23            THE COURT:  If you could pause.

24            Why are you suddenly focusing on claim 19?

25            MR. RHOAD:  Your Honor, we wanted to walk your Honor

F3RTEND1                    Fassihi - direct

1    through one of the claims -- there is some overlap in the types

2    of limitations that are -- the limitations that are described

3    in the different claims.  So we just picked one that would --

4    that we were hoping would try to illustrate some of the

5    limitations that you will see in other claims as well.

6            This is one of the claims that we are asserting that

7    each of the defendants infringes, so we are claiming that they

8    infringed this particular claim.  And so what we were planning

9    to do was go through this claim as well as claim 20, which has

10   some other limitations that are not found in this, and then

11   also talk about some limitations that aren't either one of

12   those two claims but are in other claims so your Honor would

13   get a feel for the concepts, what the limitations are about, so

14   that as you are reading the patent and reading all the

15   different claims, hopefully you would have a background in what

16   they were talking about.

17           THE COURT:  Now I have to tell you that I have tried

18   patent cases before, but by mutual consent between me and the

19   lawyers, we used very untechnical terminology.

20           What is a limitation?

21           MR. RHOAD:  A limitation, your Honor, is a part of the

22   claim.  So under the law, the law says to prove infringement

23   you have to compare the claim against the product, and

24   everything that is recited in the claim has to be found in the

25   accused product.  And the lawyers refer to limitations meaning

1    different parts of the claim.  So if we look at the first

2    slide --

3              THE COURT:  That's all I need.

4              MR. RHOAD:  Sorry, your Honor.  So limitation just

5    refers to a particular part of the claim.  So maybe I could

6    show you on a slide we have.  Looks like 86, please.

7              So your Honor, here we have on slide 86, this is claim

8    19 of the '122 patent, and all of the words of the claim are

9    here on the slide.  And what we have done is kind of broken it

10   down piece by piece so that you can compare each piece and see

11   does the accused product include each of these pieces.  And we

12   patent lawyers refer to those individual pieces as limitations,

13   so it's sort of a part of the claim.

14             THE COURT:  Okay.  Fair enough.  Go right ahead with

15   your questioning.

16             MR. RHOAD:  Your Honor, we're on slide 55, and as

17   Dr. Fassihi just explained, it says wherein upon placement of

18   the composition, and so when it's referring to the composition,

19   it's talking about that extended -- that controlled release

20   oxymorphone tablet that was recited earlier on in the claim

21   where we saw up here at the beginning of 19 it says an

22   analgesically effective controlled release pharmaceutical

23   composition with a twelve-hour dosing interval in the form of a

24   tablet.

25             So then when we get later on in the claim and it says

1   wherein upon placement of the composition, it's referring to

2   that tablet, in an in vitro dissolution test.  So in vitro,

3   Dr. Fassihi explained earlier, means in the laboratory.  So

4   this is a dissolution test in the laboratory using that

5   equipment that he showed us earlier with the paddle.  And it

6   says that test in particular is something, USP paddle method.

7   BY MR. RHOAD:

8   Q.  So Dr. Fassihi, can you explain what USP paddle method is?

9   A.  Yes.  What I showed in the previous slide with the

10  schematics picture of apparatus, that was USP paddle method.

11          THE COURT:  Wait, just a little louder and a little

12  slower, if you could.

13          THE WITNESS:  Sure.  So USP paddle method was the one

14  that I showed the picture of that in the previous slide.

15  Q.  First of all what, is USP?

16  A.  USP, your Honor, is United States Pharmacopeia, which is a

17  standard book that formulation pharmacists and scientists use

18  for understanding certain methodologies and things like that.

19  So this is a method which is described in the United States

20  Pharmacopeia, which is a standard book that we use in the

21  development of pharmaceuticals.

22  Q.  And if we could go to slide 20, please.

23          Is this a picture of equipment that you could use to

24  perform the USP paddle method dissolution test?

25  A.  That is correct.  So this is a United States Pharmacopeia

1    named dissolution apparatus called paddle -- well, this one is

2    just a dissolution apparatus.

3    Q.  If we go to the next page, slide 21, on the left-hand side

4    we have a picture of the paddle?

5    A.  That's correct.

6    Q.  When it says USP paddle method, it means you're using

7    dissolution testing that has this type of paddle?

8    A.  That is correct, yes.

9    Q.  And the claim, when it refers to 500 ML media, is that

10   referring to the amount of the blue liquid we see on side 20?

11   A.  That is right, yes.

12   Q.  And when it refers to 500 RPM or revolutions per minute --

13   A.  50.

14   Q.  Sorry, 50 RPMs, does that mean that that paddle is spinning

15   around at 50 times every minute?

16   A.  That is correct, yes.

17           MR. RHOAD:  So here, your Honor, we're back at that

18   claim limitation in claim 19.  So I think he has just explained

19   that first part about in vitro dissolution test comprising USP

20   paddle method, so using equipment that includes the paddle, at

21   50 RPM, or that paddle is spinning around 50 times every

22   minute, in 500 ML media, so that blue liquid, there's 500

23   milliliters of that blue liquid.  And that has a particular pH.

24   BY MR. RHOAD:

25   Q.  And what is pH?

1    A.  PH is the measurement of either acidity or acid character

2    of the solution in this case.  So pH 1.2 is acidic, up to 6.8,

3    which is more or less neutral.  That so that is a range of pH

4    which is similar to the pH in the GI tract in our body.

5    Q.  And it specified a particular temperature.

6            THE COURT:  We have had it before.  What does pH mean?

7    Can you tell me again?

8            THE WITNESS:  Sure.  So the pH, your Honor, is the

9    measurement of if a liquid is acidic or, for example, if you

10   have a glass of water and we squeeze some lemon in it, it

11   becomes acidic.  And the reason for that is because in the

12   human body in the stomach we have acidic conditions.  So the

13   dosage form that we swallow, it goes into the acidic

14   environment first.  So we are trying to mimic something like

15   that in this test.

16   BY MR. RHOAD:

17   Q.  And that is at a particular temperature, 37 degrees

18   Celsius?

19   A.  That is right.  That is similar to body temperature.

20   Q.  So to sum this up, what this limitation is saying is that

21   you have to run an in vitro dissolution test, a test in the lab

22   of the dissolution, and you have to do it using this particular

23   method and these particular conditions, is that right?

24   A.  That is correct, yes.

25           THE COURT:  I have got to test your patience.  Explain

1    again what is meant by pH of 1.2 to 6.8.  Go over that again.

2              THE WITNESS:  Sure, your Honor.  In this apparatus we

3    have 500 milliliters of a media, as it is shown here.  That

4    media could have a pH -- in other words, that media could be

5    acidic, and the measurement of that acidic character is

6    measured by a piece of apparatus called pH meter.  So we

7    measure that.  And pH is important because we like to know --

8              THE COURT:  PH means the degree of acid?

9              THE WITNESS:  That is right, yes.

10             THE COURT:  Okay.

11   BY MR. RHOAD:

12   Q.   And does a lower pH mean more acidic, more acid?

13   A.   That is right, your Honor.  1.2 is a strong acidic

14   condition, and 6.8 is kind of neutral, it's like water.  A

15   glass of water is neutral.  So when we talk about pH of 6.8,

16   maybe a glass of water has a pH of 6.8 or 7, but then when we

17   come down to 3, 2, 1, it becomes more acidic.

18   Q.   So then the claim limitations or the claim goes on, and so

19   it's when you do a test, a dissolution test in the lab with

20   those particular conditions, then where does the claim go from

21   there?

22   A.   So the second part of the claim, that limitation in the box

23   below, talks about how much of the drug is released when we do

24   the dissolution, every, for example, in time point.  So

25   15 percent to about 50 percent of the drug is released in one

1  hour, and that is highlighted in yellow, your Honor, for

2  convenience.  So 15 percent to about 50 percent of the drug

3  comes out of the dosage form in about one hour.

4           THE COURT:  Just a minute.

5           I see.

6  A.  And by the same measure, if we move further in dissolution

7  testing, we see that they show 45 percent to about 80 percent

8  of the drug is released at about four hours, which is also

9  highlighted in yellow.

10          THE COURT:  Okay.

11  A.  Then it goes on to say at least about 80 percent of the

12  drug is released at about ten hours, which is also highlighted

13  for you.

14  Q.  So this is referring to the dissolution curve and the

15  particular dissolution results that you get --

16  A.  That is correct.

17  Q.  -- from doing the test.

18          If we go to the next slide, can you explain what you

19  were showing here?

20  A.  Sure.  So your Honor, in this slide all those percentages

21  which were in the limitations are highlighted here.  So the

22  first red bar to the left has a range.  The lowest part is

23  about 15 percent and the highest part maxes at 50 percent.  So

24  that is our range for one hour.  At four hours, as the

25  limitation indicated, the lowest point is 45 percent and the

F3RTEND1                    Fassihi - direct

1    highest point is 80 percent.  And at ten hours at least

2    80 percent should have been released, and we just have that

3    lowest that is 80 percent, and it can maximum go to

4    100 percent.  We cannot go beyond that.

5                   (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2   Q.  All right, maybe if we can go back to slide 22, and this

3   was the dissolution curve that you explained earlier, is that

4   right?

5   A.  That is right.

6   Q.  So using that dissolution curve apparatus, you would take

7   various measurements at different time points?

8   A.  That is correct.

9   Q.  Then you would draw a line through those time points to get

10  your curve?

11  A.  That is right, yes.

12  Q.  And so then if we can then go back to slide 56, so, in

13  other words, you had these red bars here, in order to meet

14  those limitations, that curve that we just drew would have to

15  go between these red bars, is that right?

16  A.  That is correct, yes.  If it goes through the red bars,

17  that means the limitations are met.

18          MR. RHOAD:  Okay, your Honor, so we have gotten all

19  the way through claim 19.

20          THE COURT:  Let me look at this once more.

21          (Pause)

22          THE COURT:  Look, I am sure it is somewhere relevant,

23  but I don't see some of this in the words of claim 19.  For

24  instance, I don't see in claim 19 anything about 15 percent

25  being dissolved.  Wait a minute.  I am not reading it right.

1      MR. RHOAD:  Claim 19 continues on to the next page,

2   into column 27, so that appears on the next page.  That claim

3   happens to be split across the page.

4      THE COURT:  You mean I have to turn a page?  You are

5   very demanding.  Let me look at it now, please.

6      Oh, of course, I see it.  All right.  Very good.  You

7   can go ahead.

8      MR. RHOAD:  Okay, your Honor.  So that's claim 19 of

9   the '122 patent.  So the other claim, we went on a run through

10  two identical claims, so the next claim is claim 20, the very

11  next claim of the '122 patent, so that is in column 28 is where

12  it starts.  Do you see that, your Honor?

13     THE COURT:  I am going to bother you for a minute.  I

14  want to look a little more at claim 19.

15     MR. RHOAD:  Certainly.

16     THE COURT:  Give me a minute.

17     MR. RHOAD:  Your Honor, I have claim 19 written out

18  sort of limitation by limitation that I can hand up a hard copy

19  of or we can look at a particular place on the slide deck if

20  that would help your Honor.

21     THE COURT:  Actually what I want to do is to really

22  begin to get acquainted with these claims as they are presented

23  in the patent.  I want to get acquainted with those claims as

24  presented, as I am saying.

25     (Pause)

1          THE COURT:  I think I have finished looking at claim

2     19 as much as I want to at the moment.  Go ahead with what you

3     want to ask the witness now.

4          MR. RHOAD:  Your Honor, we want to move on to claim 20

5     of the '122 patent.

6          THE COURT:  Okay.

7          MR. RHOAD:  If it would be useful for your Honor,

8     maybe we can hand up again the way we have broken it out,

9     limitation by limitation, so that it might be a little bit

10    easier to follow.

11         If we start with claim 20, do you have a set of the

12    slides, your Honor?

13         THE COURT:  I am sure I do.

14         MR. RHOAD:  Your Honor, I just handed up to you slide

15    102.

16         If you can pull that up.

17         As I was mentioning before, this is kind of the claim

18    18 broken out piece by piece and claim 20.  So if you look at

19    the bottom of this page, do you see where it says "the method

20    of claim 18"?

21         THE COURT:  I do, of course.

22         MR. RHOAD:  So what that means is, that is what

23    lawyers call a dependent claim, and claim 18 is the independent

24    claim.  So in order to infringe claim 20, you would also have

25    to have everything that's in claim 18.  So we can start by

1    going back to claim 18 and then the first limitation there

2    reads, "A method of treating pain in a subject in need thereof

3    the method comprising."

4            THE COURT:  I see.

5            MR. RHOAD:  Your Honor, when we are talking about

6    method claims, claim 19 was talking about pharmaceutical

7    composition, so it's what we lawyers sometimes call a

8    composition claim or a product claim, meaning the claim is to

9    the product.  A method claim is a method of performing certain

10   steps, so this is that type of a claim is performing certain

11   steps.

12   Q.  Dr. Fassihi, looking at this first, can you explain, it is

13   a method of treating pain and then it says "in a subject in

14   need thereof."  What is that referring to?

15   A.  It is referring to a method today to treat pain, to relieve

16   pain.

17   Q.  And "in a subject in need thereof," that means somebody who

18   needs to have their pain relieved?

19   A.  That is right.  It could be a patient and a method that

20   comprises, and then it goes to the next limitation, which is

21   administering to the subject the pharmaceutical composition of

22   claim 1, in other words, that control release tablet would be

23   administered to the patient.

24           MR. RHOAD:  Your Honor, claim 1 is very similar to

25   claim 19 that we just looked at in that it talks about an

1    analgesically effective controlled-release pharmaceutical

2    compound, composition, so that is the one in the middle row

3    there with a 12-hour dosing in the form of a tablet, so that is

4    exactly what we just had in claim 19 that we just walked

5    through.  It says oxymorphone or pharmaceutically acceptable

6    salt thereof as the sole active ingredient, and then it talks

7    about a controlled-release delivery system comprising at least

8    one pharmaceutical excipient, and then it talks about the

9    particular dissolution method, and that only has one time

10   point.  So if we saw on claim 19, if you recall, there were

11   three different time points -- one-hour, four-hour and ten-hour

12   time points -- for the dissolution, this one just says 15 to 50

13   percent by weight in the last line of that middle column about

14   one hour into the test.  So that part is covering a tablet.

15         So if we go back to the second slide on the line, it

16   says administering to the subject, to the person who needed to

17   have pain relief, so somebody needs to be treated for their

18   pain, you administer to that subject a pharmaceutical

19   composition of claim 1 which is the tablet, the

20   controlled-release oxymorphone tablet.

21         Are you with us?

22         THE COURT:  Yes, I am.

23         MR. RHOAD:  Then let's go to the fourth line,

24   beginning "comprising about."

25   Q.  Can you explain what that limitation is, Dr. Fassihi.

Fcr2end2                    Fassihi - Direct

1   A.  Sure.

2           So it talks about dosage form, which has about five

3   milligrams or about eight milligram of oxymorphone or

4   pharmaceutically acceptable salt thereof.  So the dosage form

5   comprises of that.  So that talks about presence of active

6   drug, which is oxymorphone.

7   Q.  That is just telling us how much of the oxymorphone has to

8   be in this tablet, is that right?

9   A.  That is correct.

10  Q.  So that is claim 18.

11          THE COURT:  Wait a minute.  Just a minute, please.

12          Okay.  I see.  Go ahead.

13  Q.  So then we are done with claim 18, so claim 20 is the

14  method of claim 18, so what we just talked about, and then it

15  says "wherein, upon oral administration of the composition," so

16  that's referring to giving that tablet to somebody, taking that

17  orally through the mouth, is that right, Dr. Fassihi?

18  A.  That is right.

19  Q.  And then it says, "The oxymorphone AUC zero to infinity is

20  no more than 20 percent higher when the composition is

21  administered to the subject under fed conditions, as compared

22  to fasted conditions."

23          So maybe at first we can reorient the court as to what

24  that AUC parameter is.  We talked about that yesterday.

25          MR. RHOAD:  If we can go to slide 41, please.

1          So if you recall, your Honor, that is the slide that

2     we used to explain to your Honor what the AUC or "area under

3     the curve" is.

4     Q.  Dr. Fassihi, do you want to reorient us as to what we are

5     talking about here?

6     A.  Sure.  So this is an AUC that we talked about yesterday,

7     and that is area under this curve, "AUC" stands for "area under

8     the curve."  So that is a representation of how much drug is in

9     the blood circulation in the body of the human being after the

10    dosage form is taken.  So if I take a tablet, the drug would be

11    absorbed from my GI tract and reaches blood circulation, and it

12    shows the curve like this.  This is called area under the

13    curve, AUC, and it represents how much drug is there in my

14    body.

15          MR. RHOAD:  Then if we can go to slide 62, please.

16          So, your Honor, here on this slide we have blown up

17    this limitation we are talking about, and it says "Where AUC

18    zero to infinity" -- that area under the curve we were just

19    talking about -- "is no more than 20 percent higher when the

20    composition" -- when that controlled-release oxymorphone

21    tablet -- "is administered to the subject under fed as compared

22    to fasted conditions."

23    Q.  So, Dr. Fassihi, can you explain to the judge what that's

24    referring to under fed as compared to fasted conditions?

25    A.  Sure.  So basically it means here in this slide, your Honor

1    patient would sometimes take the tablet after they have had

2    food, so here on this slide -- and that affects how much gets

3    absorbed.  So in this slide, there is a green bullet point

4    which describes the patient took the tablet right after having

5    eaten a meal.  That is called fed conditions.  That means I had

6    a meal and then I took my tablet.

7              Alternatively, I can take it on an empty stomach.

8    That means I have not ingested any food.  That is referred to

9    as fasted conditions.

10             It is important for dosage forms that we should know

11   whether there is any difference in amount of drug that gets

12   into the blood circulation when we take it with food or when we

13   take it on a fasted, empty stomach.  So that difference in

14   blood levels is important and food can impact it, can increase

15   it or maybe decrease it, we can see that.

16   Q.  So when we were talking earlier about the four steps by

17   which a drug in a controlled-release dosage form goes through

18   to become effective, it first has to be released out of the

19   dosage form, then it has to be absorbed into the body, is that

20   right, in the second step?

21   A.  That's correct.

22   Q.  Whether or not there is food in your stomach and the

23   intestines can effect that second step, how much gets absorbed

24   into the body?

25   A.  That is correct, yes.

1  Q.  So let's try and explain this a little bit more maybe.  Can

2  you tell us what's shown here on slide 64.

3  A.  Sure.  So, your Honor, fed condition is we take the

4  breakfast, like what is shown here, and more or less similar

5  breakfast, you take that and ten minutes after ingesting the

6  breakfast, you take your tablet.

7       And the other side, on the right-hand side, subjects

8  or patients that are tested, they have dinner the night before

9  and they take nothing.  In the morning, when they take the

10 tablet, there is no food in their stomach.  They take the

11 tablet.

12      We start collecting blood, blood samples from these

13 subjects and we see if there is any difference between those

14 individuals that ingested the meal and then they took the

15 tablet and those that did not have breakfast and took the

16 tablet.  So we compare those two together, their blood levels.

17      THE COURT:  All right.

18 A.  So that is called fed condition and fasted condition.

19 Q.  Okay.  Is there any data provided in the patent about

20 whether or not there is -- strike that.  Let me back up a

21 second.

22      Is that sometimes called "the food effect," the

23 difference in blood levels in a patient between whether they

24 have taken it with food, like after a meal, under fed

25 conditions, or on an empty stomach, after fasted conditions?

1    A.  Yes, it is often referred to as "food effect," yes.

2    Q.  So they take those blood levels and they measure whether or

3    not there is any difference between those two conditions, and

4    that is the food effect?

5    A.  That is correct, yes.

6    Q.  Is there any data provided in the patent itself about

7    whether or not the oxymorphone formulations that the patentees

8    tested exhibited any difference between these conditions, any

9    food effect?

10   A.  Yes, there is.

11            Your Honor, here, is what is in the patent

12   specification.  So the upper box is column 19 of the patent,

13   line 15 to 19.

14            MR. RHOAD:  Your Honor, this is from PTX 001, which is

15   the '122 patent, and we have blown up some language from column

16   19 of that patent.

17            THE COURT:  Again, I am saying this over and over

18   maybe, but I am trying to get acquainted with the patent.  The

19   slides are very helpful, but I want to get acquainted with this

20   very important document.  Where on the --

21            MR. RHOAD:  We are in the '122 patent at column 19.

22            THE COURT:  Where in column 19?

23            MR. RHOAD:  Starts on line 15, so if you see -- do you

24   see the line numbers?

25            THE COURT:  I sure do.

1            MR. RHOAD:  It is the sentence that begins "both rate

2    and extent of," on that line.

3            THE COURT:  All right.  Very good.  I see that.  Go

4    ahead with the testimony.

5    BY MR. RHOAD:

6    Q.  So, Dr. Fassihi, could you just please read into the record

7    the sentence we have highlighted on the slide?

8    A.  Sure.  So this is excerpt from '122 patent in column 19 and

9    it reads, "Both rate and extent of oxymorphone absorption from

10   the oxymorphone oral solution were affected by food," and then

11   it talks about some technical terms like LS squared mean.

12           THE COURT:  What are you saying now?

13           THE WITNESS:  Your Honor this is technical term in the

14   description here, which is not -- I point to --

15   BY MR. RHOAD:

16   Q.  Maybe, Dr. Fassihi, it says "both rate and extent of

17   oxymorphone absorption," so is that referring to that second

18   step and third step that we are talking about, the rate and how

19   much and how fast the oxymorphone is getting absorbed into the

20   body, into the bloodstream?

21   A.  That's correct.  So "rate" means how fast and "extent"

22   means really representation of AUC.

23   Q.  And when it refers to oxymorphone oral solution, does that

24   mean not like the tablets that are part of the claimed

25   invention, but somebody took a solution, some liquid that had

1    oxymorphone in it and drank it?

2    A.  That is correct, because the idea here was to check the

3    food effect by giving solution of oxymorphone so that it is

4    rapidly absorbed with food and also controlled release with

5    food.  And in the first part that we went over just now, let's

6    focus on the AUC, since we talked about that, so it talks about

7    AUC that basically increased approximately about 30 percent --

8    and that is the wording in the patent -- 30 percent increase

9    when solution was taken with food.

10   Q.  So when we are talking about the oral solution, we are

11   talking about an immediate-release formulation, is that right?

12   A.  That is correct, yes.

13            MR. RHOAD:  So, your Honor, you may recall yesterday

14   Dr. Fassihi explained immediate-release formulations versus

15   controlled-release formulations.  And because this is a

16   solution, there is no tablet for the oxymorphone to dissolve

17   out of, so it is immediately available.  It is an

18   immediate-release formulation and is this indicating,

19   Dr. Fassihi, that for an immediate-release oxymorphone that

20   they tested, the area under the curve, the amount of drug

21   absorbed increased about 30 percent when it was taken under fed

22   conditions, so after a meal, versus when it was under fasted

23   conditions, basically on an empty stomach?

24            THE COURT:  Ask your question again.  It's got a lot

25   of parts to it.

1  Q.  In this paragraph or this excerpt we are talking about an

2  immediate-release oxymorphone formulation.  Is that correct,

3  Dr. Fassihi?

4  A.  That's correct, yes.

5  Q.  It is explaining that and it is talking about the effect

6  that the presence of food had on the area under the curve, AUC.

7  Is that right?

8  A.  Yes.

9  Q.  And the area under the curve, you explained, is the total

10  amount of the oxymorphone that gets absorbed into the

11  bloodstream, is that right?

12  A.  That is correct.

13  Q.  It is explaining that for that immediate-release

14  oxymorphone formulation, the amount of drug absorbed was 30

15  percent higher when it was taken with a meal as compared to the

16  total amount that got absorbed --

17  A.  Without meal.

18  Q.  -- without a meal, is that right?

19  A.  Yes, that's right.  So this was a food effect, your Honor.

20  The area under the curve, which is amount, total amount

21  absorbed when they gave oral solution, it increased when food

22  was taken by 30 percent.

23          THE COURT:  I understand.

24  A.  So that is the essence of that excerpt.

25  Q.  On the next, below that, we have excerpts from, again, the

1    '122 patent, column 19, beginning from lines 9 to 13.  Okay?

2    Is that talking about the same thing, the same difference in

3    the extent of oxymorphone absorbed, the AUC, except talking

4    about a controlled-release formulation?

5    A.   That is right.  So this section talks about giving

6    controlled-release oxymorphone tablet and when patients were

7    taking food.  So food increased the AUC by about less than 20

8    percent.

9    Q.   So, whereas, for immediate release, the presence of food

10   increased the AUC by 30 percent.

11   A.   That's correct.

12   Q.   For a controlled-release formulation of oxymorphone, the

13   AUC, or drug absorbed, was less than 20 percent, is that right?

14   A.   That is right.

15   Q.   And, in general, is it a good thing or a bad thing to have

16   a lower AUC?  So here we saw that the controlled release

17   difference in the food effect for a controlled-release

18   formulation was lower and less than 20 percent, is that

19   generally a good thing or a bad thing from the manufacturer's

20   perspective?

21   A.   It is a good thing in many ways.  That means if I take

22   controlled-release formulation today now --

23            THE COURT:  That means what?  Say it again with.

24            THE WITNESS:  That means if I take the oxymorphone

25   controlled-release tablet, with food or without food, I am

1    assured that the AUC, the extent of absorption, is not more

2    than 20 percent different.  In other words, increases with

3    food, increases in AUC with food or fasted is less than 20

4    percent.

5              THE COURT:  And why is that good or bad?

6              THE WITNESS:  It is good, your Honor, because

7    oxymorphone controlled-release formulation is to be taken --

8              THE COURT:  Because of what?  Say it again.

9              THE WITNESS:  Because oxymorphone controlled-release

10   formulation, the tablet, is to be taken every 12 hours; and

11   during the day we consume food.  We take breakfast, lunch, and

12   dinner.  So there is always food in our body, in our stomach.

13   And when we take the tablet, if the AUC is low, variation in

14   AUC is low, it is a good thing because in a predictable manner

15   I can take the medication and be assured that my blood levels

16   are not very high, the extent of drug in my body is always

17   controlled and low.  So the low AUC is good.  Low AUC with food

18   and without food is good because the percentage in AUC are not

19   too far apart.  So let me explain it more.

20             THE COURT:  I have to bother you to explain why is it

21   good or bad --

22             THE WITNESS:  Sure.

23             THE COURT:  -- once more.

24             THE WITNESS:  Sure.

25             So I would like to take a tablet that doesn't show too

1    much variation in its total absorption into my body when I take

2    food and when I am taking it on an empty stomach.

3              THE COURT:  I see what you mean, okay.

4              THE WITNESS:  So it is a good thing that can happen,

5    that.

6    Q.  So is that data that was in the patent showing a less than

7    20 percent difference in the AUC values between these two

8    conditions, is that reflected in the claim limitation?

9    A.  Yes, it is.  So in the claim actually talks about less than

10   20 percent difference in AUC values under fed versus fasted.

11   So that means that if the tablet was taken on a stomach that

12   had food in it and was fasted, empty, the difference is less

13   than 20 percent.

14             THE COURT:  Let's take a recess, please.

15             MR. RHOAD:  Okay.

16             (Recess)

17             MR. RHOAD:  Your Honor, we only have a limited time

18   before the lunch break, so what I wanted to do was to go

19   over -- I am actually pleased to report that the parties have

20   agreed to a stipulation regarding some of the facts in this

21   case that will help further narrow some of the issues, and some

22   of them relate to infringement issues, so we have it all signed

23   and I will hand it up to your Honor maybe right before the

24   lunch break or I can do it --

25             THE COURT:  Whenever it is convenient for you.  You do

1    what is convenient for you.

2          MR. RHOAD:  So I wanted to put here on the Elmo.  If

3    we can maybe zoom in a little bit.

4          So there are two parts to the stipulation.  One

5    relates to the infringement issues.  Those are the ones I will

6    highlight for your Honor right now.  There are some that relate

7    more to validity issues, and they are in the stipulation that

8    has been signed, but I won't go through them with your Honor.

9    But what it says here is that "each defendant stipulates that

10   its accused tablets" -- so Dr. Fassihi hasn't explained exactly

11   what those are, but those are the tablets that are the subject

12   of the defendant's abbreviated new drug applications --

13   "satisfies each limitation of each '122 and '216 patent claim

14   asserted against them, as set forth in Exhibit A, except that

15   defendants dispute" three sets of issues, and they are

16   specified in paragraphs one, two, and three.

17         THE COURT:  Just pause for a minute and let me look at

18   that, please.

19         MR. RHOAD:  Absolutely.

20         THE COURT:  What is Exhibit A?

21         MR. RHOAD:  Exhibit A is Exhibit A to this

22   stipulation, which is a list of each claim that the plaintiffs

23   are asserting in this case against each defendant.  So if we

24   see here, your Honor, on the left-hand side we have a list of

25   the defendants and there the accused products, the first one

1    there is Actavis CRF, then case number in parentheses, so your

2    Honor knows what that case number is.  So two of the defendants

3    have filed two ANDAs, so Actavis and Ranbaxy have filed two

4    ANDAs, so they are listed here twice.

5              THE COURT:  Just a second.  Give me that name again.

6              MR. RHOAD:  Actavis is the first one listed there.

7              THE COURT:  Filed what?

8              MR. RHOAD:  The very first row of the -- oh, they

9    filed an ANDA, abbreviated new drug application, seeking to

10   sell --

11             THE COURT:  Wait a minute.  A-N --

12             MR. RHOAD:  -- D-A.

13             THE COURT:  And that --

14             MR. RHOAD:  That stands for abbreviated new drug

15   application.

16             THE COURT:  Go back to where you were.

17             MR. RHOAD:  Sure.

18             So each of the defendants in this case has filed an

19   abbreviated new drug application, and they are essentially

20   seeking the FDA's approval to get on the market with a

21   controlled-release oxymorphone formulation that is a generic

22   version of Endo's Opana ER product that you heard Dr. Lee talk

23   about yesterday and the past few days.  So each one of these we

24   have, these are all the cases that are before your Honor as

25   part of this trial.

Fcr2end2                    Fassihi - Direct

1       And so the first one there, Actavis CRF, that's their

2   crush-resistent formulation, that is the ANDA they filed

3   seeking approval to market a generic version of Endo's

4   crush-resistent formulation of Opana ER.

5       And then, as you move over one column over, you see at

6   the top it says "'122 patent claims" in the blue?  It is a

7   little fuzzy on the Elmo.  Do you see that?  Where I am

8   pointing my finger, '122 patent claims.  Let me hand up the

9   signed version.  That might help your Honor.

10      THE COURT:  It might.  On the screen that just doesn't

11  show up at all.

12      It amazes me why you would put dark green ink on a

13  dark green background.

14      MR. RHOAD:  I wasn't the one who did that, your Honor.

15      THE COURT:  What are the headings?  I will write them

16  out.

17      MR. RHOAD:  The column on the left is "Defendant."

18  The second column over says "'122 patent claims."

19      THE COURT:  In other words, claim 2, claim 3, claim

20  19 --

21      MR. RHOAD:  That's exactly right, your Honor.

22      And the last column on the right is "'216 patent

23  claims."

24      THE COURT:  Okay.  Very good.  Very good.

25  BY MR. RHOAD:

1  Q.  So what is shown on the chart in each row, each row relates

2  to a different abbreviated new drug application filed by one of

3  the defendants, so in the first row it refers to the

4  abbreviated new drug application filed by defendant Actavis,

5  and the CRF indicates that it relates to -- it is as ANDA

6  directed to Endo's crush-resistent formulation of Opana ER.

7          THE COURT:  Just a minute.  So CRF --

8          MR. RHOAD:  -- stands for crush-resistent formulation.

9          THE COURT:  Okay.

10          MR. RHOAD:  So what this means, then, is that Endo is

11  asserting claims for and that Actavis CRF product infringes

12  claims 2, 3, 19, and 20 of the '122 patent.  Do you see that?

13          THE COURT:  So, in other words, that in the second

14  column for Actavis has 2, 3, 19 and 20, these are the claims

15  allegedly infringed, right?

16          MR. RHOAD:  That is correct, your Honor.

17          THE COURT:  And is the same thing true of the --

18          MR. RHOAD:  -- '216 column, that's exactly right, your

19  Honor.

20          THE COURT:  Okay.  Very good.

21          MR. RHOAD:  So then if we can go back to the portion

22  of the stipulation that I had on the screen earlier, which we

23  can --

24          THE COURT:  Can I interrupt you?

25          MR. RHOAD:  Certainly.

Fcr2end2                    Fassihi - Direct

1          THE COURT:  Now, 1:00, I know you have some scheduling

2     things about a witness or two.  I would normally recess now

3     until 2:15, but what I am asking is, is there something you

4     want to finish, anybody wants to finish --

5          MR. RHOAD:  What I was hoping to finish, your Honor,

6     is that there are a number of claims that I have highlighted

7     here in which, based upon the stipulation, the defendants do

8     not dispute and have stipulated that they satisfy each piece of

9     these asserted claims.  And I was just going to ask Dr. Fassihi

10    if, in light of that, he has an opinion whether they infringe,

11    and that was where I was hoping to end, and then we could break

12    for lunch.

13         THE COURT:  Very good.  That's very good.

14         MR. RHOAD:  So, your Honor, just very quickly, here on

15    the page of the stipulation that's on the screen it says, "Each

16    defendant stipulates that its accused tablets satisfy each

17    limitation of each '122 and '216 claim asserted against them as

18    set forth in Exhibit A."  So they are saying that, for each of

19    those claims we were just looking at, that are listed as the

20    allegedly infringed claims, they are stipulating that their

21    tablets satisfy each piece of those claims, except as they

22    relate to the three paragraphs that are specified there.  And

23    we will talk about those three paragraphs and what those issues

24    are more later.

25         And then it also says below that that "Endo need not

1    present any proof of infringement at trial that the defendants'

2    accused tablets satisfy any claim limitation not in dispute as

3    recited above."  So it is saying, basically, other than those

4    three categories of issues, we don't have to put on proof of

5    infringement, we don't have to prove their tablets meet each

6    piece of each claim unless it is encompassed within one of

7    those three paragraphs.  Okay?  Are you with me?

8              THE COURT:  Certainly.

9              MR. RHOAD:  And those three paragraphs specify which

10   particular claims have issues that are in dispute, and I will

11   represent to you, your Honor, that I have here highlighted the

12   fact that my understanding is -- and I invite any defendants'

13   counsel to stand up now or forever hold their peace -- that

14   those three issues do not implicate any of the '122 patent

15   claims 2, 3, or 19.

16             THE COURT:  Wait.  I don't know what you are saying.

17             MR. RHOAD:  So with respect to claims 2, 3, and 19 of

18   the '122 patent, pursuant to this stipulation, defendants have

19   stipulated that their tablets satisfy each limitation of those

20   claims, in other words, they satisfy each piece of each of

21   those claims and the standard for infringement is if you

22   satisfy each piece of each claim, you infringe.

23             THE COURT:  2, 3 and 19.  You leave out 20.

24             MR. RHOAD:  So that is a claim that is in dispute.

25   That is a claim that has limitations, has pieces that are going

1    to be in dispute.  So we will have to put on evidence of that.

2              But as to 2, 3, and 19, pursuant to this stipulation,

3    we don't have to put in evidence that they satisfy those

4    limitations because they are stipulating that, with respect to

5    all of those claims, there is no dispute about any of the

6    proofs that we would have put on.  So they are stipulating --

7              THE COURT:  Where does the stipulation say what you

8    just said?

9              MR. RHOAD:  If you go back in the two highlighted

10   sections that we have here, it says they stipulate that the

11   accused tablets, so each one of their accused tablets,

12   satisfies each limitation or each piece of each '122 and '216

13   patent claim asserted against them as set forth in Exhibit A --

14   so that's the exhibit we were just looking at, that chart --

15   except that they dispute these three categories of issues,

16   disputes.

17             So if we look, for example, at the first paragraph, it

18   says they dispute that their accused tablets satisfy the AUC

19   and C max food effect limitations recited in the '122, claim 20

20   and '216 claims 40, 42, 50, 54, 78, 79, 80, and 82.  So, in

21   other words, that's that limitation that we were just looking

22   at the very end, the AUC food effect difference, fed versus

23   fasted.  So there they are disputing one of the pieces of '122,

24   claim 20.  So that's why I didn't identify that as a claim that

25   is not disputed.

1          THE COURT:  I understand.

2          MR. RHOAD:  So what I am telling you is these three

3    sections identify which claims and which limitations are at

4    issue, and claims 2, 3, and 19 are not within the scope of any

5    of those disputed issues.  So there is no dispute in this case

6    that each of the defendants' tablets all satisfy all

7    limitations of claims 2, 3, and 19 of the '122 patent.

8          THE COURT:  Very good.

9          MR. RHOAD:  Then, similarly, it is my belief -- and I

10   invite, again, any defendant to stand up or forever hold their

11   peace -- that of the '216, claims 1, 22, 73 and 74 are not

12   implicated by any of those disputed issues, so that there is no

13   dispute and it is stipulated that each of defendants' tablets

14   satisfy each limitation of those claims.

15         THE COURT:  Okay.  Very good.

16   BY MR. RHOAD:

17   Q.  Dr. Fassihi, in light of your understanding of the legal

18   standard for proving infringement and the stipulation that the

19   defendants' tablets satisfy each limitation of claims 2, 3, and

20   19 of the '122 patent and claims 1, 22, 73, and 74 of the '216

21   patent, to the extent shown here on Exhibit A, do you have an

22   opinion as to whether or not each of those tablets infringes

23   the claims I just identified?

24   A.  Yes.

25   Q.  And what is your opinion?

1   A.   They all infringe these patents '122 and '216 and the

2   claims that were mentioned.

3           MR. RHOAD:  With that, your Honor, I think we can take

4   a break for lunch.

5           THE COURT:  Are we ready to resume at 2:15?

6           MR. BLACK:  Yes, your Honor, with a different witness.

7           THE COURT:  Okay.  Very good.  2:15.

8           (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F3RTEND3                    Deer - direct

1                     AFTERNOON SESSION

2                       (2:20 p.m.)

3              THE COURT:  Who is the witness now, please?

4              MS. CRUZ:  Good afternoon, your Honor, my name is

5     Carol Pitzel Cruz with Knobbe Martens on behalf of the

6     defendants.  And Dr. Deer is the witness, if we could call him

7     up to stand.

8              THE COURT:  All right, we'll have him.

9      TIMOTHY RAY DEER,

10         called as a witness by the Defendants,

11         having been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MS. CRUZ:

14             DEPUTY CLERK:  Speaking into the microphone, would you

15    state your full name for the record and spell your first and

16    last name.

17             THE WITNESS:  Timothy Ray Deer, T-I-M-O-T-H-Y, R-A-Y,

18    D-E-E-R.

19             MS. CRUZ:  Your Honor, since we are taking Dr. Deer

20    out of order, I want to give a little context that he is a

21    medical doctor, and we will go through this him in more detail.

22             THE COURT:  All right now, very good.

23             MS. CRUZ:  And so Dr. Deer is going to testify to two

24    issues in the case, one will be the use of Ranbaxy --

25             THE COURT:  Your name again, please?

1          MS. CRUZ:  Carol Pitzel Cruz.

2          THE COURT:  Very good.

3          MS. CRUZ:  And so one of those issues will be how

4     patients will use Ranbaxy and Roxane's products, and if that

5     use satisfies several pieces of some of the claims that

6     Mr. Rhoad had gone over earlier today, and we'll highlight

7     those issues.

8          And then there's also a few issues that Dr. Deer will

9     respond to that plaintiffs have raised or will raise in the

10    case regarding the use of Opana ER as well as other opioids

11    from the doctor's perspective.

12    BY MS. CRUZ:

13    Q.  Dr. Deer, have you prepared a set of slides to help with

14    your presentation today?

15    A.  Yes, ma'am, I have.

16         MS. CRUZ:  Your Honor, do you have a set of the slides

17    up on your desk with you?

18         THE COURT:  Very good.

19    Q.  So if we could turn to slide two.  Also in your binder

20    there should be a tab marked DX 6000.

21    A.  Yes, ma'am, I have that before me.

22    Q.  Can you tell us what that is?

23    A.  Yes, that's my curriculum vitae.

24    Q.  Is that accurate?

25    A.  I believe it is, yes.

1   Q.  If we could look at the sides, we could run through some

2   points on your career and expertise.

3          So if you could describe generally your current

4   position at the Center for Pain Relief.

5   A.  Yes, I'm the medical director of the Center for Pain

6   Relief, which is a large multi-specialty practice in

7   Charleston, West Virginia.  And I'm a professor anesthesiology

8   at the West Virginia University School of Medicine, and I have

9   been practicing in the field of pain medicine for over 20 years

10  at this point.

11         I did my medical school at West Virginia University

12  School of Medicine, did my residencies at the University of

13  Virginia with a primary specialty of anesthesia, and then did a

14  clinical subspecialty of pain management fellowship there under

15  Dr. John Robinson at the University of the Virginia.  And since

16  that time I have been practicing in Charleston, West Virginia

17  as a private practitioner and also affiliated with the

18  university.

19  Q.  And can you describe in a little bit more detail your daily

20  practice, the types of patients you see?

21  A.  Yes, we're a group of physicians, nurse practitioners and

22  physician assistants.  We treat chronic pain from cancer, so

23  for example, bone metastases and things like that.  We also

24  treat non-cancer patients, neuropathy, failed back surgery

25  syndrome, spinal disorders, things of those natures, shingles.

1    So really a multiplicity of things we treat.

2              We do medical management, including medication, all

3    the way up to more advanced therapy such as implantable devices

4    such as spinal cord stimulation systems and intrathecal pumps,

5    which are pumps that go in the spinal fluid for chronic pain.

6    We also do many procedures such ablation where we heat nerves

7    and things of that nature.

8    Q.   How many patients do you see in an average day?

9    A.   I personally see an average of about 30 or 40 patients.  I

10   see about 40 patients in a day from 7:30 until 4:30.  But at

11   the same time my nurse practitioners see patients in the same

12   clinics.  So we see about 200 or so patients personally a week,

13   but our current practice is about 500 patients a week under my

14   supervision.

15   Q.   And in your 20-plus years of practicing medicine, have

16   prescribed opioids as part of that practice?

17   A.   Yes, opioids is a part --

18             THE COURT:  I'm not quite hearing you.  If you

19   could -- I don't know what to do.

20             MS. CRUZ:  I'll speak louder.  Is that better?

21             THE COURT:  That's better, thank you.

22   Q.   So I'll repeat the question.

23             In your 20-plus years of practicing medicine, have you

24   prescribed opioids as part of that practice?

25   A.   We do prescribe opioids as one of things we do for folks.

1    Certainly it's part of the algorithm.  We prefer non-opioids

2    when possible, but opioids are necessary in some patients to

3    give them relief.

4    Q.  And can you just briefly describe what types of -- what

5    opioids that you use in your practice?

6    A.  Well, certainly with many patients we use quick acting or

7    immediate release opioids on a PRN basis, so as-needed basis.

8    For example, someone that had a fracture of their spine they

9    may need this medicine briefly for few weeks.  After a

10   procedure we may use temporary acting or quick acting

11   medication.  So we use medications such as immediate release

12   medications if you have had a fracture or had done a procedure

13   that is painful, but if you develop a chronic problem that

14   hurts every day to an intense level, we go to more long-acting

15   medications to give a chronic maintenance therapy.

16   Q.  And if could you turn to slide 3 of the slides.

17          MS. CRUZ:  Your Honor, we marked these as DX 8000,

18   just to be clear for the record.

19          THE COURT:  That's fine.

20   Q.  Have you served as an editor for any industry journals as

21   part of your career?

22   A.  Yes.  One of the things I have enjoyed doing is editing

23   articles in the field of pain medicine.  I'm the associate

24   editor of the Journal of Neuromodulation.  I'm also the editor

25   on board of Pain Medicine, Pain Practice, and Pain Physician.

1    So those have been part of my professional activity.

2            I've also been involved in various professional

3    organizations educating physicians in the United States and

4    other countries.  These include the American Society of

5    Anesthesiology, which is a 45,000 member group that I chaired

6    for almost four years in the pain division.  And the ASA looks

7    at appropriate use of pain therapies.

8            Also I'm the president elect of the International

9    Neuromodulation Society.  And what that is, that's a society

10   that deals with implants in the body, the brain, the spine, the

11   periphery, and research around those issues not just for pain

12   but things like Parkinson's and other disease states, spinal

13   cord injury.

14           I also chair the Interventional Pain Committee, the

15   American Academy of Pain Medicine, and serve on the board of

16   the American Society of Interventional Pain Physicians, which

17   is also involved in making decisions of policy on opioids.  I'm

18   also the Medicare Advisory Committee member for my part of the

19   country in the area of pain medicine.

20   Q.  And in your work as an editor of the various journals and

21   the organizations that you just referred to, do you regularly

22   discuss pain medicine and the use of opioids to treat pain with

23   other practicing physicians?

24   A.  Yes, I do.  I just came back last week from the American

25   Academy of Pain Medicine annual meeting where I spoke.  A week

1    before last I was at the Australian Pain Society.  And in each

2    of those settings we often discuss the proper algorithm:

3    Should we go with an opioid or another therapy?  What's the

4    best opioid?

5          So I have a pretty good discussion with physicians

6    around the United States about their current practices.  Also I

7    have been involved in the State of West Virginia with the

8    governor's oversight task force for opioid abuse and diversion.

9    And so we get to see all the data an abuse and addiction in our

10   state and many other states as we share information with other

11   states and those areas of opioid abuse and diversion.

12         MS. CRUZ:  Your Honor, we would like to offer Dr. Deer

13   as an expert in pain medicine, the treatment of chronic pain,

14   and the use of opioid medications to treat pain.

15         THE COURT:  Fine.

16   Q.  So moving to slide 4, you were retained by the defendants

17   in this case.  Can you just give a brief summary of what you

18   were asked to do, and then we can dive into the details on the

19   subsequent.

20   A.  Well, I was retained for my clinical expertise in this

21   area, and I was asked to look at how a clinician such as myself

22   would use the Ranbaxy and Roxane products and compare those

23   uses to method claims in '122 and '216 and respond to

24   Dr. Fassihi's report about those issues.

25         THE COURT:  I'm not understanding you.  Take it easy,

1    a little louder.  I am not understanding what you're saying

2    right now.

3            THE WITNESS:  Okay.  I will start over on this

4    section.

5    A.  I was asked to look at -- using my clinical experience, how

6    the medications involved in this case from the companies Roxane

7    and Ranbaxy, how they would be used clinically and how that

8    compares to the method claims in the patents '122 and '216.

9    And then I was asked to also look at Opana ER, the particular

10   Endo product, and other treatments and how they figure into our

11   field of treating chronic pain as a specialty.

12           THE COURT:  Okay.

13   Q.  And if we could move to slide 5.

14           And you had referred to the '122 and '216 patent

15   earlier.  Is it okay if we refer to those either by '122 and

16   '216 or the Endo patents?

17   A.  Yes.

18   Q.  And do you have a general understanding of what those

19   patents relate to?

20   A.  Yes, those are patents relating to oxymorphone extended

21   release.

22   Q.  And we also have the '060 patent listed here on the right

23   side of this slide.  Do you have a general understanding of

24   what that patent relates to?

25   A.  Yes, that relates to the crush resistant formulation of

1    oxymorphone extended release.

2    Q.  And given the tasks you identified earlier, did you reach

3    any conclusions?

4    A.  I did reach conclusions about these patents.

5    Q.  And if you could turn to slide 6.

6            Did you prepare -- is this a summary of the various

7    things that you concluded after reviewing the materials?

8    A.  Yes, this is a summary split into two parts.  The first

9    part was that Ranbaxy and Roxane, the products do not meet the

10   requirements of the method claims that are in contention here

11   today in '122 and '216.

12           The second part deals with the clinical perspective

13   relating to the items listed there, which we'll cover in more

14   detail as we go through my opinions.

15   Q.  So let's turn to that first issue.

16           THE COURT:  Let me look at this for another minute.

17           Go ahead.

18   Q.  If we could turn to slide 7.  And then is this a summary of

19   some of the limitations and the method claims that you reviewed

20   and formed an opinion as to?

21   A.  Yes, these are a summary of some of the claim requirements

22   that I felt were not met by Ranbaxy and Roxane based on some

23   points described previously.

24   Q.  And could you briefly go over these limitations, and then

25   as we go further through the presentation we can describe them

1   in more detail?

2   A.  Yes, certainly I will go through the points and get into

3   more detail in a little bit.  No single person or actor will

4   perform all the requirements of the method claim.

5           And we're going to focus on three areas.  I heard in

6   the past we talked about administration under fed versus

7   fasting conditions and what that means to the patient.

8   Providing and administering the dosage form, what providing

9   means versus administering.  And then detection of blood plasma

10  levels the metabolite and oxymorphone compound itself.  So

11  we're going to look more closely at those three areas under the

12  claim requirements of the patents in question.

13          THE COURT:  Now why do you introduce the slide by this

14  statement:  No single person or actor will perform all of the

15  requirements/steps of the method claims?

16          THE WITNESS:  It's been my understanding from counsel

17  that the method claim legally requires the same actor or person

18  provide and administered dosage form, the same person both

19  provide and administer based on the claim.  So that's been the

20  legal explanation that's come to my understanding as part of

21  the method claim.

22          MS. CRUZ:  Your Honor, maybe I can help clarify that.

23          THE COURT:  Okay.

24          MS. CRUZ:  With respect to infringement, normally when

25  you have direct infringement you have one person perform all

1    the steps.  What we're talking about here -- and we'll show you

2    the method claims as we move on, but we're talking about method

3    claims which plaintiffs don't allege any of the defendants

4    infringed directly, or at least the ones we're talking about

5    here, that it's an indirect infringement.  So as part of the

6    burden of proof, plaintiffs need to show that each of these

7    limitations is met.  And we'll go through them in context,

8    which will probably be more helpful.

9           And so part of what we need to look at also in this

10   indirect infringement analysis is whether defendants provide

11   any instruction to people taking the pills, the drug, to meet

12   any of these instructions or limitations.  So what we're trying

13   to do here from the clinical perspective is figure out if

14   someone follows Ranbaxy's or Roxane's product directions, who

15   was doing what with relation to the various claim limitations.

16          Does that help, your Honor?

17   Q.  Maybe we can move on.

18          And you're not a lawyer, Dr. Deer, is that correct?

19   A.  No, ma'am.  I have no legal training whatsoever.  I'm a

20   clinician and I practice medicine.

21   Q.  And you reviewed portions of Dr. Fassihi's opinion that

22   Ranbaxy and Roxane infringed certain of the method claims of

23   the '122 and '216?

24   A.  I did review that part.

25   Q.  And do you agree with those opinions?

1   A.  I do not.

2   Q.  And we'll go through and explain that in a little bit more

3   detail.

4           So if you could turn to slide 8.  And this was just

5   getting back to the point I made earlier about instructions.

6   Did you look at the product labels and look at the instructions

7   they provide?

8   A.  So the product label -- when you apply to FDA for approval

9   of use of a medication, you give them a proposed label.  And I

10  have been involved with the FDA for years on different

11  medications and devices.  So you give them a proposed label.

12  And in that label you instruct how someone -- you give the

13  physician instructions how to prescribe the medication that

14  would be within the safety boundaries of the FDA.  So I did

15  review the label of Ranbaxy and Roxane's products and the

16  instructions in the proposed labeling and how it relates to the

17  method claims.

18  Q.  And if you could -- maybe what we could do is dive into the

19  claims and maybe provide more context here.

20          If we could turn to slide 9.  And this is -- on the

21  top we have claim 20 of the '122 patent.  Do you see that?

22  A.  I do see that.

23  Q.  And did you review the entire claim as part of your

24  analysis?

25  A.  I did review this entire claim as part of the analysis of

1   this case.

2   Q.  And is there a relevant portion that you would like to

3   discuss?

4   A.  Yes, it's underlined here starting with oxymorphone area

5   under the curve is no more than 20 percent higher when the

6   composition is administered to the subject under fed as

7   compared to fasted conditions.

8   Q.  And is it okay if we refer to that as the fed versus fasted

9   limitation to try and make things a little easier here?

10  A.  That's normally how I would refer to it.

11  Q.  And if you turn to slide 10, you had also addressed some of

12  the claims in the '216 patent, and can you show here on claim

13  40 and 42 which portions of those claims were relevant to your

14  analysis?

15  A.  Again here looking at the underlined portions it talks

16  about the area under the curve fed versus fasting conditions.

17  Also it look looks the detectable blood plasma levels of both

18  the drug oxymorphone as well as metabolite 6-hydroxy

19  oxymorphone.  So these are two of the things in the claim

20  listed in patent '216.

21  Q.  And if you look at both of these claims, they refer back to

22  claim 38.  Do you see that?

23  A.  I do see that.

24  Q.  If we turn to the next slide.  Slide 8 -- sorry, slide 11

25  has claim 38 of the '216 patent on the screen here.  Could you

F3RTEND3                    Deer - direct

1    describe, with respect to claim 38, which portions of the claim

2    were relevant to your analysis?

3    A.   Yes, I think this is an important part of the claim on '216

4    patent.   Looking at claim 38, the first part underlined is

5    providing a solid oral dosage.   That's the providing step in

6    the method claim.   The DEA, Drug Enforcement Agency, really

7    monitors how these drugs are provided.   So you can't just

8    provide this drug, it has to go through the federal enforcement

9    process.   And so there's providing physicians write a

10   prescription and pharmacies provide the medication based on

11   federal law for controlled substances.   This is a level II,

12   which is a highly controlled substance.

13            And then it's administered in a single dose, dosage

14   form, to the subject, which I will call a patient personally,

15   clinically speaking.   And administering means actually giving

16   the drug to person.   So that is usually self-administered by a

17   patient if it's an oral pill, as opposed to an injection of

18   something that I would give, which I would be both providing

19   and administering it at that point.

20            THE COURT:   I don't understand what issue this

21   testimony is directed to.

22            MS. CRUZ:   Your Honor, these are claims that are

23   asserted by plaintiffs.   And so these are -- the limitations

24   we're going over are limitations that the defendants don't --

25   we feel that plaintiffs haven't proven that defendants meet

1    these limitations or these pieces of the claim.  And so we're

2    introducing them here and then we'll go into a look at what a

3    doctor or a patient would do according to Ranbaxy and Roxane's

4    labels and how that matches up with the claims.

5              THE COURT:  Look, my memory of our pretrial work was

6    that as far as infringement is concerned, it was conceded by

7    the defense that a substantial part of the claims at issue the

8    defense did, their products did -- I'm putting it crudely.  But

9    there was a limited issue or issues which were in contest, I

10   thought, on infringement.  We were going to limit the proof to

11   what is in contest.  I haven't heard anything from this witness

12   about that.

13             MS. CRUZ:  Maybe I can provide a little context for

14   your Honor.  Part of the issue is that Dr. Deer is going out of

15   order, so normally plaintiffs would have already provided their

16   contentions with respect to these limitations.  And we are only

17   discussing the limitations that are in dispute.

18             THE COURT:  What is he testifying about that relates

19   to what is in dispute?

20             MS. CRUZ:  He's going to testify -- and this was part

21   of the stipulation that we entered into earlier today that

22   Mr. Rhoad mentioned that defendants dispute that any one person

23   has or will directly infringe the methods of patents '122 and

24   '216, which are the claims we're going over, or that any

25   defendant has or will indirectly infringe.

1              THE COURT:  Is that a stipulation?  Where is that?

2              MS. CRUZ:  Your Honor, in the stipulation it's item

3      two.

4              THE COURT:  We apparently left ours downstairs.

5              MR. BLACK:  I'm sure we can get another copy.

6              It's a stipulation admitting infringement, and we

7      can't find it.

8              Here we go.

9              THE COURT:  Let me look at this a minute.

10             I am sorry to say I didn't look at this very

11     carefully.  It's meaningless to me.  The three so-called

12     exceptions to what is conceded, I have no understanding of what

13     that language means at all, not at all.

14             MS. CRUZ:  Perhaps I could help clarify that.  Earlier

15     when Mr. Rhoad was up here and he highlighted just a portion of

16     the asserted claims and asked Dr. Fassihi about those claims,

17     he mentioned that there were multiple claims that he didn't

18     highlight, and those claims still had issues in dispute between

19     the parties.

20             THE COURT:  It does not help me at all to list numbers

21     of claims.  I need to know what issues, factually not numbers

22     of -- lists of numbers of claims.

23             MS. CRUZ:  If we could turn back to slide 7.  So if we

24     look at the bullet points here, your Honor, the administration

25     under fed as compared to fasted conditions, that is one of the

1    limitations that's in dispute between the parties.

2              THE COURT:  That's right.  In other words, the way I

3    remember it is that one thing that is in dispute is whether

4    there's an infringement with respect to the percentage, I guess

5    I can't recite it.

6              MS. CRUZ:  It relates to two terms, that AUC or area

7    under the curve, as well as C max was the other term with

8    respect to fed versus fasted conditions.

9              But with respect to what we're talking about with

10   Dr. Deer, it's even a little bit more simple because we're

11   talking about method claims.  And so it's whether or not -- the

12   issue is whether or not Ranbaxy and Roxane instructed someone

13   to take the drug under fed as compared to fasted conditions.

14   And we will show through Dr. Deer that our labels do not

15   actually provide instructions for patient to take it under fed

16   and fasted conditions and then compare those AUC and C max

17   numbers.

18             THE COURT:  Well, let's have the testimony.  It's not

19   at all clear to me what all this -- what you mean by what you

20   are saying, but --

21             MR. BLACK:  Your Honor, may I try for a moment?

22             THE COURT:  What?

23             MR. BLACK:  May I speak for a moment?

24             THE COURT:  Yeah.

25             MR. BLACK:  The issue comes down to this:  You heard

testimony from Dr. Fassihi how in the development process tests

are run with patients who have -- who are fasting and patients

who have food in their stomach to determine whether there's a

difference in blood levels between whether you have eaten or

not, and that's the food effect.  And that's the kind of test

they do in pharmaceutical development to see whether a drug,

when administered to a patient, whether it makes a difference

whether there is food in the stomach or not.  And that's all

very nicely and in great detail described in the patent how

that's done.

          The issue they're raising on infringement, and I'm not

even sure if it involves all the defendants, because he's only

here talking for two of the defendants, I believe what his

testimony is is that as a medical doctor reading the claims

that he believes that a patient has to do one of these clinical

studies.

          MS. CRUZ:  Your Honor, if I could respond to that.

What we're looking at is method claims, and the method of

treating pain.  And one of the elements of that claim is

whether or not you have administration under fed as compared to

fasted conditions with respect to the controlled release

oxymorphone tablet.

          What Dr. Deer is here to do is just to provide the

factual basis to show that as a physician reading the product

label, the instructions that are provided with these products,

1  there is no instruction to say that the controlled release

2  oxymorphone is administered under fed as compared to fasted

3  conditions.

4          THE COURT:  Okay, let's go ahead with the testimony.

5          MS. CRUZ:  Why don't we move to slide 14.

6          And so on the left side of this slide we have just

7  compiled all of the fed versus fasted limitations that are part

8  of the method claims just to orient your Honor.  And then what

9  we could do now is just look at these labels that we have been

10  talking about, and perhaps that will help.  The witness and

11  your Honor, you have a binder there with various exhibits, and

12  if we could put this up on the screen it's DTX 3542.

13  BY MS. CRUZ:

14  Q.  Doctor, could you generally describe what this document is?

15  A.  Yes, this is the labeling document for oxymorphone extended

16  release tablets from Ranbaxy.

17  Q.  Can you also look at tab 3523.

18  A.  Yes, I have that before me.  This is the labeling

19  instructions for oxymorphone hydrochloride extended release

20  tablets from Ranbaxy as well.

21  Q.  And finally just the third label, just to orient ourselves

22  DTX 3563, can you take a look at that and tell me what that one

23  is?

24  A.  Yes, this is the labeling instructions for oxymorphone

25  hydrochloride extended release tablets from Roxane.

1   Q.  And if you could turn back to our slides DTX 8000, slide

2   15, do you see there that there's excerpts from the various

3   product labels that we just looked at?

4   A.  Yes, these are excerpts from the labels I mentioned a

5   moment ago looking at the fed versus fasted state.

6   Q.  And what do these instructions provide -- tell you about

7   how a patient would take the extended release oxymorphone

8   tablets with respect to food?

9   A.  I think the important thing is clinically we instruct

10  patients to take this medication on an empty stomach, so at

11  least an hour before they would eat or two hours after they

12  eat.  So we would never instruct someone to take this under fed

13  condition.  So this is how we talk to patients when we give

14  them instructions about medication, particularly this

15  medication, for all three of these labels, which is what we do

16  daily when we talk to patients.

17  Q.  If you could turn back to slide 14.

18          THE COURT:  So you never instruct them to take it

19  under fed conditions, is that right?

20          THE WITNESS:  No, sir, we never instruct them to do

21  that, it's always under unfed conditions.

22  Q.  If we look at slide 14, after looking at the label seeing

23  that, you never instruct anyone to take it under fed

24  conditions, how does that relate to the fed versus fasted

25  claims that we have here on the slide?

1    A.  Well, again, if the patient follows our instructions and

2    that of Ranbaxy and Roxane's labeling, then they would not take

3    it under fed conditions, and certainly we would not conduct any

4    pharmacokinetic testing on a patient.  So we wouldn't ask a

5    patent to do a study because we don't the dose this medication

6    based on that.  The availability of 20 percent or 30 percent

7    clinically is not consequential.  The consequential part is

8    does it help the pain or not, are there side effects or not?

9              THE COURT:  I'm not understanding what you are saying.

10             THE WITNESS:  Clinically we consider we only instruct

11   it under fasting conditions only, and then we make our

12   decisions about the dosing and things based on the patient's

13   response not on pharmacokinetics testing, we don't instruct any

14   pharmacokinetic blood testing to make decisions.

15             THE COURT:  Any what?

16             THE WITNESS:  Any blood testing.  We don't test their

17   blood to see if they're responding properly.  We don't draw

18   plasma levels or C maxes or areas under the curve or anything

19   like that clinically.

20             THE COURT:  Does the patent do that?

21             THE WITNESS:  The patent does do that?

22             So then these --

23             THE COURT:  The patent does what?

24             THE WITNESS:  The patent involves the method of doing

25   those things, drawing serum levels and things of that nature.

1    Clinically we don't do any of those things based on the

2    instructions of Roxane and Ranbaxy.

3              THE COURT:  Go a little slower.  The patent does what?

4              THE WITNESS:  So the method claim in the patent

5    instructions to fed and fasting dosing and then draw blood

6    levels and look at the differences in the method claims.  We

7    clinically don't do that.  We instruct people to take it only

8    fasting, and we don't require any blood drawing to determine

9    the dosing.

10             THE COURT:  Are you saying that the patent says that a

11   patient is supposed to do both and then they're supposed to

12   compare?  Is the patient supposed to do that, according to you?

13             THE WITNESS:  No, we recommend that clinically -- I'm

14   speaking from a clinical standpoint, we don't recommend that

15   they do that.  And the labeling of these two --

16             THE COURT:  What does the patent do?

17             THE WITNESS:  The method claim of the patent involves

18   testing the blood and also giving it under fed state.

19             THE COURT:  Under what?

20             THE WITNESS:  The patent claim has a method of giving

21   the drug under a fasting state and then a fed state and then

22   comparing the two based on blood draws.

23             THE COURT:  Comparing the two.  To find out how much

24   drug gets into the blood?

25             THE WITNESS:  That's right.  But clinically treating

1    patients based on the labels that we talked about a moment ago,

2    we don't recommend that.

3                THE COURT:  But you're saying that the patent involves

4    a patient and taking the patient and having the patient try the

5    drug out before the meal and after the meal, is that what

6    you're saying that the patent says should be done?

7                THE WITNESS:  The patent method claim has them taking

8    the pill before the meal, but some other time taking it with

9    the meal, in the fed state.  That's what the patent method

10   claim recommends or has a method claim.

11               THE COURT:  In the treatment of a patient, they

12   would -- or under the patent they could take it before eating,

13   right?

14               THE WITNESS:  So the patent method claim has before

15   eating as one of the times.

16               THE COURT:  What do you mean by the method claim?

17               THE WITNESS:  I'm not a lawyer, but the method claim

18   is the part of the patent that instructs the method of the

19   patent.

20               THE COURT:  Okay, fine.  And you're saying that the

21   method claim, it's the method of treating a patient, right?

22               THE WITNESS:  That's right.

23               THE COURT:  And the patient can take the drug before

24   eating, right?

25               THE WITNESS:  That's correct.

1          THE COURT:  And after eating, right?

2          THE WITNESS:  No.  Well, on a full stomach.

3          THE COURT:  With a full stomach.

4          THE WITNESS:  Yes.

5          THE COURT:  As a remember the patent, it says that the

6     difference of how much drug gets into the bloodstream is less

7     than 20 percent, isn't that what the patent says?

8          THE WITNESS:  It looks at different percentages.  I'm

9     not sure the number, but looks at different percentages

10    comparing the fed to fasting.  And they draw blood to figure

11    that out, they draw blood from the subject.

12         THE COURT:  All right.

13         THE WITNESS:  Clinically -- my testimony is that

14    clinically if you follow the labels of these two labels that we

15    just talked about a moment ago, Ranbaxy and Roxane, you would

16    not do that.  The FDA, which controls this, would have you give

17    the medicine only in the fasting patient and not to draw any

18    blood to test any levels.

19         THE COURT:  Okay.  All right.  Fine.

20    BY MS. CRUZ:

21    Q.  Then why don't we move on to the next limitation that is in

22    dispute between the parties, and if we could turn to slide 16

23    to look at that next limitation.

24         So looking at claim 38, there is the term

25    "administering" in that claim, and in other claims it appears

1   as "administered" or "administration," and did you, in your

2   review of the claims, come to an understanding along with your

3   expertise of what that term means?

4   A.  I did.  To administer a drug means to physically deliver

5   the composition into the body of the patient.  So to administer

6   a drug is to actually have a drug go into your body, whether

7   that be by pill form or some other method, in this case by pill

8   form.

9   Q.  And if could you turn to slide 17.

10  A.  Yes.

11  Q.  Could you describe -- earlier you mentioned in your

12  testimony that claim 38 has one step of providing and a second

13  step of administering.  Can you explain that in a little more

14  detail?

15  A.  Yes, providing a drug like this to a patient involves a

16  prescription being written by the doctor, and a pharmacist

17  delivering or providing the medication to the patient.  So that

18  is regulated by the DEA, because it's a controlled substance.

19  So to be a provider of opioids you have to have a DEA license

20  and the pharmacy has to have a DEA license.  That means you're

21  providing an opioid, which is different than administering,

22  which means you're taking it.  So in this case the patient

23  would take the pill, as opposed to an injection in your vein in

24  a hospital where I could both provide and administer to the

25  patient.  So there's a difference between the two.

1              THE COURT:  Wait, wait.  I'm not sure I get what

2       you're saying.  Go over that again.

3              THE WITNESS:  So --

4              THE COURT:  I want to understand what you're saying.

5              THE WITNESS:  Absolutely.  So I will try to explain

6       that again, and if I don't do a good job, I will do it again.

7              So claim 38 has two separate steps, and that's the

8       whole point medically speaking.  And again, I'm not giving a

9       legal opinion, I'm giving a medical opinion.  One is providing

10      a solid oral pill, so a pill, that's step one, providing.  And

11      in the United States, to provide a level II opioid, which this

12      is, all of these manufacturers, these are level II opioids,

13      that's the highest level, control level, level II, with the

14      DEA, the Drug Enforcement Agency.  You have to have a physician

15      write it based on the controlled substance laws and his or her

16      state and the federal law, and then you have to have a

17      pharmacist with a license dispense the drug or provide the drug

18      to patient.  That's step one, it takes a physician and a

19      pharmacist to do step one.

20             Step two is administering.  And to administer this

21      drug, the patient would have to take the pill.  So this is

22      called a sel-administered drug because it's oral.

23             So the point is I was asked clinically is this two

24      different steps, and the answer is it certainly is with this

25      type of drug because it's a heavily controlled substance.

1            THE COURT:  How does this relate to issues in our

2    case?

3            THE WITNESS:  I would defer that to legal counsel on

4    both sides, but what I understand is there is a question of one

5    person can do the whole thing, can one person both provide and

6    take the medicine.  And providing, to me, means two -- at least

7    three people are involved in this process, a physician, a

8    pharmacy, and a patient.  I was asked if that could be with one

9    person or need to be more than one.  Clinically speaking it has

10   to be three.  The legal issues --

11           THE COURT:  To deal with what is in the patent --

12           THE WITNESS:  Yes.

13           THE COURT:  -- requires three persons?

14           THE WITNESS:  The patent method claim, certainly I

15   could let the lawyers speak to that, but the clinical question

16   for me was is this one step, one person do this whole thing,

17   and clinically speaking in America it takes three people to do

18   this step.

19           THE COURT:  Before the patient can take the pill,

20   right?

21           THE WITNESS:  Well, it takes two people before the

22   patient can take the pill, the doctor and the pharmacy, because

23   they have to be licensed to do so by the federal government.

24   And then the patient administers this pill to themself, as

25   opposed to IV injection.  For example, chemotherapy, the same

1    doctor may provide it and administer it, that could be one step

2    if you have a chemotherapy drug.  But this is very different.

3    This is a pill prescribed --

4              THE COURT:  What does this have to do --

5              MS. CRUZ:  If I may, your Honor, legally it matters

6    whether these two steps are done by the same or separate people

7    as a matter of patent law.  And so what he's saying is

8    factually in a practical aspect it's separate actors.  So if

9    one actor legally does not perform all the steps, then

10   defendants don't infringe this claim or the claims depending

11   from this claim.  So that's the issue in dispute between us and

12   plaintiffs.

13             THE COURT:  Say that again.

14             MS. CRUZ:  Sure.  So legally it matters whether these

15   two steps, the providing and the administering, are done by the

16   same or separate people.  And some of the case law says

17   "actor," but I will use the term "people."

18             And what Dr. Deer is saying is that factually in

19   practice it's separate actors that are performing these two

20   steps, the physician and the pharmacist on one hand and then

21   also the patient.  And so if one actor doesn't perform all of

22   these steps, then defendants don't infringe this claim or the

23   claims that depend from this claim.

24             THE COURT:  This claim being?

25             MS. CRUZ:  Claim 38.  And claim -- there's several

1    dependent claims that are asserted that include these

2    limitations.  So for example, claims 40 and 42 of the '216

3    patent.

4            THE COURT:  Where is it in the patent that talks about

5    how many people have to be involved?

6            MS. CRUZ:  It's a combination of the case law as well

7    as the patent itself.  So this --

8            THE COURT:  Where in the patent does it say this?

9            MS. CRUZ:  It's part of the legal framework in

10   determining whether or not this patent claim, claim 38, which

11   is up on the screen, whether or not that is infringed by a

12   single person.

13           Plaintiffs are alleging that the defendants induced or

14   contribute to other people infringing these claims, and there

15   is case law that says that if we're in that context, a single

16   person needs to perform the steps that are in the claim.  And

17   so our point here through Dr. Deer is that it's not a single

18   person performing these steps.

19           THE COURT:  And what persons do perform the steps?

20           MS. CRUZ:  So for the providing step it would be the

21   physician or the pharmacist, and with respect to the

22   administering it would be the patient.

23           THE COURT:  And you're saying that the patent just

24   means that one person is involved?  Is that what you're saying?

25           MS. CRUZ:  What I'm saying is that the patent lists

1    the steps, so there is step A, providing, step B,

2    administering.

3              THE COURT:  Where does it say that?

4              MS. CRUZ:  If you look at claim 38, it's on the screen

5    there, and if you look at step A of --

6              THE COURT:  Just a minute.  Claim 38.  Which patent?

7              MS. CRUZ:  It's the '216 patent, your Honor, it's PTX

8    5, if that helps.

9              THE COURT:  So the '216 patent, right?

10             MS. CRUZ:  Correct.

11             THE COURT:  And claim 38.

12             MS. CRUZ:  38.  It's in column 29 of the patent.

13             THE COURT:  Right.

14             MS. CRUZ:  And it's towards the bottom left-hand

15   corner, claim 38.  And you will see part A, and it says

16   providing a solid oral dosage form.

17             (Continued on next page)

18

19

20

21

22

23

24

25

Fer2end4                    Deer - Direct

1              THE COURT:  Just a minute.  I see that.

2       Q.  And then the claim continues on, actually, to the next

3       column, and then there is a part B.  Do you see there at the

4       top of column 30?

5              THE COURT:  Right.

6              MS. CRUZ:  And step B says "administering a single

7       dose of the dosage form," so administering the solid oral

8       dosage form, which in this case is the controlled release

9       oxymorphone.

10             THE COURT:  What is the point that you are making?

11             MS. CRUZ:  The point is that the patent lists these

12      two different steps and to infringe the claim, you have a

13      two-part thing.  The steps have to be performed, but the law

14      requires that all of the steps be performed by one person or

15      one actor, and our point here --

16             THE COURT:  Wait a minute.

17             What did you say claim 38 means on the subject you are

18      talking about?

19             MS. CRUZ:  So claim 38, if you take a step back, it is

20      a method claim for treating pain.

21             THE COURT:  That's right.

22             MS. CRUZ:  So step A of that method is providing a

23      solid oral dosage form.  And then I'm not going to go into the

24      rest of that part of the claim, because it is not relevant to

25      what we are talking about right now.  And step B requires

1    administering that solid oral dosage form to the subject or to

2    the patient.

3              THE COURT:  I am sorry to say I just don't understand

4    any other way to do it.  "Providing," to me, means

5    manufacturing, whatever is needed to make the pill.  And I

6    assume that, whether you are a plaintiff or a defendant here,

7    if you are trying to provide the pill, the pill has to be

8    manufactured.  It doesn't come out of nature.  Whether it is

9    plaintiffs' side or the defense side, the pill has to be

10   manufactured.  And then obviously you don't keep it in a desk

11   drawer, so it is given to somebody to take.  How else could it

12   be?

13             MS. CRUZ:  What's relevant here, your Honor --

14             THE COURT:  How else possibly could it be?

15             MR. CLEMENT:  Your Honor, if I may, Alan Clement on

16   behalf of Roxane, so the issue here is there has to be direct

17   infringement of the claim.  Under the recent Supreme Court

18   case, and this is spelled out in our pretrial brief, proof of

19   direct infringement can only occur when all of the steps of a

20   method claim are performed by one actor.  That is the way the

21   Supreme Court has said method claims have to be looked at when

22   determining infringement.  This only applies to these claims,

23   40 and 42, which depend from 38.  This defense doesn't apply to

24   the other claims in this case, but the way this claim is

25   written it is just fatally defective.  Because, as your Honor

1   said, "providing" means manufacturing, "administering" means

2   the patient ingesting the drug, and since that necessarily

3   requires two actors, it cannot be infringed.  And, as Dr. Deer

4   has been testifying, he is confirming that, that providing is

5   done by other actors than the --

6           THE COURT:  Are you saying the Supreme Court says it

7   has to be one actor?

8           MR. CLEMENT:  Yes, I am, your Honor.

9           THE COURT:  In other words, the same person has to

10  manufacture it?  Has the Supreme Court held that?  The same

11  person has to manufacture the pill and give it to a patient?

12          MR. CLEMENT:  What the Supreme Court held in the

13  *Limelight* case is that all of the steps --

14          THE COURT:  I am asking you a more specific question.

15          MR. CLEMENT:  I understand that, and I think, under

16  the holding of the Supreme Court, that is how that would be

17  interpreted if they were presented with this specific claim.

18  The case before the Supreme Court dealt with another multistep

19  method claim, and they said since one actor did not perform all

20  the steps, even though multiple actors did perform --

21          THE COURT:  I think the Supreme Court case is talking

22  about something much different than what we are talking about.

23          MR. CLEMENT:  I think the Supreme Court was very clear

24  in its holding and it has been followed in other cases, and it

25  is set forth on page 22 of our pretrial brief --

1          THE COURT:  We are not going to go on endlessly, but

2     why don't you go ahead and let's complete this examination and

3     we will get back to the legal issues later, of course.

4          MR. CLEMENT:  Thank you, your Honor.

5          THE COURT:  All right.

6          Go ahead.

7          MS. CRUZ:  Why don't we switch gears to secondary

8     considerations at this point.

9          THE COURT:  All right.

10         MS. CRUZ:  And, your Honor, this is an analysis that's

11    relevant to all three patents, and what Dr. Deer will be

12    responding to is just some various assertions plaintiffs have

13    made regarding Opana ER and the marketplace, and we can turn to

14    those now.

15    Q.  On slide 21, does this show the various areas of assertions

16    that plaintiffs have made that you were looking at from a

17    clinical perspective?

18    A.  Yes, this summarizes the clinical opinions I made based on

19    those areas of interest and secondary considerations.

20    Q.  And in forming your opinions, are there areas of expertise

21    that you drew upon?

22    A.  Yes.  I looked at my own clinical practice for 21 years;

23    looked at my work around the country with other physicians,

24    other societies, and policy-making areas; my work in the state

25    legislature in West Virginia, looking at new legislation to

Fer2end4                    Deer - Direct

1   curb drug abuse; and also my experience of my colleagues as

2   well in the area of commercial success.

3   Q.  If we could turn to slide 22, and if you could describe

4   briefly your statement here that there were adequate treatment

5   options available prior to introduction of Opana ER and

6   Opana ER CRF.

7   A.  Yes.

8           Your Honor, I am going to talk about three areas here

9   clinically.

10          The first is in 2006, when Opana ER was first

11  approved, I am going to look at what else we had available

12  clinically at that time to treat similar patients.  So that's

13  the long-acting opioid issue.

14          Then I am going to look at some of the benefits you

15  may see with this medication being attributable to the compound

16  itself, oxymorphone, not to the sustained-release version of

17  that or the extended-release version.

18          And then, lastly, and sadly, I am going to look at how

19  the crush-resistent formulation really has done nothing to

20  change drug abuse in America, which is what we see on a daily

21  basis around the U.S.  So those are the three areas I am going

22  to use my clinical --

23          THE COURT:  Has the crush-resistent feature done

24  something to reduce the use of this kind of pill?

25          THE WITNESS:  No, sir, I believe has not, and the FDA

1   agrees with me on that so far.

2              THE COURT:  Oh, okay.

3              Do drug addicts just crush it?

4              THE WITNESS:  No, the drug addicts tend to take more

5   pills.  So if they took one before and crushed it, now they can

6   take three or they can dissolve it and take it in the dissolved

7   state.  So they don't have to crush it to abuse it.  These

8   folks are very savvy.

9              THE COURT:  How do they abuse it again?

10             THE WITNESS:  For example, instead of maybe take one

11  pill, they may take two pills or three pills or four pills.

12  They may dissolve it and do other things with it, such as shoot

13  it in their vein or drink it.  So they can do a lot of things

14  with it besides crush it, unfortunately.  So this has really

15  done, in my opinion, nothing to stem the abuse of the

16  medication.

17  BY MS. CRUZ:

18  Q.  If we could turn to slide 23.  If you could explain this

19  slide and how it relates to the marketplace when Opana ER was

20  first introduced in 2006.

21  A.  So, in 2006, when Opana ER was first introduced to

22  physicians in America to use, the question is, was there a

23  large need for this medication?  At that time we had other

24  drugs listed here that gave either 12-hour or 24-hour dosing,

25  or in the case of the now patch, the Duragesic patch, up to

1   every three days you put a patch on your body.  We also had

2   methadone, which has a long half-life, and we had a drug not

3   listed here, Tramadol Extended Release which now is controlled.

4        So we had many agents at that time that were

5   sustained-release agents.  So this wasn't a drug that we were

6   all clamoring for, if you will.  There was no long felt need to

7   bring this to the marketplace.  It was another opioid option

8   that was brought to our clinical practice.

9   Q.  Looking at the dosing schedule column that's on this chart,

10  can you explain that in a little bit more detail?

11  A.  Yes.  There are two groups of opioids.  There is the

12  short-acting opioids, which last three or four hours, so that's

13  things like Tylox or Percocet, I think Lortab, where you take

14  it every four hours or so when you break your leg or you have

15  some new injury.  Those drugs are not good long-term because

16  you have to take them so often it becomes a real problem.

17       So there are long-acting drugs where you give them

18  every 8 to 24 hours, 12 hours, listed here, labeled by the FDA,

19  that last much longer.  So we had a lot of options in 2006, all

20  the options listed here plus another option called Tramadol

21  Extended Released.  So we had at least eight options at that

22  time for patients who had chronic pain and didn't want to take

23  a pill every three or four hours.

24  Q.  Just so we have it clear in the record, can you just

25  describe which long-acting opioids are listed here on the

1   chart?

2   A.   Yes, MS Contin, Oramorph, Kadian, Avinza, all of which are

3   forms of morphine; OxyContin, which is oxycodone; Duragesic

4   which is a patch; Fentanyl; methadone, which is a drug that is

5   long-acting, given to drug addicts for abuse, but also given

6   for pain in some cases; and then, not listed here at the time,

7   as I thought of it, going through the slide, was Tramadol

8   Extended Release which is another mu-receptor drug.

9   Q.   Even beyond, this is just a list of opioids.  At the time

10  Opana ER was introduced in 2006, there were also non-opioid

11  treatments available.  Is that true?

12  A.   That's true.  We tried to avoid opioids when possible using

13  physical therapy, injections, neurostimulators, and also pumps

14  that infuse medication in the spinal fluid, intrathecal drug

15  delivery systems in some cases.  So these are the opioids that

16  were available, but in some cases we can control pain without

17  that.  A good example is kyphoplasty, where we could cement

18  into a broken bone in the spine rather than put them on pills.

19  So there are other things we can do other than opioids in 2006

20  and today.

21  Q.   And if we can turn to slide 24, you had also mentioned that

22  there were various factors that affect your prescribing

23  decisions.

24  A.   Yes.  I think my prescribing decisions are similar to other

25  doctors.  We look at the effectiveness of treatment.  Does it

1    help the patient?  That's number one.

2            Number two, we look at cost.  For example, if a drug

3    is helpful, but the patient can't afford a large copay and they

4    can't get the medication, then it is not of much value.

5            Side effects, and then the patient's previous

6    experience with opioids, we wouldn't give someone on a

7    long-acting opioid if they have never had a short-acting opioid

8    because they would be naive to the medication and could have

9    major issues.

10            We look at the route of administration, such as

11    through the skin versus through the mouth versus through the

12    spinal fluid; the dosing schedule, long-acting versus

13    short-acting; and then, lastly, we look at the risk of abuse,

14    which is a problem in America right now, and drug diversion,

15    which is when they sell their medication to someone else, which

16    is another problem.  So we look at all these factors when we

17    prescribe a medication.

18            THE COURT:  We will take a recess, please.

19            THE WITNESS:  Yes, sir.

20            (Recess)

21            THE COURT:  Go ahead, please.

22            MS. CRUZ:  Thank you, your Honor.

23            We are going to move into some assertions, just due to

24    Dr. Deer being out of order in the case that you will hear

25    about from plaintiffs further on in the case, so I just wanted

1    to make a couple of factual points that we disagree with

2    plaintiffs on.

3              THE COURT:  Go ahead.

4    BY MS. CRUZ:

5    Q.  Looking at slide 25, you had mentioned earlier that some of

6    the benefits are attributable -- some of the benefits

7    plaintiffs have mentioned are attributable to the active

8    ingredient oxymorphone.  Can you explain that in a little bit

9    more detail?

10   A.  Yes.  So oxymorphone has been used clinically in the past,

11   in the 1950s and '60s.  It was used by IV and by suppository.

12   It was used in other countries at other times.  And in recent

13   years, since 2006, it has been available commercially in the

14   United States.  One of the issues at hand is whether or not it

15   is the oxymorphone itself, the compound, or the formulation

16   involved in the patent we have been discussing this afternoon.

17   So those are the issues that I was asked to look at.

18             THE COURT:  Say that again, please.

19             THE WITNESS:  So the issues are, some of the things

20   that will be discussed about oxymorphone, which is the active

21   drug that we are discussing, is it the oxymorphone compound or

22   is it the formulation the patent involves?  The patent involves

23   an extended-release version of oxymorphone, so it is limited to

24   extended-release oxymorphone.  But the active ingredient is the

25   compound oxymorphone.  So it was available before.  It wasn't

1    invented in this patent.  It was already available as a

2    compound.  So that's what I have been asked to look at; is it

3    the oxymorphone or is it the invention that became clinically

4    available in 2006?

5              THE COURT:  The issue being?

6              THE WITNESS:  The issue being is there something

7    special about the extended-release version involved in these

8    patents or some of the things we are going to discuss in this

9    slide, as you see in this slide on the board.  Is it related to

10   the compound, the active ingredient, which is not what this

11   patent is about.

12             THE COURT:  Go ahead.

13   BY MS. CRUZ:

14   Q.  Looking, first, at your first bullet point, talking about

15   metabolism of oxymorphone, can you just briefly describe the

16   process of metabolism of oxymorphone with respect to the CYP2D6

17   that's mentioned here?

18   A.  Yes.  There is an enzyme in the body that breaks down

19   oxymorphone to its metabolites including hydroxy-oxymorphone.

20   And some people have a gene that isn't very good for that, so

21   they are what we call a poor metabolizer.  So if you give them

22   oxymorphone, they really won't process it.  That is directly

23   related to the compound and has nothing to do with the

24   extended-release version of it.  It is the drug itself, not the

25   issue in the patent.  So that's the issue with the metabolism

1  that is related directly to oxymorphone compound.

2         So in some cases, there are genetic tests available

3  where you can determine if someone has the right enzymes; but,

4  clinically, speaking as a doctor who takes care of these folks,

5  that isn't a relevant issue because no one pays for that

6  genetic testing.  For example, Medicare doesn't pay for genetic

7  testing of that enzyme system, so you couldn't, even if you had

8  the test available, you could not use that test to determine if

9  someone is a metabolizer of this compound.

10  Q.  And there is also, we will hear talk about CYP354 enzyme as

11  well.  Does that also interact directly with the oxymorphone?

12  Can you explain that?

13  A.  Yes.  The issue there is if you take oxymorphone with other

14  drugs, there can be some interactions.  Again, they can be

15  complete interaction or partial interactions.  But in all those

16  cases, it is the oxymorphone compound that is important, not

17  this extended-release version of it that is debated in these

18  patent litigation cases.

19         And then, lastly, the side effects of opioids, they

20  all have side effects.  Opana ER has side effects.  Morphine

21  has side effects.  Oxycodone has side effects.  So these side

22  effects are seen in all patients who take opioids to some

23  degree, and Opana ER is just another one of those opioids.

24         So that you can see euphoria with Opana ER just like

25  you can see euphoria with morphine.  You can see nausea, things

Fer2end4                    Deer - Direct

1    of that nature, with Opana ER as you can with oxycodone.  So it

2    is a molecule in Opana ER that causes side effects, not the

3    formulation debated in these patents.

4            So the points of those first three issues really go

5    back to the action of the molecule which was available before

6    the patents, it was invented before the patents.

7            Opioid rotation is the last issue clinically.  Opioid

8    rotation is a process where someone is on morphine for six

9    months and it quits working for them.  They develop tolerance.

10   You rotate them to Fentanyl, because their body hasn't seen

11   that drug before, and then over six months they get tolerant to

12   that drug.  Then you can go to oxycodone.  Then they get

13   tolerant to that drug, and you go to methadone and you go back

14   to morphine or you go to oxymorphone.  So "opioid rotation"

15   means you change the drug based upon someone getting tolerant,

16   where it doesn't work as well, or getting side effects.

17           That isn't done in patients who are doing well,

18   though.  You would keep them on the same drug they have been

19   on.  That is also a factor of the molecule of oxymorphone, not

20   anything to do with the patents of the extended-release version

21   of it.

22           So those are the points I wanted to clinically make

23   about the molecule versus the compound, extended-release

24   medication.

25   Q.  If we can turn to slide 27, I just want to expand a little

1    bit on the opioid rotation point you mentioned.

2    A.  Yes.  I have 27 before me.

3    Q.  Can you explain how it is that it is the molecule that is

4    relevant to opioid rotation in providing a different response

5    in the patient?

6    A.  Yes.  So in your spinal fluid in your brain, you have

7    receptors that bind opioid, so there are different receptors.

8    There is mu, which is involved in the pain response, and then

9    there are other receptors, sigma, kappa, gamma, other

10   receptors.  So if you give someone a compound such as morphine,

11   it will bind in a certain fashion to those receptors.  If, over

12   time, they don't do as well as they were doing, you can go to

13   Fentanyl, for example, and that may bind differently to those

14   receptors.  And oxymorphone, the active ingredient of that

15   drug, would do the same thing; it would bind differently.

16          So the whole point of opioid rotation is based on the

17   receptors in the spinal fluid and the spinal cord and the brain

18   seeing different things it hasn't seen before, so that it may

19   respond better if someone gets tolerant.  So opioid rotation

20   could be helpful in certain patients because they develop

21   tolerance to a medication.  Other patients may be on the same

22   drug for ten years and never develop tolerance and keep their

23   dose really low, and their receptors aren't prone to tolerance.

24          So that's the issues at hand with opioid rotation.

25   Q.  If we could actually go back to slide 26, I just wanted to

Fer2end4                    Deer - Direct

1  touch on a little bit more on the metabolism that you

2  mentioned.  With respect to CYP2D6 and CYP3A4, I believe you

3  testified that those are both enzymes involved in metabolism of

4  oxymorphone?

5  A.  Well, certainly one is -- they are both involved in the

6  metabolism and in the pathways in the body, that's correct.

7  Q.  Is CYP2D6 known to be a problem with respect to OxyContin?

8  A.  Oxycodone can be one of those drugs which has difficulty

9  with that enzyme system, that's correct.

10 Q.  And actually what we have up on the screen here is, if we

11 can look at the top selection, that is a section of the

12 drug-drug interaction section of the Opana Immediate Release

13 product label, and it is DTX 2071, and we also on the screen

14 have an excerpt on the bottom from the extended release,

15 Opana ER product label, and that is taken from DTX 0879.

16      So if you look at these two sections, from the

17 immediate-release and the extended-release product, does that

18 have any bearing on your opinion that it is an interaction of

19 the oxymorphone active ingredient with the CYP354 enzyme?

20 A.  Yes.  I believe this is very important in that the FDA has

21 not stipulated a difference between the two, and certainly here

22 in the labeling, the immediate-release product label, as

23 approved by the FDA, used the data from Opana ER on this issue

24 so the FDA felt that they were the same, which would suggest

25 the molecule is the important factor here.  And so I think

1  that's consistent with FDA labeling policies of drugs such as

2  this.

3  Q.  Then if we could move forward to slide 28?

4  A.  Yes, I have 28 before me.

5  Q.  I believe you have made all these points, but I am not sure

6  that you had drawn out point three, if you could explain that

7  point.

8  A.  Yes.  As I have said earlier, I do not believe the

9  crush-resistent formulation has really stopped abuse of Opana.

10  Also the FDA has ruled currently, in my understanding, that

11  their risk-versus-benefit ratio favors keeping the label the

12  same and not allowing --

13            THE COURT:  Favors what?

14            THE WITNESS:  The FDA, when they were asked to change

15  the labeling for abuse deterrence of the crush-resistant

16  formulation said, no, that there was no evidence that the

17  benefit was great enough to change the label for diversion or

18  abuse.  So they would not -- they found insufficient evidence

19  to allow doctors to be told about the abuse deterrence.  So

20  when you come talk to a physician about this medication, if you

21  work for a company, you are not allowed to tell us it changes

22  abuse, because there is no evidence that the FDA found credible

23  to show that.  Currently speaking, I have seen no evidence of

24  that either, nor have I seen evidence, as I have traveled the

25  country and talked to other physicians.

1      And then the last point is that we have made some

2   headway in drug abuse in America, fortunately, in the last few

3   years.  I think that's from several factors.  And Opana ER

4   crush-resistent formulation or the other companies that have

5   similar things has not been the reason why.  We have had new

6   legislation, new laws around the country making it more

7   difficult for these pill mills who give medications without

8   justification.  We have had education of physicians about

9   proper prescribing and how they should do routine office visits

10  and monitoring of the patient.

11      So I think the other factors that contribute to

12  reduction, which has been shown in multiple areas, including

13  the State of Washington, which recently showed a major

14  reduction in prescribing of opioids, has been based on

15  physician education and legislation more than anything else.

16  So I would certainly hope we continue to collaborate with

17  physicians and government to help continue to strengthen laws

18  and safety around these issues.

19  Q.  In your experience, is there a stigma for patients

20  associated with any particular opioids?

21  A.  Well, there certainly has been a stigma with opioids.  For

22  example, when I first started practicing in West Virginia 21

23  years ago, people would come in and they would say, Don't give

24  my grandmother morphine for her broken bone in her spine

25  because it is morphine.  Give her something else.  So they knew

1    that word "morphine."

2           Over time, oxycodone had a stigma with it; and then as

3    oxymorphone became more common, and we started to see it

4    mentioned in newspapers and news report, it is began to get a

5    stigma in some cases as well.

6           So it seems that every time a new medication comes out

7    to the availability of doctors, we see an initial uptick in the

8    reputation of the new medication.  But, unfortunately, anything

9    that can be abused, we see that over time also become

10   stigmatized.

11          So I do believe there is a stigma for opioids in

12   general in noncancer patients, and that's something that we see

13   clinically from our patients and their families.

14   Q.  So turning to unexpected results, if you could turn to

15   slide 30.

16   A.  Yes, ma'am, I have slide 30 before me.

17   Q.  On this slide you mention that certain benefits are common

18   to all controlled-release formulations.  Can you describe what

19   you mean by that?

20   A.  Well, I have been using controlled-release formulations for

21   many years.  So we expect certain things that are not

22   unexpected.  If you give someone a controlled-release

23   formulation, you expect them to take medicine less often.

24   That's the whole point.  If you give someone a medicine they

25   take once or twice a day or every three days in the case of a

1    patch, you expect improved compliance because they don't have

2    to remember to take a patch every day or take a pill six times

3    a day.  If they don't have to wake up in the middle of the

4    night to take a medicine, then their sleep improves generally.

5    So that's an expected result of a controlled-release

6    medication.  And you expect in some cases there will be fewer

7    side effects.  That's not always the case.  And, in fact, even

8    with controlled release, all opioids have side effects.  But it

9    wouldn't be unexpected if they had less side effects.

10   Q.  And if we can move to slide 31, you had mentioned benefits

11   that were attributable to the active ingredients, and we have

12   already talked about the drug-drug interactions, but if you

13   could explain your point on urine monitoring.

14   A.  Well, a few years ago it was very difficult to monitor

15   certain drugs in the urine, and that's been part of the

16   legislation that has been passed around the country is if

17   someone is on a chronic opioid, you should see them in the

18   office and do urine drug screening.

19         What we find now is that we have very high complex

20   urine screening tests, so we can measure the urine monitoring

21   and the compliance with all these medications -- morphine,

22   oxycodone, oxymorphone and the metabolites.

23         I think if there is any benefit of oxymorphone in

24   urine, it would be from the active ingredient, not the drugs in

25   the patents, but I think but with the high complexity urine

1    screening we are seeing less benefit from that point overall

2    anyway.

3    Q.  Maybe for the court reporter you could just slow down a

4    little bit.

5    A.  No problem.

6    Q.  So turning now to slide 32, and it looks -- let's discuss

7    some of the prescribing decisions and factors that may be

8    raised that do not impact your prescribing decisions.

9    A.  Well, we talked earlier about the main factors and decided

10   what prescription to write for someone in pain.  We talked

11   about safety, effectiveness, cost, availability, other disease

12   states, experience with opioids.  All those things are

13   important.

14          What doesn't impact physicians in my opinion and,

15   again, speaking to physicians around the country and in my

16   practice, they have little or no expectations about drug

17   formulations and the bioavailability of the compound.  They

18   rarely ever consider this and certainly isn't a part of their

19   clinical thinking or training.

20          I have medical students with me all the time in my

21   rotation, and certainly it is not something we teach in the

22   medical school as a component of this factor in most cases.

23   And then dissolution testing doesn't impact our prescribing at

24   all.  In fact, I would think most physicians wouldn't even

25   understand what dissolution testing means.  So the

1  bioavailability and the dissolution testing aren't important

2  factors in prescribing.  It is those other things that I

3  mentioned earlier that are important.

4  Q.  Turning to slide 33, if we could move to the commercial

5  success topic.

6  A.  So, I was asked my clinical opinion of whether or not this

7  drug Opana ER was clinically, commercially a success

8  clinically, so I had a few thoughts on that based on my

9  experience.

10      One is, Endo has been very aggressive in marketing

11  this medication.  Physician brochures mailed to your office and

12  offices that allow representatives, representatives talking to

13  physicians about prescribing this, they have had online

14  Internet coupons for patients to get the medication.  So they

15  have been very aggressive.  I don't think there is anything

16  wrong with that.  That's just a way companies present their

17  medication to people.  So I don't have a criticism of that in

18  any fashion.

19      Despite that, Opana ER has not become a first-line

20  treatment for most clinicians, including myself, for several

21  factors which I mentioned earlier.  In my practice it has been

22  a third- or fourth-line therapy, and I think that's pretty

23  consistent with my colleagues as I have traveled the country.

24  Q.  Can you describe what your first- and second-tier drugs

25  would be with respect to opioids?

1    A.  Our first tier is try to avoid long-term opioids.  We try

2    to other things, such as procedures or physical therapy or

3    drugs like Gabapentin, which is a non-opioid.  If those things

4    aren't successful and we go to opioid, we try to keep opioids

5    on a limited basis, on an as-needed basis initially.  If that

6    is successful, we would stay with that over time.

7              But there are cases where an extended-release

8    medication is needed and is clinically appropriate.  In those

9    cases, morphine, which is MS Contin or one of the other

10   morphine extended-release drugs, has been one of our first

11   choices.  Second line of therapy has been Duragesic or other

12   Fentanyl patch prescribing areas.  OxyContin, certainly in

13   low-risk patients for abuse, has been a third-line choice in

14   some patients, although certainly has had a history of

15   diversion.  And Opana ER, to me, is in a similar group, with

16   OxyContin, as a third- or fourth-line option in those patients.

17   So certainly it is acceptable clinically.  It is certainly a

18   drug that is certainly reasonable to prescribe.  It is just not

19   a first-line therapy in clinical practice for myself or most

20   other physicians that practice pain medicine.

21   Q.  Just to clarify, your opinions on commercial success, those

22   are based on your clinical perspective.  You are not an

23   economist, is that correct?

24   A.  No.  I don't have any opinion on whether or not it is a

25   profitable drug or things of that nature.  So I would defer

1   that to people with that expertise, certainly not me.

2   Q.  And turning, more specifically, to the Opana ER CRF

3   version, if we can go to slide 34.

4   A.  Yes, ma'am, I have the slide before me.

5   Q.  This one deals with some commercial success points with

6   respect specifically to the crush-resistent formulation.  Can

7   you elaborate on these points?

8   A.  Well, I was asked if I felt Opana ER CRF, which is the

9   crush-resistent formulation, had any significant demand from

10  physicians, and I would tell you that my discussion with

11  physicians, both locally and around the country, including

12  family practice doctors, is most of them don't know this even

13  exists.  As we said earlier, the FDA has not allowed that to be

14  marketed in that fashion, so most physicians still write for

15  Opana ER as their primary drug when they give this medication.

16  In fact, when I write for this medication, that's what I have

17  written for as well.

18          I was surprised to learn that it is not substituted

19  for generic, because I don't keep track of what's generic and

20  of that nature over time.  So apparently it is not

21  substitutable.  So if you write Opana ER currently, then they

22  get the brand product, which, again if they can afford that, I

23  have no problem with that.  It's just not well understood by

24  physicians.

25          So the point is that I think the crush-resistent

1  formulation hasn't changed the demand because, number one,

2  doctors aren't told that it changes abuse, because it is not

3  allowed to be marketed that way; and, secondly, most

4  physicians, when they write for Opana ER, I don't think they

5  understand the generic substitution for this product versus the

6  brand-necessary product.

7  Q.  If we could turn to the final slide, slide 35, this slide

8  has to do with industry acclaim.  I believe you already stated

9  these points, but do these points also apply to whether or not

10 you feel there has been acclaim in the industry for the

11 Opana ER CRF product?

12 A.  Yes.  When you go to a meeting, for example, the American

13 Academy of Pain Medicine I mentioned a moment ago, we have

14 another meeting in three weeks of the American Society of

15 Interventional Pain, when something new comes along, there is a

16 lot of chatter among doctors, Have you seen this, have you

17 tried this for your patients?  And certainly I have not seen

18 any of that with this medication.  That's not to say it is a

19 bad medication in any fashion.  It has just not had acclaim in

20 the industry thus far in my opinion.

21       MS. CRUZ:  Your Honor, we have reviewed several

22 documents today with Dr. Deer, and if it is acceptable to the

23 court --

24       THE COURT:  Are you offering them?

25       MS. CRUZ:  Yes.

1          THE COURT:  Received.

2          MS. CRUZ:  Would you mind, for the record, if I could

3    list the DTX and PTX numbers just so it is clear for the

4    record?

5          THE COURT:  It is a waste of time.

6          MS. CRUZ:  DTX 0879 --

7          THE COURT:  Please.  You can do that with the court

8    reporter after the session.

9          MS. CRUZ:  Okay.  Thank you, your Honor.

10          THE COURT:  Any further questions of this witness?

11          MS. CRUZ:  No further questions.

12          (Defendants' Exhibits DTX 0879, DTX 2071, DTX 3523,

13    DTX 3542, DTX 3563, DTX 6000 received in evidence)

14          THE COURT:  Is there no cross?

15          MR. BLACK:  Oh, there is cross, your Honor.  Yes.

16          We have a bit of a scheduling issue.  We have had a

17    long direct, and I am not sure I am going to be able to get my

18    cross done.  I understand that Mr. Deer will be able to come

19    back, not next week, but maybe the following week if we have

20    to.

21          Is that correct?

22          THE COURT:  Well, do your best.  We can even get on

23    the telephone, if necessary.

24          MR. BLACK:  It might not be as exciting, but all

25    right.

Fer2end4                    Deer - Direct

1  CROSS EXAMINATION

2  BY MR. BLACK:

3  Q.  Dr. Deer, I'm going to start from back to front with your

4  examination.

5       You basically, I would sum up your testimony -- tell

6  me if it is fair -- that tamper-resistent technology for

7  opiates is no big deal.  You don't think it is very important,

8  right?

9  A.  I don't recall saying it that way, sir.  What I said was

10  currently there is no evidence that I have seen, either by

11  studies or in my experience, that it has changed abuse

12  potential of the medications, and the FDA has agreed with me on

13  that point so far.

14  Q.  So far.

15       So you believe that the tamper-resistent technology

16  that's currently available is not adequate, not relevant, not

17  commercially successful?

18  A.  In my hometown there have been recently some teenagers

19  overdose on this substance, so I think it doesn't keep you from

20  taking more than you are supposed to, for taking diverted

21  drugs, for taking dissolved drugs.  You can still find ways to

22  abuse this drug and die from it if you take it improperly, and

23  that's what drug addicts do.  So I don't think there is any

24  clinical evidence, in studies or definitely not in society,

25  that has changed anything as of yet.  If a study is done that

1    shows that, I would be glad to view that and comment.

2    Q.  You mentioned your hometown.  You are from West Virginia,

3    is that correct?

4    A.  That's correct.

5    Q.  My condolences on the basketball game last night.  I

6    believe you guys had a tough night.

7         You said earlier in your testimony that you do some

8    sort of consulting work for the state, are involved in

9    reviewing data relating to opioid abuse, is that right?

10   A.  No.  It's not consulting work.  It's volunteer work.  We

11   have a task force of the Pharmacological Oversight Committee,

12   which I serve on at the appointment of the governor, and we

13   look at things like death from different medications, including

14   heroin, which is not prescribed.  The medical examiner is

15   involved in that, the board of pharmacy runs the task force

16   along with the D.A., the state police, and other physicians --

17         THE COURT:  Can I ask you, listen very carefully to

18   his question and limit your answer to his question and that's

19   the way we can make progress.

20         THE WITNESS:  Yes, sir.  I will do so.  Thank you.

21   Q.  Are you familiar with Patrick Morrissey?  Do you know who

22   he is?

23   A.  Patrick Morrissey is the Attorney General, I believe,

24   currently.

25   Q.  Of West Virginia, correct?

1    A.  Yes, sir.

2    Q.  He seems to disagree with you.  Do you know that?

3    A.  No, I didn't know that but certainly I would be glad to

4    hear what Mr. Morrissey has to say.

5    Q.  Let's take a look at tab eight of your binder.  Do you have

6    a binder up there, white binder?

7    A.  No, I don't.  No one gave me one, sir.

8    Q.  Okay.  Well that's a problem.  We will correct that.

9            MR. BLACK:  Does the court have a binder?

10           THE DEPUTY CLERK:  We are fine.  Thank you, Mr. Black.

11   A.  Thank you very much.  Which tab was that, sir?

12   Q.  That would be tab eight.

13   A.  Tab eight?  Yes, sir.

14   Q.  This is a letter, it is a one-page letter from the National

15   Association of Attorneys General.  Do you see that?

16   A.  I do.

17   Q.  It is dated March 11, 2013.  It is an unusual letter in

18   that the text of the letter is one page and the signatures run

19   to three pages.  Do you see that?

20   A.  I do see that.

21   Q.  It is signed by almost all -- I think 48 -- of the

22   attorneys general of the various states of the United States.

23   Do you see that?

24   A.  I do.

25   Q.  The letter is addressed to the Food and Drug

1    Administration, specifically to Margaret Hamburg, who was then

2    the head of the FDA.  Do you see that?

3    A.  I do.

4    Q.  I want to see whether you agree or disagree with the 48

5    attorneys general of the United States.

6          First thing they say is, "Relief from pain is

7    important to millions of individuals who suffer from chronic

8    illness and prescription drugs, such as opioids, have proven

9    useful."

10         Do you agree with?

11   A.  I think in some patients they are very useful.

12   Q.  They then say, "However, the abuse of prescription drugs is

13   a significant danger and has reached epidemic levels in many of

14   our states."

15         Do you agree with?

16   A.  I certainly agree with that.

17   Q.  "Against this background, the development of

18   tamper-resistent drugs provides an opportunity."

19         Do you agree?

20   A.  Certainly an opportunity.  I do agree with that.

21         THE COURT:  Wait.  Do you agree or disagree?

22         THE WITNESS:  I think it is an opportunity.  I would

23   agree with the term it is an opportunity, yes.

24   Q.  "Adding new physical and chemical features to prescription

25   opioids to deter abuse could reduce misuse of these drugs and

1    its sometimes deadly consequences."

2            Do you agree?

3    A.  I agree with the word "could reduce," yes.

4    Q.  "These products can be part of a comprehensive approach

5    which should include prevention, interdiction, prosecution, and

6    substance abuse treatment."

7            Do you agree with that?

8    A.  Certainly not opposed to that in any fashion.

9            THE COURT:  You better just be a tiny bit slower.

10           MR. BLACK:  Okay.

11   Q.  "In our states, nonmedical users are shifting away from the

12   new tamper-resistent formulations to nontamper-resistent

13   formulations of other opioids as well as to illegal drugs."

14           Do you agree with the 48 attorneys general who signed

15   this letter?

16   A.  Not exactly.  That's not what has been showing.

17           THE COURT:  Read that again.

18   Q.  "In our states, nonmedical users are shifting away from the

19   new tamper-resistent formulations to nontamper-resistent

20   formulations of other opioids as well as to illegal drugs."

21           In other words, once the tamper-resistent products

22   came out, drug abusers shifted from the tamper-resistent to the

23   available nontamper-resistent products, isn't that right?

24   A.  I don't think that's correct, and I can tell you why if you

25   would like.

1    Q.  I just want to know at this point whether you agree with

2    the 48 attorneys general who signed this letter, yes or no?

3    Yes or no, sir.

4    A.  I partially agree because heroin is on the rise, there is

5    no question, in every state, including West Virginia.  But a

6    move away from all opioids is also being seen, not just

7    tamper-resistent.  So I would agree that that's one of the

8    categories, but certainly I don't think it has anything to do

9    with the tamper-resistent portion of that.  But heroin is on

10   the rise terribly right now.

11   Q.  I don't believe I asked you about heroin, but thank you.

12   A.  You said illegal drugs, sir.

13   Q.  "There is great concern in our law enforcement community

14   that many nontamper-resistent products are available for abuse

15   when only a few products have been formulated with tamper

16   resistent features."

17          Do you agree with that concern or is that not a

18   concern of yours?

19   A.  Well, certainly I know the state police well in West

20   Virginia, and they are concerned about all opioid abuse and

21   diversions, and that would be one of the things they would be

22   concerned with.  And this is helpful, so I would tend to agree

23   with that overall.

24   Q.  "As a specific example, we are concerned with the

25   possibility that generic versions of extended-release opioid

1    prescription drugs and other nontamper-resistent products may

2    reach the market."

3            Do you agree with that?  Do you have that concern?

4    A.  I'm not sure I understand the concern.  They are talking

5    about generic tamper-resistent drugs?

6    Q.  "We are talking about generic versions of extended release

7    opioid-resistent drugs, like the generic products in this

8    case."

9            Right?

10   A.  It appears that's their opinion on this issue.  I think we

11   should hopefully reduce the use of all opioids when possible as

12   well as diversions.  So I would agree with that as I would any

13   opioid reduction.

14   Q.  So you would agree that generic versions of

15   extended-release opioid prescription drugs and other

16   nontamper-resistent products should not reach the market,

17   correct?

18   A.  No, I wouldn't agree with that.  I would say there is no

19   evidence of that so far with tamper-resistent drugs, which

20   makes a difference.  So I would agree all opioids should be

21   reduced where appropriate to reduce diversion, so that would be

22   my thought on that.  So I can't agree with that as written

23   because I don't think there is any evidence scientifically or

24   clinically it is true.

25   Q.  So you disagree with the opinion of the 48 state attorneys

1   general of the United States?

2   A.   I doubt there are any physicians among those 48 folks.   I

3   am speak clinically, so I have got no political -- in fact, I

4   know Mr. Morrissey invited me to his fundraiser, so I know him

5   fairly well.

6   Q.   Have you made any political contributions to him?

7   A.   I have not.  I think I went for free, but he invited me and

8   I did meet with him actually.  Seems to be a nice guy.

9   Q.   "We applaud the FDA for expeditiously proposing guidelines

10  establishing clear standards for manufacturers who develop and

11  market tamper- and abuse-resistent opioid products while

12  considering incentives for undertaking the research and

13  development necessary to bring such products to market."

14          Do you applaud the FDA for putting those guidelines

15  out?

16  A.   They should have guidelines, and that's why they haven't

17  approved yet the language to be marketed, because they haven't

18  shown that based on that study that you are talking about.  So,

19  yes, more research should be done.  I agree 100 percent that

20  more research is needed to show any effect of this

21  tamper-resistent drug.

22  Q.   Are you aware that the FDA has published guidelines on this

23  issue?

24  A.   I am aware of it.

25  Q.   Have you read them?

1    A.  I don't know if I have or not.  I have read a lot of

2    materials.  I may have.

3            THE COURT:  I didn't understand the question, please.

4            MR. BLACK:  I will back up, your Honor.  I introduced

5    a new thought here.

6    Q.  The FDA, actually, is actually very concerned about the

7    proper methodology for approving drugs with tamper-resistent

8    claims, right?

9    A.  So, I think Janet Woodcock wrote something about these

10   guidelines that I read and reviewed, and I think she is the one

11   that saw the decision so far that the evidence wasn't adequate;

12   and if that be the case, she may have been the one calling for

13   more guidelines and been part of that.  So I may have seen it.

14   Under oath, I don't want to say I haven't seen it.  I don't

15   recall what it says exactly.  I know they called for more

16   expeditious study and money being spent on it.

17   Q.  Right.  You know that generally there are FDA guidelines

18   for approving tamper-resistent products but you haven't read

19   the guidelines in preparation for your testimony today, is that

20   right?

21   A.  That's not what I said at all, not even close to what I

22   just said.

23   Q.  Okay.  Which one did I get wrong?  Are you aware or are you

24   not aware whether there are FDA guidelines?  Yes or no.

25   A.  Sir, I said a moment ago I was aware of that.  I did read

1    some materials signed by Dr. Janet Woodcock, I believe was her

2    name, which I can certainly look at if you have, and that may

3    have been part of those guidelines, but I can't recall the

4    exact guidelines currently.  I do know they exist.  And I would

5    applaud them for creating such a thing, so I would agree with

6    that part of the sentence.

7    Q.  If you take a look at the last sentence of the letter, the

8    conclusion, "Most importantly, we encourage the FDA to assure

9    that generic versions of such products are designed with

10   similar features."  Do you see that?

11   A.  I do see that.

12   Q.  Do you agree with at that statement or you disagree with

13   the attorneys general of the United States?

14   A.  Well, again, I am speaking from a clinical standpoint, not

15   a politician's standpoint.  But I would say that if that

16   research shows tamper-resistent medications do make a

17   difference, which certainly would be great, that would be

18   something we should try for.  Right now there is no clinical

19   evidence that I am aware of that shows that makes a difference

20   in abuse or deterrence, and we are not seeing that in

21   communities.

22   Q.  Let's talk about communities.  Let's talk about drug abuse

23   in the path to towing the line.  So I heard you testify, and it

24   is certainly the case, that one method of abuse of opioids is

25   to take too many pills, right?

Fer2end4                    Deer - Cross

1    A.  That's correct.

2    Q.  And there is a next step along the line, though, which is,

3    if you can do it, crushing the pills and snorting it, correct?

4    A.  That would be a method, yes.

5    Q.  Yes, it would.

6         And it's a method that many people use in the United

7    States tragically, correct?

8    A.  I think that's true.

9    Q.  It is also a method that is, if the pill can be easily

10   crushed, which unfortunately is preferrable for teenagers,

11   because they are normally going to be afraid and worried about

12   the next step along the line, which is intravenous injection,

13   isn't that right?

14   A.  You know, I haven't seen any studies on that.  Most of the

15   teenager abuse we see is taking pills.  So I don't think what

16   you said is scientifically correct, and I don't know much about

17   the fear of teenagers using IV drugs.

18   Q.  First step along the road is taking too many pills, right?

19   A.  Again, I'm not a teenage expert on how they abuse drugs.

20   You mentioned teenagers taking too many pills.  We have an

21   abuse unit at a local hospital we get a lot of referrals from

22   after they go through rehabilitation to try to treat pain

23   without opioids, and certainly those people do a lot of things.

24   They shoot drugs up.  They snort drugs.  They take drugs by

25   mouth.  They do a lot of things with medication.  So I think

1    that drug addicts find many ways to abuse medication, all of

2    which are unfortunate.

3    Q.  First and easiest thing is, as you testified before, steal

4    some pills and take them and maybe take more than you need to,

5    right?

6    A.  Unfortunately I don't think most of it is theft.  I think

7    it is selling on the street or diversion, so I think that's a

8    more common theme we are seeing, rather than thefts.

9    Q.  And if the drug user gets to the next stage and says, you

10   know what, those pills, especially those controlled release

11   pills that last for hours and are designed to have lower blood

12   levels, if they want to get high faster, easiest way to do that

13   is to find a crushable pill, crush it, and snort it, isn't it?

14   A.  I have treated probably 2 to 3,000 people with abuse

15   histories in my career.  None of them has ever told me what you

16   just said.  So I know you are testifying to that, but certainly

17   my testimony would be, I have never queried that nor have I

18   seen any research or literature on that.

19   Q.  You are not aware that people take pills and crush them and

20   snort opioids to get high?

21   A.  I said earlier people do that as one of the methods, but

22   you keep saying it is the easiest method.  I don't think that's

23   true.

24   Q.  Is it easier or harder to take one of the crushable generic

25   tablets that are at issue in this case, crush them up and snort

1  them than to prepare -- to obtain the necessary tools and

2  prepare IV injection?

3  A.  Again, I don't have a good opinion on that.  I would say

4  more people take pills than anything else.  People do shoot up

5  drugs all the time, though.  We see them in the hospital with

6  phlebitis.  But snorting them would be another option in a

7  noncrush-resistent pill.  That's the whole theory behind it,

8  and if the study shows that makes a difference, I am certainly

9  not opposed to it.

10  Q.  It's a lot easier to crush up a pill and snort it than it

11  is to prepare it for IV injection, isn't it?

12  A.  I wouldn't think so.  They dissolve it in a spoon with some

13  heat, so that would seem pretty easy to do, and we do see IV

14  drug abusers pretty often in consultation, so I don't have any

15  scientific evidence to mirror what you just said, because some

16  people don't really like to snort drugs, but some people do.

17  So is it easier?  I don't know.  I certainly haven't tried

18  either method.  I have seen both patient groups.

19  Q.  And if you are talking about the folks who -- the hardcore

20  drug abusers who dissolve the drug in the spoon and inject it,

21  they, too, have to crush the pill to get the drug so they can

22  put it into the solution to inject, don't they?

23  A.  Well, we are seeing a lot of abuse of Opana right now in

24  that fashion, so how they are able to do that is certainly

25  something I am not an expert in, but they are able to do it.

Fer2end4                    Deer - Cross

1    We see it pretty often.

2              THE COURT:  Look.  Can I just interrupt?

3              The questions are really about your common sense, and

4    that's what I am listening for.  In other words, Mr. Black is

5    asking about how one might do a certain thing, and I will have

6    to tell you that I don't find it particularly of interest to

7    hear about the lack of research or the lack of studies and all

8    that.  It seems to me that the questions are questions about,

9    as a matter of common sense, common sense of your profession,

10   is this doable or feasible or whatever.

11             Let's listen to the questions with that in view.  He

12   is not asking for a research paper.

13             THE WITNESS:  Yes, your Honor.  I appreciate that

14   insight.  Thank you very much.  Yes, sir.

15   BY MR. BLACK:

16   Q.  So you would agree, would you not, that in order to get a

17   quick high from one of the opioids at issue in this case, a

18   user could, and many do, crush the pills, which can be done

19   quite easily in most of the formulations in this case, and

20   snort the drug, correct?

21   A.  So I think you used the word "most," and the most common

22   thing we see is people taking more pills than they should.

23   Q.  Right.

24   A.  People do snort the pills sometimes.  And you are correct;

25   if you can crush that pill, it is easier to snort.

1  Q.  Thank you.

2           And also in preparing the drug for injection, a drug

3  abusers will take the pill and grind it up, which they can

4  easily do, and then put it into solution in a spoon, I think

5  you said something about heating it up -- I'm not sure if

6  that's needed, but if you say so -- and then they inject the

7  drug into their body, correct?

8  A.  We do see people who inject all these drugs into their

9  body.

10  Q.  Right.  Now, you said there was a lack of scientific

11  evidence on the topic, right?

12  A.  Well, again, I was speaking towards studies but your Honor

13  wanted me to talk more clinically, so that's what I am doing

14  currently.

15  Q.  You are familiar with the history of OxyContin's

16  reformulation, aren't you?

17  A.  I am.

18  Q.  And you know that OxyContin had a crushable pill which was

19  taken off the market and has now been replaced by a tamper

20  resistent pill, correct?

21  A.  I am not sure all of the steps along the way, but I know

22  they have had some issues with the one pill being taken off the

23  market.

24  Q.  And they now have a crush-resistent pill on the market,

25  right?

1  A.  I believe they do.  I don't use that as a primary agent of

2  mine.

3  Q.  The FDA gave them approval to call it tamper resistent?

4  A.  I believe that's accurate.

5  Q.  Do you know that the very same technology that's used in

6  the OxyContin pills is used in the Opana pills?

7  A.  I think they both involve a tamper-resistent component.

8  Q.  Right, which came from Grunenthal, right?

9  A.  That's my understanding, yes, sir.

10  Q.  You mentioned lack of data.  You are here as a rebuttal

11  witness to Dr. Ross, who is the plaintiffs' expert and had to

12  leave to treat patients, as I know all of you do, and he will

13  come back next week.  But your testimony is, in part, in

14  response to Dr. Ross, correct?

15  A.  I believe that's correct, yes, sir.

16  Q.  And you reviewed Dr. Ross's report, right?

17  A.  I did.

18  Q.  Would you look at tab 5 of your binder.  We have a copy

19  there of Dr. Ross's report.  I want to give you an opportunity

20  to respond to some of his statements, since he is testifying

21  later in the case and we are out of order.

22          Dr. Ross, if you look at paragraph 2, he is a clinical

23  instructor in anesthesia at Harvard Medical School and an

24  associate professor of anesthesia at Harvard Medical School.

25          Are you aware of that?

1    A.  I am, that's correct.

2    Q.  You would agree that he is a pain management specialist

3    like yourself?

4    A.  That's correct.

5    Q.  Dr. Ross, in his report, said that there is data that he

6    has reviewed relating to the issue of Opana ER's superiority

7    over the original version, correct?

8    A.  Can you point me to the part of the report where he says

9    that, sir?

10   Q.  Why don't you take a look at page 52.  Excuse me, paragraph

11   52 at the bottom of page 18.

12   A.  Okay.

13   Q.  Dr. Ross, in his report, which you are here to testify in

14   rebuttal to, said that epidemiological studies have

15   demonstrated that crush resistance of Opana ER CRF has reduced

16   abuse of Opana ER CRF by snorting compared to the original

17   formulation of Opana ER.  And it goes over to page 19, and then

18   he cites an Endo document, Endo production, a report, research

19   report.

20          Do you see that?

21   A.  I do see that.

22   Q.  It didn't look like, in your expert report that we -- where

23   we got the documents that you reviewed, that you even bothered

24   to read that report.  Have you read it?

25   A.  Well, I certainly work with many journals --

Fer2end4                    Deer – Cross

1          THE COURT:  The question is did you read the

2     particular report?

3          THE WITNESS:  No, sir.  I don't recall reading that

4     report.

5     Q.  He then wrote, "Notably, despite lower prescription

6     volumes, the rate of abuse of generic oxymorphone ER is higher

7     than Opana ER CRF with snorting as the most common route of

8     administration among abusers of generic oxymorphone."

9          You didn't read that section of the report, did you?

10    A.  I don't recall reading Endo documents, but -- Endo-based

11    studies.

12    Q.  He then wrote, in paragraph 53, "Qualitative data have also

13    shown that abusers prefer generic oxymorphone for abuse

14    compared to Opana ER CRF.  In online discussion boards,

15    individuals indicated that the generic crush-up, just like the

16    old Opana ER formula, and can be easily snorted.  The brand are

17    trash.  And that considering, as a poster said, that the

18    generics are available, don't waste your time with

19    tamperproof."  That was also in that report which you didn't

20    read.

21    A.  I don't recall reading this Endo document, so if someone

22    has those materials I would certainly be glad to review it,

23    again.  But I don't recall.  I know it was produced by Endo.

24    Q.  Were you curious at all about which generic tablets he

25    might be referring to there that are preferred to Opana ER CRF?

1    A.  Again, I don't recall seeing the document, so I would have

2    to see the document to comment on that further, I think.

3    Q.  We can accommodate you.  Take a look at tab 7, PTX 376,

4    page 62.

5    A.  Yes, sir, I am there.

6    Q.  Take a look where it says "many authors" in the middle?

7    A.  Which page are you on, sir?

8    Q.  62 of 65.  Are you there?

9    A.  No.

10   Q.  The pages are numbered several ways because of the

11   production.  Do you see?  Oh, 62 of 85.

12   A.  Yes, sir, I am there.  "Selection" --

13   Q.  Actually go up one paragraph.  "During Q2 2014, authors

14   participating in discussion on the monitored Web sites often

15   expressed negative opinions of reformulated Opana ER due to its

16   tamper-resistent properties.  For example, one individual wrote

17   that reformulated Opana ER tablets were 'by far the hardiest

18   opiate in pill form you will find' while another simply stated

19   'yeah, I' curse word 'hate Opana ER.  If you get lucky enough

20   to get IRs' -- that's immediate release -- 'they are amazing.'

21   Yet another individual indicated that it was useless to attempt

22   snorting the product as it just gels up in contact.

23        Do you see that?

24   A.  I do see that, yes, sir.

25   Q.  It says many, "Authors participating in discussion during

 1   Q2 2014 suggested seeking out generic oxymorphone ER products

 2   in place of the brand Opana ER, indicating that the generics

 3   were more effective and desirable for recreational use.  One

 4   author wrote that use of reformulated Opana ER was a waste and

 5   stated that not only is it hard to break down for sniffing, it

 6   doesn't work when taken orally either."

 7           Do you see that?

 8   A.  I do see it.

 9   Q.  "The author went on to strongly suggest asking for the

10   generics when you fill your prescription.  Several authors also

11   made similar statements."

12           Here is the next one.  It says, "Did you get brand or

13   generics?  The Actavis generics crush up just like the old

14   formula and can be easily snorted.  The name brand are trash."

15           On the next couple of pages, there are actual quotes

16   taken off the Web sites.

17           Are you aware that folks who abuse drugs go on Web

18   sites and swap information with them.

19   A.  Well, it looks like Endo has gone to Web sites, your

20   client, and picked things off the Web that said these things.

21   I don't get in these chat rooms, so I am sure there are many

22   chat rooms that would say whatever you would like.  So the

23   credibility of this is pretty limited, in my opinion, based on

24   coming from the people who make the drug.

25   Q.  This is actually a survey produced by an outside expert,

1    but since you haven't reviewed it, I really only have one other

2    comment on it, which is, that this comment is about the Actavis

3    generics crushing up like the old formula.  Are you aware when

4    the Actavis generics came on the market?

5    A.  I don't understand your question.

6    Q.  Do you know that the Actavis generics came on the market

7    during the course of this case?

8    A.  I am not sure of the exact date.

9    Q.  Did you know than Endo sought a preliminary injunction to

10   prevent that from happening, but failed; and, as a result,

11   these generics from Actavis went on the market before we could

12   have our trial here?

13   A.  No, I don't know that.

14          MR. BLACK:  Your Honor, this might be a good point to

15   break.  I am not going to finish cross and I am sure they have

16   redirect.

17          THE COURT:  Let's break.

18          What about this witness?

19          MR. BLACK:  I don't control him, obviously.  Someone

20   else will have to speak to that.

21          MR. ZIMMERMAN:  Your Honor, we will confer about it

22   and find a way to get it done with plaintiffs.

23          THE COURT:  I'm sure you will.

24          Okay.  We will break now.  I am going to try to start

25   earlier in the day so we have fuller days, so we will start at

Fer2end4                    Deer - Cross

1  10:30 Tuesday.

2              MR. BLACK:  Thank you, your Honor.

3              THE COURT:  We are recessed until 10:30 Tuesday

4  morning.  All right.

5              (Adjourned until Tuesday, March 31, 2015, at 10:30

6  a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    INDEX OF EXAMINATION

Examination of:                              Page

REZA FASSIHI

Direct By Mr. Rhoad . . . . . . . . . . . . 458

TIMOTHY RAY DEER

Direct By Ms. Cruz . . . . . . . . . . . . . 498

Cross By Mr. Black . . . . . . . . . . . . . 553

                    DEFENDANT EXHIBITS

Exhibit No.                              Received

 DTX 0879, DTX 2071, DTX 3523, DTX 3542, . . . 552

          DTX 3563, DTX 6000